# EXHIBIT 3

# TAB V

## WITNESS TESTIMONY AND STATEMENTS

V1.  VERBATIM TESTIMONY OF MP1 ........................................................................ V-1.1

V2.  VERBATIM TESTIMONY OF MP2 ........................................................................ V-2.1

V3.  VERBATIM TESTIMONY OF 645 AESG/PM ......................................................... V-3.1

V4.  VERBATIM TESTIMONY OF COAP ..................................................................... V-4.1

V5.  VERBATIM TESTIMONY OF J35/IAP ................................................................... V-5.1

V6.  VERBATIM TESTIMONY OF DJOC/OIC .............................................................. V-6.1

V7.  VERBATIM TESTIMONY OF J3/DOO ................................................................... V-7.1

V8.  VERBATIM TESTIMONY OF PR/NCOIC .............................................................. V-8.1

V9.  VERBATIM TESTIMONY OF CDO ....................................................................... V-9.1

V10. VERBATIM TESTIMONY OF AVT ....................................................................... V-10.1

V11. VERBATIM TESTIMONY OF HNR/PM ................................................................. V-11.1

V12. VERBATIM TESTIMONY OF HNRE1 .................................................................... V-12.1

V13. VERBATIM TESTIMONY OF HNRE2 .................................................................... V-13.1

V14. VERBATIM TESTIMONY OF HNRE3 .................................................................... V-14.1

V15. VERBATIM TESTIMONY OF FBI/SA .................................................................... V-15.1

V16. VERBATIM TESTIMONY OF P1 ........................................................................... V-16.1

V17. VERBATIM TESTIMONY OF P2 ........................................................................... V-17.1

V18. VERBATIM TESTIMONY OF P3 ........................................................................... V-18.1

V19. VERBATIM TESTIMONY OF MSO1 ...................................................................... V-19.1

V20. VERBATIM TESTIMONY OF MSO3 ...................................................................... V-20.1

V21. VERBATIM TESTIMONY OF AVS ........................................................................ V-21.1

V22. VERBATIM TESTIMONY OF MXL ........................................................................ V-22.1

V23. VERBATIM TESTIMONY OF MXT ........................................................................ V-23.1

V24. VERBATIM TESTIMONY OF LI ............................................................................ V-24.1

V25. VERBATIM TESTIMONY OF FSM ........................................................................ V-25.1

V26. VERBATIM TESTIMONY OF CCID ...................................................................... V-26.1

V27. VERBATIM TESTIMONY OF OIS/SA ................................................................... V-27.1

V28. VERBATIM TESTIMONY OF NAV/AIR/LNO ....................................................... V-28.1

V29. VERBATIM TESTIMONY OF SAI/BA .................................................................. V-29.1

V1.  VERBATIM TESTIMONY OF MP1

# VERBATIM TESTIMONY OF

## MR. MP1

**PRESIDENT:**  My name is Brigadier General Scott Zobrist.  I am investigating the aircraft accident that occurred on 5 October 2013, in the Republic of Colombia, South America.  This investigation, conducted under Air Force Instruction 51-503, is separate and apart from the safety investigation that was conducted under Air Force Instruction 91-204.  This accident investigation board is a legal investigation convened to inquire into the facts surrounding the aircraft accident, to prepare a publicly-releasable report, and to gather and preserve all available evidence for use in litigation, claims, disciplinary actions, administrative proceedings, and for other purposes.  And, Mr. MP1        , I understand that you did, indeed, testify before the SIB, the safety investigation board, is that correct?

**WITNESS:**  Yes, sir, that is correct.

**PRESIDENT:**  Okay.  Thank you.  A safety investigation board was previously conducted on this accident and so this statement pertains to that.  Any testimony you gave before the safety investigation board will be kept confidential and if you were so advised, and can be used only for accident prevention purposes.  This board does not have access to any confidential testimony you gave before the safety investigation board.  You may not state that you gave any particular information to the safety board under promise of confidentiality.  Your sworn testimony to us may be used for any proper purpose.  Additionally, your testimony can be released to the public.  Do you understand the purpose of this accident investigation?

**WITNESS:**  Yes, sir, I do.

**PRESIDENT:**  Do you understand the difference between your testimony before the safety board and that of this accident board?

**WITNESS:**  Yes, sir, I do.

**PRESIDENT:**  In compliance with the Privacy Act and the Air Force Privacy Act program, you were given or shown a copy of the Privacy Act statement prior to the start of this interview.  Is that correct?

**WITNESS:**  Yes, that is correct.

**PRESIDENT:**  Okay.  Thank you.  As my legal advisor discussed with you during the pre-briefing, your testimony to us will be recorded.  Do you consent to the interview being recorded?

**WITNESS:**  Yes, I do.

**PRESIDENT:**  Thank you.  And your testimony in this investigation will be under oath.  At this time, I will administer the oath.  Would you please raise your right hand?

**[The witness did as directed.]**

**PRESIDENT:**  Do you solemnly swear that the testimony you are about to give in the matter now under investigation shall be the truth, the whole truth, and nothing but the truth, so help you God?

**WITNESS:**  Yes, I do.

**PRESIDENT**:  Thank you.  Okay.  Today is the 12th of December.  The time -- 2013.  The time is now nine-thirty, Central Standard Time, 0930 Central Standard Time, in the morning.  This interview is being conducted in the Brook Army Medical Center, Building 3551, Room TN243-6 in San Antonio, Texas.  Persons at the -- present at San Antonio, Texas, are myself, Brigadier General Scott John Zobrist, Lieutenant Colonel [AIB/LA], Lieutenant Colonel [AIB/PM], Captain [AIB/MDM], Technical Sergeant [AIB/R], the witness, Mr. [MP1], and the attorney for the contractor and witness, Mr. [PCA], and Mr. [MP1's] spouse and -- Mrs. [MP1/S].

**QUESTIONS BY THE PRESIDENT:**

**Q1 (PRESIDENT):**  So, would you -- Mr. [MP1], would you please state your full name and then spell your last name.
**A1 (WITNESS):**  My name is [MP1].  It's spelled                                      .

**Q2 (PRESIDENT):**  Thank you.  And what is your job title?
**A2 (WITNESS):**  My job title is site lead for the contractor.

**Q3 (PRESIDENT):**  Okay.  And in that -- and you are also a pilot?  You can also fill pilot duties in that --
**A3 (WITNESS):**  Yes, sir.

**Q4 (PRESIDENT):**  -- capacity as a --
**A4 (WITNESS):**  As a back-up pilot.

**Q5 (PRESIDENT):**  Okay.  Great.  Thank you.  And your current location is here in San Antonio for medical treatment.  Is that true?
**A5 (WITNESS):**  Yes, sir.

**Q6 (PRESIDENT):**  Okay.  And how long have you been with the company?
**A6 (WITNESS):**  I worked two times for the company.  The first interval was as a subject matter expert starting in approximately 2009.

**Q7 (PRESIDENT):**  Okay.
**A7 (WITNESS):**  When that contract was complete or there wasn't full time employment available for me, so I went to Afghanistan and worked as a -- another job for a little over a year.

**Q8 (PRESIDENT):**  Okay.

**Q183 (PRESIDENT):** -- we're being kind of generic in general.  So, you can call JIATF South "the customer."  Okay.  What was the impact of the mission stoppage on the team?  It sounds like you let them try to take care of some of the administrative burden, things that they probably hadn't had a chance to get at.
**A183 (WITNESS):**  Yes.  There was a lot of hurdles to jump through with respect to personal documentation that was required by the Panamanian immigration.

**Q184 (PRESIDENT):**  And what was the total time of the stoppage?
**A184 (WITNESS):**  About a month.  Maybe even five weeks.

**Q185 (PRESIDENT):**  Okay.  And my understanding was that that was tied largely to visa issues?
**A185 (WITNESS):**  Yes, sir.

**Q186 (PRESIDENT):**  Okay.  And what --
**A186 (WITNESS):**  It was a request by the ambassador to cease activities until we had proper work visas.

**Q187 (PRESIDENT):**  Because the visas you arrived in were not work visas?
**A187 (WITNESS):**  Yes, that's correct.

**Q188 (PRESIDENT):**  Okay.  Let's transition a little bit to -- I know you're very familiar with military parlance -- the chain of command, if you will.  Who would you describe as -- and you can use the organization's -- the names of the organizations here, what role did Big Safari play at the Air Force Material Command and JIATF South and SOUTHCOM and your company, how did they all -- and the contractor, how did they all -- what role did each one of them have from your position as the site lead?
**A188 (WITNESS):**  Received collective guidance from all organizations.  The boundaries of which I don't think were clearly defined.  Big Safari was -- well, primarily a contractual organization.  My understanding that they were involved in the operational issues as well.

**Q189 (PRESIDENT):**  Who primarily gave your operational guidance, if you got any?
**A189 (WITNESS):**  The missions were defined by the customer, JIATF South.

**Q190 (PRESIDENT):**  Okay.
**A190 (WITNESS):**  However, my immediate supervisor was the program manager which was initially Mr.                        and then later Mr.                  .

**Q191 (PRESIDENT):**  And that's the program manager at --
**A191 (WITNESS):**  At --

**Q192 (PRESIDENT):**  At the contractor?
**A192 (WITNESS):**  At the contractor.

**Q193 (PRESIDENT):**  Okay.
**A193 (WITNESS):**  Correct.

base operations people, the Aero Civil, who would put our flight plan into the system.  And then from that time we would walk out to the aircraft.

**Q367 (PILOT MEMBER):**  Okay.  Would you do a crew rally at the aircraft then?
**A367 (WITNESS):**  Yes.  We would have a pre-flight meeting.  And since the ground power unit is running on the outside, and often the air conditioning units, we would just hold our pre-flight briefings inside the aircraft, in the back of the aircraft.

**Q368 (PILOT MEMBER):**  All right.  Would you cover any kind sort of ISOPREP?  Isolation preparation in case of an incident or -- in the military before we fly operational missions we always review, you know --
**A368 (WITNESS):**  We had ISOPREPs as part of our deployment package but that was not typically discussed.

**Q369 (PILOT MEMBER):**  Okay.  Would you cover NOTAMs?
**A369 (WITNESS):**  Yes.

**Q370 (PILOT MEMBER):**  Okay.  So, weather, NOTAMs.  Did you guys fly SIDs at all?  Was it a standard departure where you file, like you said, just a one point, or two points and then due regard?
**A370 (WITNESS):**  Yes, that's correct.

**Q371 (PILOT MEMBER):**  You just take off with tower and check in with ATC departures, standard, standard?
**A371 (WITNESS):**  That's correct.

**Q372 (PILOT MEMBER):**  Okay.  Who else -- on the night of the mishap mission, who all was at -- was present at the briefing?  Was there anybody besides the primary crew members and maintenance?
**A372 (WITNESS):**  No.  I don't recall anyone else being there.

**Q373 (PILOT MEMBER):**  Okay.  How would you receive -- you said you would receive it the day prior, your working area, where you were planning on going?
**A373 (WITNESS):**  Yes.  Generally, they would say this is what you're going to be doing tomorrow night, same hours, same location, or something to that effect.

**Q374 (PILOT MEMBER):**  Would you get any specifics on possible targets, without getting into classified, or different -- you know, were there different roles in missions?
**A374 (WITNESS):**  Well, that was the issue that they're targeting started two days prior.  JIATF has a number of different layers that they go through to determine what actual mission we're going to be flying that night.  And there's the long term, short term, and so forth.  So, the actual JOC floor at the customer's facility might give us something completely different at the time we would launch the aircraft.  We might have the box, the search box, programmed in and they would say, "No, you're going to go to -- somewhere else," at the last moment.

**Q375 (PILOT MEMBER):**  All right.  During the brief again, would you talk say minimums that you were planning on going down to?  Or what the plan was for the mission?
**A375 (WITNESS):**  Yes.

**Q376 (PILOT MEMBER):**  And then, again, cross-check that with the weather?
**A376 (WITNESS):**  Yes.  Because there was often a marine layer out there that we were required flying lower.

**Q377 (PILOT MEMBER):**  Okay.  How low would you typically go?  And what was the lowest you can recollect the guys doing?
**A377 (WITNESS):**  We had a written procedure on that that there's only two captains on -- I mean, you have to realize at the time but -- that initially we started out at a fairly high minimum at night until we just got used to the procedures and we worked our way down.  The lowest we would go down is 800 feet MSL and that was just usually a look/see.
**PILOT MEMBER:**  Okay.
**A377.1 (WITNESS):**  The radar worked it's best at about 5,000 feet.  So, some crews, MSOs, would like us to stay at 5,000 feet.  The aircraft stayed a little bit cooler.  They had a better angle of view with the radar.  And then if they saw a target of interest then maybe we would dip down, have a look at it, and then come back up again.  Where other crews preferred just to fly lower, under the marine layer at all times, and not have to go up and down.

**Q378 (PILOT MEMBER):**  Okay.  Were the fuel loads pretty standardized?
**A378 (WITNESS):**  Yes.

**Q379 (PILOT MEMBER):**  Okay.  Basically you just fill it all the way up and go?
**A379 (WITNESS):**  Yes.

**Q380 (PILOT MEMBER):**  All right.  When you guys took off and on departure, how high would you climb?
**A380 (WITNESS):**  It depended on how distant the search box was.
**PILOT MEMBER:**  Okay.
**A380.1 (WITNESS):**  Sometimes it would go up to 15,000 feet.  Usually we wouldn't have to go higher than that.  Based on the boxes that we were flying at and more common was just to go to 5,000 or 8,000 feet.

**Q381 (PILOT MEMBER):**  All right.  As far as during your brief, would you discuss any of the roles and responsibilities of the different crew members?
**A381 (WITNESS):**  Yes.

**Q382 (PILOT MEMBER):**  And what would that entail, usually?
**A382 (WITNESS):**  It was pretty well predefined as to who was going to do what.  But I can only tell you what happened in my particular flight.  It is -- well, let me digress.  Some of the other crews preferred flying in one particular position for their four days and then they would swap on their next four day cycle.  Rather than going back and forth, left and right seats.  On this particular flight, since I was not currently qualified as an aircraft commander or pilot in command, it was decided that I would fly second in command and fly in the left seat which is

**PRESIDENT:**  Mr. [645 AESG/PM], do you swear that the testimony you are about to give in the matter now under investigation shall be the truth, the whole truth and nothing but the truth so help you God?

**WITNESS:**  I do.

**PRESIDENT:**  Thank you.

And Lieutenant Colonel [LDPM], thank you for your time.  You may leave the room now.

**LIEUTENANT COLONEL [LDPM]:**  All right.  I appreciate it.

**PRESIDENT:**  Mr. [645 AESG/PM], let me know when he is gone.

**WITNESS:**  He is gone, sir.

**PRESIDENT:**  Thank you.

Today is the 26th of November, 2013.  The time is 8:17 local time, eastern standard.  This building (sic) is conducted in building 587, room 122, of Joint Base Langley-Eustis in Virginia.  Persons present at Joint Base Langley-Eustis, Virginia are: myself, Brigadier General Scott Zobrist; Lieutenant Colonel [AIB/LA]; Lieutenant Colonel [AIB/PM]; Captain [AIB/MDM]; Master Sergeant [AIB/MXM]; Technical Sergeant [AIB/R]; and the witness, Mr. [645 AESG/PM], who is testifying telephonically from Wright-Patterson Air Force Base, Ohio.

**QUESTIONS BY THE PRESIDENT:**

**Q1 (PRESIDENT):**  Mr. [645 AESG/PM], could you please state and spell your full name please?
**A1 (WITNESS):**  [645 AESG/PM];                    ,                         .

**Q2 (PRESIDENT):**  Thank you.  And what is your GS rank?
**A2 (WITNESS):**  I am a GS-13, sir.

**Q3 (PRESIDENT):**  Thank you.  And what is your job title?
**A3 (WITNESS):**  Program Manager Counter Narcotics.

**Q4 (PRESIDENT):**  And where are you currently assigned?
**A4 (WITNESS):**  I am assigned to 645 Aeronautical Systems Group, Wright-Patterson Air Force Base, Ohio.

**Q5 (PRESIDENT):**  And can you -- how long have you been in your current position at that location?

**A5 (WITNESS):**  As a government civilian, I have been in this position for about 26 months now.  I also served for about five years when I was still commissioned in the Air Force.  So total I am coming up on seven.

**Q6 (PRESIDENT):**  In your Air Force time, where you in the same -- the Aeronautical Systems Group, or were you in a different organization?
**A6 (WITNESS):**  I was assigned to the same unit, sir, just different programs.

**PRESIDENT:**  Okay.

**Q7 (PRESIDENT):**  And what was your duty position at the time of the mishap in question?
**A7 (WITNESS):**  I was the program manager of the aircraft in question.

**PRESIDENT:**  Copy that.

**Q8 (PRESIDENT):**  Could you briefly describe your responsibilities in your current duty position?
**A8 (WITNESS):**  My responsibilities, sir, is to work with combatant command, which is US Southern Command, as well as the tactical control authority, which is Joint Interagency Task Force South, to understand their requirements, work with US Southern Command to get the money to go ahead and, you know, build the platform that they need for their mission down there to do detection and monitoring.

**Q9 (PRESIDENT):**  And does your duty include -- so you said the requirements in getting the money as a program manager, and we will get a little more into this, but up front can you tell me additionally what other responsibilities you have in terms of any contract management, oversight of the operational pieces, facilitation of the operational mission?  Can you tell me anything along those lines?
**A9 (WITNESS):**  As the program manager for this effort, I was also responsible for writing all of the statements of work and coordinating those with the contractor and my contracts office upstairs.  We set in the threshold standards that we were looking for under the contract and for the contractor to adhere to.  Which for this program the contractor was responsible for maintaining an 80 percent mission availability rate.  There is also a set hour of flight hours every month that the contractor was responsible for.  The latest rev of the contract was set for 300 hours a month.  That was no showing 100 hours per aircraft per month going forward.  The contractor was also responsible for supporting 21 days of TDY operations from a location forward of what we call the forward operating location, which was in Panama.  And then, you know, I would have to look at making sure that they are maintaining the aircraft in accordance with FAA rules and regulations.

**Q10 (PRESIDENT):**  And in terms of -- would it be fair to say that you were -- those all sound like contract management or contract oversight, as opposed to operational oversight.  Of course it

gets into operational when you start to talk about the number of hours, but the manner in which they operated down there, what is your role?

**A10 (WITNESS):**  Really, sir, my only role as the contracting officer's representative I just have to make sure that the contractor is meeting the requirements specified in the contract, which was the 80 percent mission availability rate that I was talking about and the flight hours.  As far as any direct mission involvement, I really just helped coordinate, you know, communications between the contractor and Joint Interagency Task Force South, the folks that are in the J-3 operational side of the house.  The JIATF South folks actually communicate directly with the contractor to do like daily mission tasking through their daily intentions mission message and things like that.

**PRESIDENT:**  Okay.

**Q11 (PRESIDENT):**  And I am kind of putting the cart -- I am getting a little bit of head.  I was going to go in order but since we are talking about it -- well, I will stand by.  I have got a couple of questions about operational control, tactical control, force provider versus combatant commander, et cetera.  I will get to that in a second.

Let's go back to kind of the start of the program.  Talk me through the requirements development, how the requirement came about.  And again, we have to keep it unclassified and not -- please use consideration for operational security issues, but talk me through the requirements, the document development and requirements, this statement of work that you talked about where we articulate the, I believe, the requirements and how this program was envisioned to operate with regard to the command and control and who was going to exercise the OPCON, TACON, and oversight of the program.

**A11 (WITNESS):**  Roger that, sir.  Just so that everyone is aware, my role in this program didn't start up until actually October of 2012.  So by the time I actually got involved in this program, it had already been being worked by the 645th Aeronautical Systems Group for about two years.  I really got strongly involved with the program around about the end of November of '12.  That is how long it took me to get caught up on all of the financial and contracting documents.  So as far as the early interactions on how the requirements were vetted, what meetings occurred, who the people were involved, I really don't have personal awareness on that.  What I can share with the board is that we had a systems requirements document that came out of US Southern Command and Joint Interagency Task Force South that called out for, you know, how far they needed an aircraft to fly, the loiter time that they needed, the types of sensor equipment that was required on board the aircraft.  The ----

**Q12 (PRESIDENT):**  Did -- if I could interrupt for a second.  Did it get into very specific operation -- or specific requirements in the aircraft, for instance, the number of sensors, the number of displays, or anything like that?  Or did it talk about basic operational capability like EO, IR, maritime moving target, et cetera?

**A12 (WITNESS):**  It was -- it was generic as you had mentioned, sir.  It never called out specific types of equipment.  It is more the generic capabilities and types of functions that they were looking to achieve in the mission set.

**PRESIDENT:** Okay.  Thank you.

**Q13 (PRESIDENT):**  Can you keep going then with the development of the systems requirement document and where it was taken from there?

**A13 (WITNESS):**  That is what I am actually trying to look through all of my info right now to pull it up so I can tell you exactly who signed off on that systems requirement document.

**Q14 (PRESIDENT):**  Well, that is okay.  I think in general what I am looking for is to understand the context of the mission and how it got fielded and what capabilities we told the contractor they had with some amount of specificity, and you have kind of already answered that.  In general it sounds like it has got capabilities required but not specifics of, you know, three scopes here, two scopes there.  It talks about basic capability, X number of hours, loiter time, to provide ISR capabilities in the following spectra, you know, EO, IR, radar and that kind of thing.  Is it a fair statement that the latter is a -- what I just said is kind of the generic way that the systems requirement document is laid out?

**A14 (WITNESS):**  That is a true statement, sir.

**Q15 (PRESIDENT):**  So without worrying about the specifics of the systems requirement document, can you tell me how we fielded the system and who it was provided to?

**A15 (WITNESS):**  The system went under development.  It took approximately 20 months to deliver the first two modified Q200 Bombardier aircraft for fielding.  Those aircraft were available in mid-May of this year.  Once the aircraft were available, we actually did a trip down to Key West in May where each aircraft and each air crew showed up on station.  We did an inchop brief with the Joint Interagency Task Force South personnel.  Colonel [J3/DOO] was one of the briefers there as well as [COAP] and others.  We kind of went over the safety aspects and covered what the typical mission laydown was going to be.  And the whole focus of that event -- it wasn't a training event.  We called it an ops rehearsal event because we definitely saw that we wanted to get the crews off on the right start, and we figured the best way to do that was to get them face-to-face interaction with the folks that were going to be at the command and control center to better understand the mission set that they were going after, you know, to have some more seat time in the aircraft.  And we actually worked with the J-3 folks down there to set up scenarios on a closed range where they put what we would consider a target of interest vessel in the water.  They did things that we would typically see an adversary do.  They put a blue tarp over the hull so that the crew could see what that looked like.  They had an interdiction boat that they also put into the water so that the crew could work -- do a talk-on to a target of interest to actually do an intercept.  Right before we had left Key West, one of the crews was out flying and they actually got diverted for a real-world scenario that they got called in to support the US Coast Guard who had had a boatload of illegal immigrants coming out of Cuba.  So the whole event lasted approximately one week.  Once we finished up with that event, both of the aircraft and air crews transited to the forward operating location in Panama at that time.  And then we started flying operational missions after they had done all of their orientation flights and things like that on or about 7 June of 2013.  And we only got about six days of operations in when we ran into an issue that the US Ambassador to Panama had basically grounded all operational

way that you can take somebody from the ground up in two weeks and expect to train them and be super proficient and knowledgeable on our radar system like that.  It is a very complex operation.

**Q20 (PRESIDENT):**  What other training re -- what other training did the company besides the radar course?

**A20 (WITNESS):**  The company also brought the air crews out, and specifically the mission systems operators, they brought him out to Centennial, Colorado, and they gave them training on the graphical user interface that the sensor operators were going to use to, you know, do things like tune radios, if it was a moving map display how to access the video, chat, you know, the beyond line of site communications links and all that kind of stuff.

**Q21 (PRESIDENT):**  Did they have mockup of the aircraft there or were they using the actual aircraft?

**A21 (WITNESS):**  No.  There was a -- there was a systems integration lab type set up to where they could run through because the software that they were actually training the crews on is a standard type of software that they use in multiple programs.  So it wasn't anything that we had been aircraft available that the crews could get on and actually manipulate the system, you know, with seat time.  Now what we did do is as the aircraft was getting ready to leave the production plant in Centennial, Colorado, when we finished up the significant test cards that were required to deliver that aircraft -- or, you know, actually get it out of Centennial moving to the forward operating location, we actually put the crews on board that aircraft and gave them some opportunities to fly while we were verifying operation of like the Selex radar.  They had done that at a location that was off of the East Coast because we needed to get the aircraft outside of territorial waterways to go and turn on things like the IFF system onboard the aircraft and things like that.  So that was the only opportunities that the crews really had to get in and fly the system while the aircraft was, you know, airborne and doing something.

**Q22 (PRESIDENT):**  Could you describe the proficiency of the MS -- the mission system operators that you observed during the rehearsal missions?  I assume you were -- first of all, were you on the mission rehearsal, any of the mission rehearsal sorties?

**A22 (WITNESS):**  I was in Key West with them during that time period.  I actually sat in the joint operations center watch floor with a lot of the JIATF South personnel.  We actually opened it up that some of the Joint Interagency Task Force South personnel were able to get on board the aircraft and fly with the crews, folks that were a lot more experienced on operations.  I know Mr. [COAP] went up with them.  I believe General _____ actually flew one mission with them.  But I was watching everything was from the joint operations center.

**PRESIDENT:**  Copy that.

**A22.1 (WITNESS):**  Now from what I was seeing in the joint -- on the JOC floor, you know, I was not real happy with the performance of the crews, specifically because a lot of the personnel that were part of this effort had been flying for other contracted airframes in that area of responsibility.  So I mean, we had people with firsthand knowledge of how these operations worked, similar types of systems, you know, work and stuff.  To me it appeared that the crew's

Task Force South.  We did an assessment of approximately five different probable locations in Central America.  After our team went down there and met with everybody, we provided a briefing back to Joint Interagency Task Force South, as well as US Southern Command, to mark all of our different metrics based on, you know, housing, ramp space, you know all of the logistics type of stuff that goes into supporting an aircraft.

**PRESIDENT:** Okay.

**A24.1 (WITNESS):**  Based on that recommendation, we had said as a program office we believe that                     was the best option out of the locations that were provided to us to actually go ahead and stage the aircraft.  So in January of 2012, you know, just shortly before we actually fielded the system is when the decision was actually made by US Southern Command on where the aircraft was going to be located out of.

**PRESIDENT:**  Okay.  Copy that.  That is sufficient I think.

**PRESIDENT:**  I am going to transition to a bunch of contractual questions to understand your primary role in the program, but before I do that -- and we will have the chance -- I just want to offer my team here the opportunity to answer -- ask any questions along the lines of the questions that we have just answered.  Team, anything?

**[Negative responses.]**

**PRESIDENT:**  Okay.

**Q25 (PRESIDENT):**  I am going to transition to some contractual questions, Mr. [645 AESG/PM].  Could you describe what a service contract is?  And first of all, my understanding is that this was a service contract.  Could you confirm that, and then tell me what a service contract is?

**A25 (WITNESS):**  Roger.  It is a non-personal services contract, sir.  It is really basic when you set it up.  We get into services contract because there is no specific government oversight or tie.  Typically when you get into a flying operation we do other things like government owned - contractor operated where the government actually always an aircraft, so therefore the government had a vested interest to make sure that our rules and procedures are followed to a T because we now have an investment asset involved in a program that a contractor is flying.  In this case the decision was made that we were not going to purchase aircraft.  There was nobody that could actually own them, like an Air Combat Command.  So we went out and said okay, we are going to go find a contractor that has a past history that understands intelligence, surveillance, reconnaissance operations, folks that have done these types of missions with the type of equipment that we think is going to be involved.  So based on all of that, we looked at our portfolio of programs and we operated under a selection to go with the company that was chosen on this based on their previous track record.  And we signed them up to say okay, we don't tell you guys how to go do your operations.  You are an experienced company that does flight operations in multiple areas of operation.  We just want you to be able to go ahead and provide these numbers of hours with these types of aircraft.  We would like to have these types

**Q54 (PRESIDENT):**  So would it be accurate to say that the Prospector aircraft were OPCON, operational control by SOUTHCOM, with TACON, or tactical control, given to Joint Interagency Task Force South?
**A54 (WITNESS):**  Roger that, sir.  That is the message that was emphasized throughout our engagements from the user end.

**PRESIDENT:**  Okay.

**Q55 (PRESIDENT):**  Can you talk to me a little bit about any pressures, real or perceived, that you are aware of the contractor might have felt due to their performance to date in the program as of early October, before the mishap?
**A55 (WITNESS):**  There was nothing that I am aware of directly from Joint Interagency Task Force South or us to (inaudible 10:01:21).  Now, what I can tell you is at senior management levels there have been discussions over, you know, we're putting you in a very sweet corridor as far as where you should be IDing targets and we are not seeing it.  And that really tied back to how much training did we provide on the radar system.

**Q56 (PRESIDENT):**  So are you saying that compared to other systems -- at the senior leader level they were seeing the results that they expected with the system such as the Prospector in the target area that they were operating?
**A56 (WITNESS):**  I believe that answer would be yes, sir.  And I will say that, you know, certain personnel down there, we had always talked about a crawl, walk, run approach.  You can't take a new system, because this was a new system, you know, that was out there, and put them down there and expect them to perform at the same level as say a P-3 crew or another type of asset that has been in that theater of operations for a year or two years.  You know, you have to expect that there is going to be a learning curve that occurs.  So I believe Joint Interagency Task Force South did a great job of, you know, putting the aircraft up in a configuration that allowed them to rely on somebody else to help tip them off to targets.  I believe they put them in a good position where they were going to see a lot of traffic that should have been being picked up as targets of interest so that the crew could get their arms around it, see a lot of activity, you know, and start reporting on this stuff.  And as you start to build through small successes, you know, you get better and better and better and you see the crews performing more.  Now, it took us quite some time from the first flight that we talked about until the crew actually had their first intercept because the actual first detection and intercept from the Prospector Program didn't occur until 16 August.  And once we saw that event occur on 16 August, in between that time and the date of the crash on 5 October, the crews started seeing a lot more activity and they started reporting on a lot more targets of interest that resulted in an end game scenario for the user.  So I mean, we were seeing that the proficiencies were coming along, folks were getting more comfortable, they were starting to see more traffic, you know, communication in between the air crew and the Joint Operation Center in Key West was most likely improving.  You know, something was headed in the right direction because we saw a long period of they couldn't find anything, they weren't reporting anything of interest, and then all of a sudden after 16 August they were starting to get better at IDing target vessels.  Whether it was them understanding the

getting on an aircraft is cleared to do so.  That is not a contractor's responsibility to say hey, does he have all of his paperwork squared away to get on the airplane.  The contractor's only role in that scenario is to make sure that, you know, they know what the egress procedures are for the airplane.  You know, they are really there as a safety factor to make sure that that individual gets on and off the aircraft in a safe manner.

**LEGAL ADVISOR:**  Right.  Okay.

**Q65 (LEGAL ADVISOR):**  And then the other question I had for you, are you aware of any security incidents involving the contractor in the course of this -- in the course of them operating up until the crash, any problems with them handling classified information?
**A65 (WITNESS):**  I am not aware of any issues with them handling classified information.

**LEGAL ADVISOR:**  Okay.  I think that was my last question.  Thank you.

**PRESIDENT:**  The board president again; other questions from the pilot or medical members?

## QUESTIONS BY THE MEDICAL MEMBER:

**Q66 (MEDICAL MEMBER):**  A question from the medical member.  What was your experience with the mishap aircrew?
**A66 (WITNESS):**  I had only met a majority of that aircrew on one occasion down in Key West.  I had met Mr. [MP2] for probably a period of about three hours.  I sat through a debrief with him.  You know, I had met him at a post-crew meeting actually at one of the hotels.  The same thing with the mission systems operators.  The one individual, Mr. [MMSO], I had a little more interaction with him because he was actually put into what we call the lead mission systems operator role.  So I had actually seen him at Key West on a second event when aircraft 431 was down there for their operations rehearsal.  Mr. [MMSO] was actually the one who sat in at the hot wash, as we called it, for the first, you know, 90 days of operations.  That was something that was a little bit perturbed as of the ambassador doing a stand down.  We had always intended to do like a 90 day check on how the flight crews were doing, but because flights had been delayed for almost 2 months at the direction of the ambassador that timeline kept slipping right.  Anyway, getting a little bit off track there.

## QUESTIONS BY THE BOARD PRESIDENT:

**Q66.1 (PRESIDENT):**  Board President here.  Did you say someone was perturbed, or say again that ----
**A66.1 (WITNESS):**  No.  Our -- just our planning process.  We had always intended as a program management office in conjunction with the end-user that after 90 days of operations, we wanted to have a sit down with, you know, some of the key folks from the crews, all the folks, you know, up in Key West, as well as the program management office to sit down and go okay, we've now did our crawl phase.  You know, we should be learning how to walk.  What kind of

things do we need to brush up on?  You know, were there communications issues that we are having?  You know, is there something technical that we need to work on?  Do you guys feel comfortable with the daily intentions messages and, you know, how things were unfolding during operations?  It was just a period to check six and make sure everything was coming along as we had expected.  So when I say perturbed I mean my timeline to host that event was perturbed because when the ambassador basically stood us down six days after we started operations and we didn't fly for 60 days, it is kind of hard to go to a hot wash when you don't have any flights to really evaluate and go how are we doing.  So we kind of kicked the can and let that event slip to the right, which we were actually talking about going down and doing that early in November again, to have a full up hot wash.

**PRESIDENT:**  Okay.  The board president.  Copy that.  Thank you very much for clarification.

**WITNESS:**  Roger that, sir.

**A66.2 (WITNESS):**  And for the medical officer on the board, the last individual, Mr. [MP1], [MP1] was by far the one that I probably knew the best on the crew, again because he was the lead pilot.  He was the site lead, so I spent a lot more time communicating with him throughout the course of, you know, preparing for this deployment and operation.  That and he also was one of the prime contractor employees, whereas all of the other folks that were involved in this were subcontractor employees that weren't brought on until later in the process.

## QUESTIONS BY THE MEDICAL MEMBER:

**Q67 (MEDICAL MEMBER):**  Medical member question.  Did you ever get the chance to observe the mishap aircrew functionally working together?

**A67 (WITNESS):**  Negative, sir.

**MEDICAL MEMBER:**  Okay.

**Q68 (MEDICAL MEMBER):**  Did you ever notice any functional problems interpersonally in any of the air crew members?

**A68 (WITNESS):**  I had never personally witnessed anything, sir.  But what I do know is there was concern from the company's end because they actually had their -- they have a company psychologist that gets involved with all aircrews in types of operations like this where they want to make sure that people were, you know, mentally checked in and ready to go.  As she had watched and observed the crew both in their events in Key West, as well as operations down at the forward operating location, she said, "Hey, you know, they need some coaxing and pushing in the right direction to get their teamwork online."  You know, there was a couple of things going on that she was unsatisfied with.  Based on her input, we actually had a very trusted agent for the company report in to the forward operating location and he actually arrived there just before aircraft BAT02 took off for its mission that fateful day.  So he was actually going down there to get involved and take a look at, you know, who were the top performers, who were the, you know, who were the people that needed a little bit of work, and to provide recommendations back to his senior leadership inside of the company chain.

## QUESTIONS BY THE BOARD PRESIDENT:

**[The witness did as directed.]**

**PRESIDENT:** Do you solemnly swear that the testimony you're about to give in the matter now under investigation shall be the truth, the whole truth, and nothing but the truth so help you God?

**WITNESS:** I do.

**PRESIDENT:** Thank you. Today is 20 November 2013; the time is now 1452 local Eastern Standard Time. This interview is being conducted in building 290, room 170, JIATF-South, Key West Florida. Persons present, at JIATF-South are myself, Brigadier General Scott Zobrist, Lieutenant Colonel [AIB/LA], Lieutenant Colonel [AIB/PM], Captain [AIB/MDM], Master Sergeant [AIB/MXM], Technical Sergeant [AIB/R] and the witness Lieutenant Colonel [DJOC/OIC].

**WITNESS**: Lieutenant [DJOC/OIC].

**PRESIDENT:** What's that?

**WITNESS:** Lieutenant [DJOC/OIC].

**PRESIDENT:** Oh, Lieutenant. I promoted you. For the record, thank you, he is not a Lieutenant Colonel; Lieutenant. And is [DJOC/OIC], pronounced [DJOC/OIC]?

**WITNESS:** [DJOC/OIC].

**PRESIDENT:** [DJOC/OIC]. Thank you. Sorry about that.

**QUESTIONS BY THE PRESIDENT:**

**Q1 (PRESIDENT):** Lieutenant [DJOC/OIC] would you please state and spell your full name?
**A1 (WITNESS):** [DJOC/OIC].                .                .                          .

**Q2 (PRESIDENT):** And your rank please?
**A2 (WITNESS):** Lieutenant, Navy.

**Q3 (PRESIDENT):** And your current job title?
**A3 (WITNESS):** Deputy JOC OIC.
**PRESIDENT:** Okay.

**Q4 (PRESIDENT):** And you are currently assigned to JIATF-South here at Navy Air Station Key West?
**A4 (WITNESS):** Yes Sir. J3 department.
**PRESIDENT:** J3 department, okay.

**Q5 (PRESIDENT):** And how long have you been assigned to this unit?
**A5 (WITNESS):** Two years in this coming February.

**PRESIDENT:** Okay.

**Q6 (PRESIDENT):** And was your position the same on the day of the mishap, on 5 October?
**A6 (WITNESS):** Yes Sir.
**Q6.1 (PRESIDENT):** You were the JOC ----
**A6.1 (WITNESS):** Deputy, yes Sir. It was a different OIC.

**Q7 (PRESIDENT):** And I can't remember if you told me already. How long have you had the job as a deputy OIC?
**A7 (WITNESS):** For about two months prior to the Prospector getting here. So March, March-April.
**PRESIDENT:** Okay.

**Q8 (PRESIDENT):** Could you briefly describe your duty responsibilities in your current job?
**A8 (WITNESS):** Ensure the watch floor is maintained. Basically good order and discipline on the watch for. We get daily taskers for information from external agencies requesting information. It's my job to follow up with those make sure things are handled, make sure the CDO's are doing what they're supposed to be doing as far as their job; the Command Duty Officers. And any kind of taskers that the OIC gives me. I'm also the Air Bridge Denial Officer here, so I'm in charge of the Air Bridge Denial Program of Columbia.
**PRESIDENT:** Great, thank you.

**Q9 (PRESIDENT):** Could you give us your general experience level with the Prospector aircraft? For instance, have you flown in it before? The number of missions? Your experience with the sensors? That kind of thing.
**A9 (WITNESS):** I did one flight with them on the first day they came to Key West for the training we provided them. Flew just as a passenger and I did stand on the back and I watched the operators work for a little while, interacting with the            software and the computers in the back. Ah, working the radars and the cameras.

**Q10 (PRESIDENT):** Were you on the headset, listening?
**A10 (WITNESS):** I was at the seat but I wasn't when I was standing behind them. They didn't have a long cord for the headset so, it was noisy on the plane so I couldn't really hear a lot of what they were talking about. I was just watching them mash buttons and ah, work with the software. But when I was on headset, at the seat, I could hear everything that was going on.

**Q11 (PRESIDENT):** Okay, and your specialty in the Navy is -- what else have you done in the Navy besides this position?
**A11 (WITNESS):** I was originally Undesignated Airman. I worked on the flight deck of a carrier then a [inaudible] struck me and I changed jobs to be an Operation Specialist. I did that for about nine years and I got picked up for OCS to be a P3 NFO, Naval Flight Officer, backseat rider on the P3's and I've done one full squadron tour and a year of the RAG. So about four years of that. I did two tours operationally in JIATF-South AOR, SOUTHCOM AOR.
**Q11.1 (PRESIDENT):** And the RAG is, Replacement Air Group? Is that --
**A11.1 (WITNESS):** That's the basically training squadron.
**Q11.2 (PRESIDENT):** Training squadron. I can't remember what RAG stands for.

**A11.2 (WITNESS):**  So two, four month deployments out of El Salvador flying missions on counter drugs flying on go fast.

**Q12 (PRESIDENT):**  Okay.  I was going to ask you that.  So in your time in the P3 you spent time in the SOUTHCOM AOR also?
**A12 (WITNESS):** Yes Sir, eight months.
**PRESIDENT:**  Okay.
**A12.1 (WITNESS):**  Working directly for JIATF-South.

**Q13 (PRESIDENT):**  When, back to the mission that you flew on the Prospector here.  When you're on the headset could you -- did you hear interactions between the pilot and the Sensor Operators?
**A13 (WITNESS):**  Yes Sir.

**Q14 (PRESIDENT):**  How would you characterize that?  What were they talking about?  What were they doing?
**A14 (WITNESS):**  [inaudible], standard stuff that you would talk about during a flight.  I mean, the flight we were on I was on the first day where they were just out flying around getting acquainted with their systems; trying to figure out how they were working out.  The operators were having a lot of issues with the software.  They had, uh they told told me they had minimal training back at -- in Colorado with SNC on how to use the systems.  The systems still had some bugs in the systems they were trying to work out.  They called it           is the software that kind of manages their tactical displays and they were having to reboot it repeatedly and having some issues with it.  There was a lot of talk about that on ICS and the pilots were, they were pretty quiet for the most part.  There wasn't a lot of interaction with them it was a lot of the Operators sitting back there for three to four hours trying to get acquainted with their systems.

**Q15 (PRESIDENT):**  Did they have the opportunity to work at target, if you will?  Once the systems got up and running?
**A15 (WITNESS):**  On that flight it wasn't -- there was no intended purpose for targeting.  The follow-on flights, the next two days.  It was kind of a walk, crawl, run mentality is what Commander           , the OIC at the time, had come up with.  So the first day was just go out fly around if you see some small boats out there go ahead and lock onto them, try to get them on radar, see what ranges you're getting them on radar, where they fade on radar, where you're blind spots if you have any stuff like that.  So they were looking at targets when the systems were working.  They would try to lock onto targets and see if they can track them to make sure the cameras were doing their auto slew functions were working, things of that nature.  But yes Sir, they did track targets.
**PRESIDENT:**  Okay.

**Q16 (PRESIDENT):**  Did you, uh on that mission, that you got to fly on, did you participate in any preflight briefs or mission briefs or anything along those lines?
**A16 (WITNESS):**  Yes Sir.  We did a preflight brief actually in this room with the whole crew.  It was led by Commander           at the time.  He gave the brief and then he handed out knee board cards with frequencies and stuff for ATC, small graphic of the op area and then went over

again that it was just a training day, to do kind of standard stuff as far as what you would expect to do on your very first flight ever operationally, simulated operationally.

**Q17 (PRESIDENT):**  And did Commander          go on that sortie also?
**A17 (WITNESS):**  He was not on that flight.  It's on that list ----
**PRESIDENT:**  Okay.
**A17.1 (WITNESS):**  That document.  I don't -- he wasn't on that flight with us.  I was on that flight and the only one from the mishap crew that I remember being on there was [MP2].  He was one of the pilots on that flight.

**Q18 (PRESIDENT):**  Okay.  Did you have any other interaction with any the -- or know any of them personally?  Any of the other mishap crew members, other than that one interaction with [MP2]?
**A18 (WITNESS):**  [MMSO], I knew him.
**Q18.1 (PRESIDENT):**  Okay.  And where did you know him from?
**A18.1 (WITNESS):**  He was here week prior to the accident.  For the second sheet I gave you all over there, with the hot wash.  Mainly he was here for the hot wash which was done in the -- well part of it I believe was done in here, but most of it was done in the command conference room here at JIATF-South.  But I do remember specifically sitting at this table and talking to him that day.

**Q19 (PRESIDENT):**  Did you have any other interactions with him outside the professional environment?
**A19 (WITNESS):**  No Sir.

**Q20 (PRESIDENT):**  Okay.  During the sortie that you were on, were you able to see -- and sounds like the focus was on getting the centers up and running -- was the cockpit door open or closed?  Do you remember looking in to see the pilots and what they were looking at?
**A20 (WITNESS):**  I do.  I do remember going up there and leaning over the pilot's seat for a short period.  So yeah, I believe it was open.

**Q21 (PRESIDENT):**  Do you recall what was on their scopes regarding -- were they looking at sensors that were being repeated from the back?
**A21 (WITNESS):**  I believe that day when the systems was up and working I remember seeing a moving map I believe they had up on their screen in the cockpit.
**PRESIDENT:**  Okay.

**Q22 (PRESIDENT):**  From the JOC perspective how would you execute a change in tasking?  If you needed to shift an asset from one part of the AO to another, talk to me through how that would be done?
**A22 (WITNESS):**  So that's a pretty common thing to do with aircraft.  We get updated intelligence or report from somebody that there is a gofast or some other illicit activity that we would be interested in.  And so we'll commonly we re-task aircraft to go from one place to another.  I specifically remember us doing it for Prospector many times.
**PRESIDENT:**  Okay.

**A22.1 (WITNESS):** So the process would be we get some kind of information on the watch floor that takes precedence over what we have them looking at, at the current moment. We take a look at it, we evaluate it, if we think it's important we call them on the radio. Well first, we have the TAO draw a new box for them if it's not within the box their already searching inside of. We'll have them draw a new box and then we have them pass the coordinates for the new box to the aircraft. And we tell them as much as we can on the radio for the classification of information. We tell ----

**Q22.2 (PRESIDENT):** How do they pass the coordinates? For the box?

**A22.2 (WITNESS):** In Lat Long. So point Alpha, point Bravo, point Charlie, point Delta and then the Lat Long for each one.

**Q22.3 (PRESIDENT):** And but at what -- on chat? Or ----

**A22.3 (WITNESS):** Oh, it's on the 4-1 net.

**PRESIDENT:** Okay.

**A22.4 (WITNESS):** The radio. Its SATCOMM radio.

**Q22.5 (PRESIDENT):** Okay. So audibly?

**A22.5 (WITNESS):** Yes Sir. Yes Sir. Well we do have a chat with them. It's kind of up to the TAO, really. We have passed stuff to aircraft that have chat capability; we have passed it to chat before. It's easier, there is less of chances for errors but typically most aircraft don't have chat. The Prospector was kind of unique in that regard, it had jabber chat. So to finish answering your questions Sir, once they get the new box they would generally just transit there, their own TTP's for how they get from one box to the next. They do the math, if it's going to be fuel efficient to climb in altitude or if it's close enough they'll just stay at altitude in transit. Sometimes we have to have them go from the Carib to the East Pac, over to the Pacific side. In those situations we, JIATF-South, will work out their clearances if it's needed; generally it's not. We have blanket clearance over flight for most countries, on the Central America. So we'll give them their clearance number and then tell them they're clear to proceed. So that would be the only kind of difference in passing a new box is if they had to cross over land.

## QUESTIONS BY THE PILOT MEMBER:

**PRESIDENT:** Pilot Member.

**Q23 (PILOT MEMBER):** Question from the pilot. Do you guys de-conflict in those boxes? How many different aircraft can you be tracking? So if you say you got another tip and you got somebody already on another contact, would you de-conflict?

**A23 (WITNESS):** We de-conflict their boxes. So if we had a customs aircraft flying in one box and it's anywhere near another box, for another aircraft, we make sure both aircraft are aware of the other aircraft and give them the boxes for the other aircraft. So they can plot it out on their own operating system. And so they know where the other aircraft is. And then if it's going to be overlapping, if we have to overlap them, we put the pilots in direct communications with each other so they can work it out themselves, to de-conflict airspace vertically by altitude blocks.

## QUESTIONS BY THE PRESIDENT:

**Q24 (PRESIDENT):** What was your role on the night of the mishap? What were you doing on the night of the mishap?

**A24 (WITNESS):**  The night of the mishap I got awoken about 5 AM by Lt Col            .  He said I needed to come in to work.

**Q24.1 (PRESIDENT):**  So you weren't on duty at the time?

**A24.1 (WITNESS):**  I was not on duty Sir, no.  It was a Saturday morning I believe.  Yeah, I think it was Saturday morning or Sunday morning, I can't remember which day.  It was a weekend.  But I came in, about 530 I got in, and throughout the day I was just assisting as I could.  The PR cell guys were doing their thing, the CDO was doing his thing, and so I was just trying to assist where I could.

**Q25 (PRESIDENT):**  If you had to -- who is leading the PR cell that day?  Do you recall?

**A25 (WITNESS):**  It was Gunnery Sergeant [PR/NCOIC].  He was kind of taking charge of the whole, a lot of it.  And then Captain        he came in at some point during the morning, I can't remember exactly when but he came in at some point and he was doing a lot of the stuff with Gunny [PR/NCOIC].

**PRESIDENT:**  Okay.

**Q26 (PRESIDENT):**  Back to the boxes that you were talking about.  Do you ever recall, in your time in the JOC, one of the aircraft being out of the box slightly, or significantly?

**A26 (WITNESS):**  No Sir.  Not that I -- I've never seen that until this.

**PRESIDENT:**  Okay.

**A26.1 (WITNESS):**  And they weren't that far out of the box it's just -- technically I don't believe we had a box for them that night.  We asked them to -- it was a target they were chasing.  Once there's a target a box is just kind of a, here's an area to work.  And we always tell aircraft if you need to go outside of the box is totally fine, we get it, so if you see on radar a contact 20 miles outside of your box, don't hesitate to let us know that you're going to head outside your box to visually identify the target and make sure it's not a go fast.  We get that frequently especially with the long-range tracking aircraft that can see 200 miles, or however far they can see.  But they'll see something outside of their box -- but they have to let us know if they're going to leave their box that's a significant thing.  So on the night of the mishap, even if they were outside of their box, we knew about it we can de-conflict any kind of error that we saw out there.

**PRESIDENT:**  Um,  Okay.

**A26.2(WITNESS):**  But no, it's not common for aircraft to go outside of their box without letting us know.

**Q27 (PRESIDENT):**  Would it be an accurate statement to say that the box is a coordination measure that you have that is superseded by a tasking, active tasking, when they are executing their mission?

**A27 (WITNESS):**  Absolutely Sir.

**PRESIDENT:**  Okay.

**PRESIDENT:**  What questions do the other board members have?

**QUESTIONS BY THE PILOT MEMBER:**

**PRESIDENT:**  The question was from the Pilot Member.

**PILOT MEMBER:**  Sorry.

**QUESTIONS BY THE PRESIDENT:**

**Q48 (PRESIDENT):**  Board President with a question.  In your time in the JOC watching the Prospectors operate.  Do you ever recall seeing them overland when they weren't cleared for overland?
**A48 (WITNESS):**  No Sir.  Not once.
**PRESIDENT:**  Okay.

**Q49 (PRESIDENT):**  Do you ever recall seeing any of the other assets overland when they weren't cleared to be overland?
**A49 (WITNESS):**  Nope.  No Sir, never.

**PRESIDENT:**  Other questions from the board members?

**QUESTIONS BY THE MEDICAL MEMBER:**

**Q50 (MEDICAL MEMBER):**  Question from the Medical Member.  Do you have any sort of mechanism in place to go back and retrace the flight pattern of your aircraft, or Prospector type aircraft, excuse me, validate that they never crossed over borders?
**A50 (WITNESS):**  The Prospector specifically?
**Q50.1 (MEDICAL MEMBER):**  Correct.
**A50.1 (WITNESS):**  Yes.
**Q50.2 (MEDICAL MEMBER):**  Is that something that's done on every flight?
**A50.2 (WITNESS):**  No.
**Q50.3 (MEDICAL MEMBER):**  How often is that completed?
**A50.3 (WITNESS):**  Never.  It's not something we would go back and research.  We're way too busy to -- we don't have the time to go back for every flight, for every aircraft.  Typically other aircraft we don't have that real-time link with them, like we did with Prospector.  So Prospector is pushing updates to us every few seconds, we're getting their positional update.  So if you go into the history trail in our software you're going to see hundreds, thousands of dots per flights.  Typically for normal aircraft we manually enter those positions in whenever they give them to us over the radio.  So you got long lines that looks more like -- it looks more geometric.  It's from one point, then we get an update 30 minutes later maybe 45 minutes later we get another update and those are the only points that get put into our system.  So if you hit history trail on those it just looks like a geometric shape of wherever they came from.  But for Prospector it was a long string of dots because we would get so many frequent updates.  And honestly we just don't have the time to go review every tape and see exactly where they flew.  We're watching it real-time on the watch floor.

**PRESIDENT:**  Other questions?

**[Silence from board members]**

**QUESTIONS BY THE PRESIDENT:**

**Q51 (PRESIDENT):**  Okay, I think you know in general who the people we've talked to or we're going to talk to.  Do you know of anyone else who might have information we would find helpful for this investigation?
**A51 (WITNESS):**  Possibly Commander          .  I think you already know about him.
**PRESIDENT:**  Okay.
**A51.1 (WITNESS):**  No, the list I saw was pretty conclusive.

**Q52 (PRESIDENT):**  Similarly are there any documents, reports, or other evidence that the board might find helpful for this, if we don't already have access to?
**A52 (WITNESS):**  I believe you're ready have the requirements document?  That was probably the biggest one.
**PRESIDENT:**  I'll look into that.
**A52.1 (WITNESS):** I think I saw it.  I think I saw an e-mail to one of your board members that included it.
**PRESIDENT:**  Okay.
**A52.2 (WITNESS):**  But the initial request for the aircraft or the platform and what was required of it.  What it was being required to be able to accomplish.
**PRESIDENT:**  Okay.  I'll double check that too.

**Q53 (PRESIDENT):**  Are there any matters that we haven't covered that you may believe are important to our investigation?
**A53 (WITNESS):**  No Sir.  I think we covered a lot, almost everything.

**Q54 (PRESIDENT):**  You are reminded of the official nature of this interview.  You may not discuss your testimony with anyone without my permission at any time before the report of this investigation is officially released to the public.  You are subject to recall at any time while this board is in session.  Any questions?
**A54 (WITNESS):**  No Sir.

**PRESIDENT:**  All right, this concludes this interview.  I will turn off the tapes.

**PRESIDENT:**  Thank you.  Today is the twentieth of November 2013.  The time is now 1409 local time Eastern Standard.  This interview is being conducted in Building 290, Room 170, JIATF-South, Key West, Florida.  Persons present at JIATF-South are myself, Brigadier General Scott Zobrist, Lieutenant Colonel [AIB/LA], Lieutenant Colonel [AIB/PM], Captain [AIB/MDM], Technical Sergeant [AIB/R], and our witness, Colonel [J3/DOO].

**QUESTIONS FROM THE PRESIDENT:**

**Q1 (PRESIDENT):**  Colonel [J3/DOO] would please spell - - state and spell your full name.
**A1 (WITNESS):**  Yes sir.                 …   …                                     .

**Q2 (PRESIDENT):**  Thank you and your rank?
**A2 (WITNESS):**  Colonel

**Q3 (PRESIDENT):**  And your job title right now?
**A3 (WITNESS):**  Director for Operations J3.

**Q4 (PRESIDENT):**  And your current duty assignment the base you're stationed at?
**A4 (WITNESS):**  Naval Station Key West, sir.

**Q5 (PRESIDENT):**  Okay.  And I guess your unit of assignment is officially JIATF-South?
**A5 (WITNESS):**  Yes sir, it is.

**Q6 (PRESIDENT):**  Okay.  How long have you been assigned to JIATF-South?
**A6 (WITNESS):**  About two and half year's sir.

**Q7 (PRESIDENT):**  Okay.  And at the time of the mishap what was your duty position?
**A7 (WITNESS):**  J3 Director for Operations.

**Q8 (PRESIDENT):**  J3.  Current position.  Okay.  And have you been in the J3 job your whole time here?
**A8 (WITNESS):**  I have, sir.

**Q9 (PRESIDENT):**  Okay.  And could you briefly describe your - - the job, the duty title, or what - - your responsibilities in the J3 job?
**A9 (WITNESS):**  Yes sir.  I am - - as the J3, I am responsible to the admiral for the tactical employment of assets for the prosecution of detection of monitoring of and pursuant or in consonance with our title 10 responsibilities.

**Q10 (PRESIDENT):**  Okay great.  Okay, I'm going to get into some - - some questions here, but since you did - - well, you previously gave testimony to the Safety Investigation Board on 23 October 2013.  Is that correct?
**A10 (WITNESS):**  That's correct, sir.

**Q11 (PRESIDENT):**  That testimony is at Tab R pages R-4 through R-10.  Did you review this testimony before testifying here today?

**A17 (WITNESS):**  Okay - - this is a very important question here.  The, as we know in a joint organization - - the, the program flows, really, from OPCON, the operational control, which would be SOUTHCOM down to the local J5, which is your plans.  It's sort of like your long range planning - - section, so that would be the J, J5 here at JIATF-South and when it - - when the platform or when the capability when the operations getting ready to be executed, it's turned over to the J3 for current operations.  And that's really what we are, is we're a current operations.  So we take a packaged - - a packaged, um, resource capability or operation and then take that into the J3 for execution.  The J3's role in the execution is to, and without getting into our, our tactics, techniques, and procedures, we take it through a, a, a twenty-four to seventy-two hour vetting process, if you will, a screening process.  And then we codify the instructions in what's called a daily intentions message which is a enterprise scrubbed - - a process where a specific document is, is - - where a specific classified document is produced - - which gives instructions on what it is we want that specific asset or resource to go ahead and provide for JIATF-South in pursuit of - - detection and monitoring.

**PRESIDENT:**  Okay that makes sense to me.  Other questions from board members?

## QUESTIONS FROM THE PILOT MEMBER:

**Q18 (PILOT MEMBER):**  Yes sir, Pilot Member. You mentioned the daily intentions.  As I understand, it there were the, the, the mishap aircraft was originally scheduled on the daily intentions that comes out about 10 A.M. - - was released around 10, is that correct?
**A18 (WITNESS):**  It, it, it will come out sometime in the morning after a rather involved process which - - which includes inputs from our law enforcement folks, from our other kind of community folks, and from - - our, our targeting folks.  Yes, that's correct.

**Q19 (PRESIDENT):**  Okay.  And before, it's my understanding, or, actually, can you tell me, what, if you know, when did it change to move the operating area for the mishap aircraft to the current - - the, the mishap area, if you call it that.
**A19 (WITNESS):**  I do have specific knowledge of that and that was as result of information that came in from a source of information, which annotated that, that a target of interest was in a specific area that was not, that was - - unknown to us - - when the daily intentions message was produced.

**Q20 (PILOT MEMBER):**  Okay.  So, but it did come out before take-off - - they were not, the aircraft was not re-tasked in flight, correct?
**A20 (WITNESS):**  The aircraft was not re-tasked in flight, that's correct.
**Q20.1 (PILOT MEMBER):**  Okay. So they…
**A20.1 (WITNESS):**  Not, not, not to my, not to my knowledge.

**Q21 (PILOT MEMBER):**  So they stepped to the jet with the correct objective?
**A21 (WITNESS):**  I would - - if my memory serves me correctly, and I don't want to speculate, but if my memory serves me correctly, it was some measure of time before it was wheels-up, but I would have to go back through the logs to, to actually see that.  It's not uncommon to shift operating areas. As we know, the enemy is a, a dark, asymmetric, unpredictable, and so when the

enemy shifts, you can't stick to, you know, what you knew before. You've got react to current contemporary enemy information. So that would not be out of, out of the ordinary.

**PRESIDENT:** Other questions from our board members.

## QUESTIONS FROM THE MEDICAL MEMBER:

**Q22 (MEDICAL MEMBER):** Question from the Medical Member. Sir, did you know the mishap aircrew at all?
**A22 (WITNESS):** Professionally speaking, I spoke with the aircrew - - I think a couple of times and they were basically 30,000 foot. This is what, you know, JIATF-South is about, this is where we are, what direction that we're moving into, the importance of the mission, the importance of communication, and the importance of exchange of information. It was basically a big blue arrow introduction to the J3. J3 operations , current operations.

**Q23 (MEDICAL MEMBER):** Was there anything in your interaction or involvement with the mishap aircrew that you led you to believe that they were less than 100% capable of executing their mission?
**A23 (WITNESS):** You know what, I'm an infantry officer by trade. I, I wouldn't be a guy who would be qualified to know whether or not, you know, somebody was qualified to go ahead and, and work a highly technical, - - you know, piece of equipment like, like, like an aircraft. That would be way outside of my lane to, to make a, to make a judgment.

## QUESTIONS FROM THE PRESIDENT:

**Q24 (PRESIDENT):** Have you ever - - the Board President here. Have you ever flown on a Prospector aircraft? To your recollection?
**A24 (WITNESS):** I, I think that I have, sir. I can't, I can't recall - - probably in theater but…

**Q25 (PRESIDENT):** Okay. There were training missions done here to, to flush out some of the systems, I'm told, to familiarize some of the aircrew with some of the procedures. Were you, did you fly in any of those missions?
**A25 (WITNESS):** I did not, sir.

**Q26 (PRESIDENT):** Okay. Other questions from the board members? Is there anything else about the Prospector mission, - - your previous testimony not-withstanding, that you would like to add? - - Or even more broadly anything else that would like to add to, to your testimony?
**A26 (WITNESS):** No sir, no sir.

**Q27 (PRESIDENT):** Okay. And as you're aware we've coordinated with your staff, but I would like to ask you if there's any other - - anyone else who might have information that we might find helpful for this investigation that hasn't come to our attention at this point?
**A27 (WITNESS):** No sir I think you've talked to our - - I think you have on the docket our duty experts. Those individuals who've got specific skill sets that can lend a greater fidelity to, to your investigation.

**PRESIDENT:**  Do you solemnly swear that the testimony you're about to give in the matter now under investigation shall be the truth the whole truth and nothing but the truth so help you God?

**WITNESS:**  Yes Sir.

**PRESIDENT:**  Okay.  You can put your hand down thank you.  Today is November 20, 2013, the time is now 1825 Eastern Standard Time.  This interview is being conducted in building 290, room 170, JIATF-South, Key West Florida.  Persons present, at this time are myself, Brigadier General Scott Zobrist, Lieutenant Colonel [AIB/LA], Lieutenant Colonel [AIB/PM], Captain [AIB/MDM], Master Sergeant [AIB/MXM], Technical Sergeant [AIB/R] and also the witness Lieutenant Colonel [CDO].  Um let's see, okay alright let's start.

## QUESTIONS BY THE PRESIDENT:

**Q1 (PRESIDENT):**  Would you please state and spell your full name?
**A1 (WITNESS):**                         .  That's                    .           ,                .         ,
.

**Q2 (PRESIDENT):**  What is your rank?
**A2 (WITNESS):**  Lieutenant Colonel.

**Q3 (PRESIDENT):**  And your job title?
**A3 (WITNESS):**  Command Duty Officer, JIATF-South and Program Manager for the Air National Guard program JIATF-South.

**Q4 (PRESIDENT):**  So for all -- I'll get into that in a second I guess -- so you're currently assigned to JIATF-South?
**A4 (WITNESS):**  Yes Sir.

**Q5 (PRESIDENT):**  And how long have you been assigned to JIATF-South?
**A5 (WITNESS):**  One year, one month.

**Q6 (PRESIDENT):**  Okay.  And what was your duty position at the time of the mishap that I mentioned?
**A6 (WITNESS):**  Command Duty Officer.

**Q7 (PRESIDENT):**  Okay.  And, let's see you said one year one month.  And can you describe your -- the duties of your position as a CDO, and mention briefly about your Guard responsible -- or the Program Manager responsibilities?
**A7 (WITNESS):**  Okay.  Yes Sir.  As far as the Program Manager responsibilities for the Air National Guard I just manage the Air National Guard folks that are down here and manage their orders and take care of all their administrative OPR/EPR type of items.  And as far as the Command Duty Officer, I'm actually the represent when I'm on the floor, I represent the commander for all tactical actions and operations for surface and air assets and the administration of all that while I'm on the floor.

**A13 (WITNESS):**  Five to ten thousand feet, depending on the weather to avoid weather and still be effective.

**Q14 (PRESIDENT):**  And if they wanted to change their mission profile for some reason and maybe if they were going to remain within the area where you expected them but wanted to change their altitude would they be required to get approval from you to do that or is it a coordination thing like as a courtesy, if they're going to change altitude?
**A14 (WITNESS):**  We're simply procedural so the only thing that we really are concerned about is overt versus covert.  So we want them to stay covert to the max extent possible if we cleared them to go overt, then altitude is really at their discretion and at their contractor SOP, whatever that is as long as we get what we need as far as staying -- keeping eyes on the target and so forth and stay within their parameters.
**PRESIDENT:**  Okay, understood.
**WITNESS:**  Yes Sir.

**Q15 (PRESIDENT):**  Have you -- there are procedures for going over land where they don't have blanket approval for going over land, I'm familiar with that.  Do you -- have you seen them, the Prospector specifically, be over land before when you -- when they did not have approval?
**A15 (WITNESS):**  Not typically, no.  I mean, they take off out of the country they take off out of they would obviously fly over that but ----
**PRESIDENT:**  Right ----
**A15.1 (WITNESS):**  If they're flying cleared TTW's, Territorial Waters, then they are not cleared over land and I can't remember a time I saw that before specifically.

**PRESIDENT:**  That answers my question.  Okay, what questions do we have from the board members?

**QUESTIONS BY THE PILOT MEMBER:**

**Q16 (PILOT MEMBER):**  This is the Pilot Member.  I understand you had one FAM flight that didn't have a headset on, so I understand the limited knowledge but you said it was autopilot on a great deal?
**A16 (WITNESS):**  Yes.

**Q17 (PILOT MEMBER):**  Can you describe the autopilot location, if you remember, and basically kind of how they operated?  Is it, you know -- was it, a turn the knob here?  Or was it a roll up and down?
**A17 (WITNESS):**  I really don't remember on the DASH-8 just because I'm not that familiar and I was doing a lot of walking back and forth from the back to the front.  I can't specifically say where the autopilot was at.

**Q18 (PILOT MEMBER):**  Okay.  Do they both have MFD's in front of them, each one of them?
**A18 (WITNESS):**  Yeah, from what I remember it both have the same displays.

**PILOT MEMBER:**  Okay.

**A25 (WITNESS):**  No.  There was a conversation with the person that he was developing a checklists, because they didn't have one, and they were working to develop it and so forth.  That was their, I think their first flight in the airplane was from Colorado down here, if I remember right.  And so they were developing that checklists at that time.

**Q26 (PILOT MEMBER):**  Did they have like their flight manuals out?  Is that what they were going off of?
**A26 (WITNESS):**  You know, and -- now the cockpit that had the standard I think DASH-8 checklists, I think I saw that up front.  Talking about purely a mission area back there now because that's what we're talking about, I remember that specifically saying they were developing a checklist.  And I don't know if he had one in hand at that time or they were still working on it I can't remember the specifics but that's we were talking about.

**PRESIDENT:**  Med Member any questions?

## QUESTIONS BY THE MEDICAL MEMBER:

**Q27 (MEDICAL MEMBER):**  Yes Sir.  Medical Member question.  Sir, what is your familiarity with the training program for the aircrew flying this mission?
**A27 (WITNESS):**  I know they -- I know we had a guy Mr. [COAP], [COAP], goes up -- went up there and did some of their training that's pretty much my extent of it.  I know he went over how we'll employ them and so forth but I haven't really been a part of their training honestly so I can't say specifically about that one.

**Q28 (MEDICAL MEMBER):**  Okay.  What percentage of the missions that you have observed fly over land during the course of executing their mission?
**A28 (WITNESS):**  None, other than their takeoff and landing and return.  Everything is over the water with the exception of the islands and a lot of those have some territorial waters around them they have to avoid but generally the missions are over water.

**Q29 (MEDICAL MEMBER):**  Did you know the mishap crew at all?
**A29 (WITNESS):**  Yes.  I knew, I had met everybody.  Mostly down here.

**Q30 (MEDICAL MEMBER):**  What was the extent of your experience with the mishap crew?
**A30 (WITNESS):**  They -- I didn't know them well enough to have a real good knowledge of anything.  They were more acquaintances that I had met in this room.  But we sat around and talked about mission stuff and so forth and matter-of-fact, a couple of them had just left I think a week or two prior we had just met there before they went down there.

**Q31 (MEDICAL MEMBER):**  That being said Sir, did you have any awareness of any major life stressful events or major circumstances going on in the lives of the aircrew?
**A31 (WITNESS):**  No, I mean that doesn't mean it wasn't happening it means I didn't have any knowledge of it.

**Q32 (MEDICAL MEMBER):**  Did anything in your experience with the aircrew lead you to believe that they were less than 100% capable of executing the mission?

**A32 (WITNESS):**  No.  Not uh -- I mean there were new so, I mean that.  You know just going through those growing pains of, you know, employment and how they were flying the airplane and so forth.  But, you know when I say that it's just purely tactical it's nothing to do with the crew themselves.

**Q33 (MEDICAL MEMBER):**  Did you ever notice any problems with communication or technological systems on the aircraft?
**A33 (WITNESS):**  Yeah, I mean we've lost probably, I think it was 10 days prior, maybe 12, I can't remember the exact number of days that their mission systems shut down completely and we lost the video feed and we couldn't talk to them and they came back and landed.  I think they landed with no radios.  I obviously wasn't down there so I don't know but I'm pretty sure I heard they came in NORDO, and NORDO is no radios and we couldn't talk to them, so.  That night that this mishap happened I -- when we lost initial contact with them I thought it was they lost their radios.

**Q34 (MEDICAL MEMBER):**  Was this a common issue?
**A34 (WITNESS):**  Uh, common.  I'd say 50-50.  I mean it was something they were troubleshooting and it wasn't always the same thing it was something -- you know we would just lose video feed sometimes.  We wouldn't always necessarily mean we would lose radios and you're asking technologically than you know there were little glitches every now and then from different things.  Again, probably not anything too unusual for a new airframe that they're trying to get the kinks out of.

## QUESTIONS BY THE MAINTENANCE MEMBER:

**Q35 (MAINTENANCE MEMBER):**  Maintenance member.  What did they find was the problem in this case?  What fixed the problem?
**A35 (WITNESS):**  I know the answer to that but I'd have -- I can't, I don't want to say the exact part because I'm not 100% sure that name of that part -- it's probably been said already. Anyway, I'm gonna go with I don't know right now, but I did know at the time that it happened.

**MAINTENANCE MEMBER:**  That's all I have.

**PRESIDENT:**  Any questions from anyone else?

## QUESTIONS BY THE PILOT MEMBER:

**Q36 (PILOT MEMBER):**  Pilot again.  We had someone talk about that there was a suspected TR fire and shut -- basically blacked the plane out.  Do you know anything about that?  Did that happen?
**A36 (WITNESS):**  TR fire?

**PRESIDENT:**  TRU, Transformer Rectifier.

**MAINTENANCE MEMBER:**  Transformer Rectifier Unit

## VERBATIM TRANSCRIPT

### MR. CCID

**PRESIDENT:**  My name is Brigadier General Scott Zobrist.  I am investigating the aircraft accident that occurred on 5 October 2013, in the Republic of Colombia, South America.  This investigation, conducted under Air Force Instruction 51-503, is separate and apart from the safety investigation conducted under Air Force Instruction 91-204.  This accident investigation board is a legal investigation convened to inquire into the facts surrounding the aircraft accident, to prepare a publicly-releasable report, and to gather and preserve all available evidence for use in litigation, claims, disciplinary actions, administrative proceedings, and for other purposes.

**PRESIDENT:**  Mr. [CCID] would you tell me who is in the room with you to confirm your identity?

**WITNESS:**  Lieutenant Colonel [SC/SJA] United States Air Force.  He's with the Staff Judge Advocate's office at US Southern Command.

**PRESIDENT:**  Great thank you.  Lieutenant Colonel [SC/SJA] could you please state your full name and then spell it?

**[SC/SJA]:**  Yes, it's Lieutenant Colonel [SC/SJA].                    ,                    .

**PRESIDENT:**  And do you know the witness Mr. [CCID]?

**[SC/SJA]:**  I do and I verified his identity through his DoD CAC card.

**PRESIDENT:**  Thank you.  Lieutenant Colonel [SC/SJA] if you could remain in the room for a few more minutes.

**[SC/SJA]:**  Sure.

**PRESIDENT:**  Okay Mr. [CCID] a safety investigation was previously conducted on this accident.  You did not provide testimony or a statement to that safety investigation.  Your sworn testimony to us may be used for any proper purpose.  Additionally, your testimony can be released to the public.  Do you understand how your testimony before this accident board may be used?

**WITNESS:**  I do sir.

**PRESIDENT:**  Thank you.  In compliance with the Air Force Privacy Act Program and with the Privacy Act, you were given or shown a copy of the Privacy Act Statement prior to the start of this interview.  Is this true?

**WITNESS:**  That is correct sir.

**PRESIDENT:**  Got it.

**WITNESS:**  Sir, I'm on hand held now.

**PRESIDENT:**  I gotcha loud and clear.

**WITNESS:**  Okay sir.

**Q5 (PRESIDENT):**  And uh how long have been with SOUTHCOM in that capacity?
**A5 (WITNESS):**  Since October of 2002.

**Q6 (PRESIDENT):**  Okay thank you.  On the night of the mishap excuse me on October 5th 2013, were you in that same job position?
**A6 (WITNESS):**  I was.

**Q7 (PRESIDENT):**  Would you tell me a little bit about uh the duties as in that current duty position?
**A7 (WITNESS):**  I provide coordination and validation for Department of Defense support, to US partner nation, drug law enforcement agencies, and militaries of other countries who participate in counter narcotic operations.

**Q8 (PRESIDENT):**  And um what's your military background or other inner agency background that helps you do your job - - helps you do your job now?
**A8 (WITNESS):**  I'm a retired Army Lieutenant Colonel.  24 years of active duty.  My last three years on active duty were in US Southern Command in the counter narcotics division.  I worked briefly in 2002 at Joint Interagency Task Force South in Key West, Florida which is one of the national task forces for counter narcotics.  And I've been in the counter narcotics business sense 1999.

**Q9 (PRESIDENT):**  Okay thank you.  Um what's your involvement with the Prospector program?  Could you give me a little bit of that background?
**A9 (WITNESS):**  I helped determine the program and establish the requirements which were then funded through the office of the deputy assistant secretary of defense for counter narcotics and global threats.  This plane was designed to replace an earlier B200 series of plane and fill gaps that DoD assets can't provide just due to op tempo.

**Q10 (PRESIDENT):**  And you mentioned the funding uh could you tell me where the funding came from did it come from SOUTHCOM or did it come from an outside agency and came through SOUTHCOM for execution?
**A10 (WITNESS):**  It comes from what's called the central transfer account.  Which is a one line item in DoD's budget which is then executed by the deputy assistant secretary of defense for counter narcotics Ms.                    .  They then release money to the combatant command and the actual money is executed from our J8-5 which is the counter narcotics program office.

**Q11 (PRESIDENT):**  Okay um and the uh command and control relationships for the Prospector well let me go back to the the requirements piece of it.  Did you work with the Air Force Material Command folks on the requirements that ended up in the contract?
**A11 (WITNESS):**  I did.

**Q12 (PRESIDENT):**  And could you tell me a little bit about the um some of the details unclassified of those contractual requirements specifically I'm looking for information about under what rule set they flew regarding the FAA rules and anything about uh training or oversight those kinds of things?
**A12 (WITNESS):**  I have very limited knowledge of that.  The aircraft is designed primarily to be a maritime patrol aircraft.  It's outfitted with EO/IR sensors and a wide area surface search radar.  The actual requirements were a certain range which I don't have off the top of my head.  Duration on station time and the ability to look for small go-fast type vessels 24 hours a day.  So in both day and night conditions.

**Q13 (PRESIDENT):**  Okay thank you.  How would you describe the command relationships with the Prospector operation once it was in Panama regarding force provider OPCON, TACON etcetera?
**A13 (WITNESS):**  Yes sir.  For all intents and purposes the aircraft was OPCON to US Southern Command but that's applying a doctrinal term to a non DoD asset but in essence it was operationally commanded by US Southern Command and it was essentially TACON to Joint Interagency Task Force South.

**Q14 (PRESIDENT):**  And is that actually written anywhere?
**A14 (WITNESS):**  The closest document that would establish that is the National Interdiction Control Plan of 17 March 2010.  That makes Joint Interagency Task Force South a direct reporting unit to Southern Command in addition to being a national task force.  I don't think a written document exists that established formal command and control relationship of an OPCON or a TACON of the Prospector aircraft.

**Q15 (PRESIDENT):**  Thank you um there's a predecessor to the Prospector in the B200 program I'm told.  Could you compare any compare and contrast that program to this one in terms of major differences in command and control?
**A15 (WITNESS):**  The command and control was essentially the same.  SOUTHCOM actually acts as a force provider once it receives a contractor owned contractor operated asset and then TACON is passed to JIATF-South.

**Q16 (PRESIDENT):**  Okay so um so basically using the doctrinal terminology the force provider is essentially SOUTH- for Prospector SOUTHCOM was the force provider although you my understanding is to get that force you used money from the method you talked before using a contracting mechanism from the Air Force is that true?
**A16 (WITNESS):**  That's correct sir.

**Q17 (PRESIDENT):**  Okay so SOUTHCOM is the force provider and also had operational control of Prospector again using doctrinal terms is that an accurate statement?
**A17 (WITNESS):**  Yes sir I believe that's accurate.