# EXHIBIT 16

# <u>UNITED STATES AIR FORCE AIRCRAFT ACCIDENT INVESTIGATION BOARD REPORT</u>



### DHC-8-202, T/N N356PH

### UNITED STATES SOUTHERN COMMAND
**Forward Operating Location**
**REPUBLIC OF PANAMA**



### LOCATION:
### 1 KM SOUTH OF PANAMA-COLOMBIA BORDER

### DATE OF ACCIDENT:  5 OCTOBER 2013

### BOARD PRESIDENT
### BRIGADIER GENERAL SCOTT J. ZOBRIST

### Conducted IAW Air Force Instruction 51-503

# EXECUTIVE SUMMARY
# AIRCRAFT ACCIDENT INVESTIGATION

## DHC-8-202, T/N N356PH
## 1 KM SOUTH OF THE PANAMA-COLOMBIA BORDER
## 5 OCTOBER 2013

On 5 October 2013, at approximately 0042 hours local time (L), a de Havilland DHC-8-202 "Prospector" aircraft, tail number (T/N) N356PH, impacted the terrain in a remote area of the Republic of Colombia, approximately 1 kilometer south of the Panama-Colombia border, while on a night counter-narcotics mission. The mishap aircraft, operated by Sierra Nevada Corporation (SNC) pursuant to a contract awarded by Air Force Materiel Command, was operating in support of United States (US) Southern Command. Four of the six aircrew members onboard were killed on impact. The two pilots were injured. Additionally, the crash destroyed the mishap aircraft along with $7.2 million in US government equipment on board the aircraft.

The six aircrew members were: mishap pilot #1 (MP1); mishap pilot #2 (MP2); the mishap mission commander (MMC); the mishap mission systems operator (MMSO); the mishap host nation rider (MHNR); and the mishap host nation rider escort (MHNRE). MP1 was a US civilian employed by SNC who also served as the manager for SNC operations in Panama. A pilot certified by the Federal Aviation Administration (FAA) with over 6,500 total flying hours, MP1 was the second in command and was flying the mishap aircraft at the time of the mishap. MP2, the MMC, and the MMSO were US civilians working for a sub-contractor, New Frontier Innovations, LLC (NFI). NFI provided pilots and mission systems operators to the primary contractor, SNC. MP2 was an FAA-certified pilot with over 6,900 hours of flying time and was the pilot in command (PIC) of the mishap aircraft. The MMC was a mission systems operator and was retired from the US Air Force and US Customs and Border Protection. The MMSO was a mission systems operator and had previous systems operations experience in the US Air Force. The MHNR was an officer in Panama's National Air and Navy Service and had extensive experience in counter-drug operations. The MHNRE was a 20-year US Air National Guard veteran and had over 200 sorties and more than 2,200 flying hours as a host nation rider escort.

The mishap aircraft, call sign Bat 02, departed a forward operating location in the Republic of Panama at 2245L on 4 October 2013, and proceeded to its tasked area of operations in the Caribbean Sea off the southeastern coast of Panama. The mishap crew had detected a boat suspected of transporting illegal drugs and monitored it from an altitude of 1,500 feet above mean sea level in the darkness. Although intending to remain over water during all operations, MP1 and MP2 unintentionally flew over land and impacted the terrain. The board president found, by clear and convincing evidence, the cause of the mishap was MP1 and MP2's failure to ensure the aircraft remained over water, which resulted in unplanned night flight over land at low altitude and subsequent controlled flight into the terrain. Additionally, the board president found, by a preponderance of evidence, four other factors substantially contributed to the mishap: (1) inappropriate delegation of terrain avoidance responsibility; (2) ineffective communication among the mishap aircrew; (3) an inoperative Enhanced Ground Proximity Warning System; and (4) lack of operational oversight.

*Under 10 U.S.C. § 2254(d) the opinion of the accident investigator as to the cause of, or the factors contributing to, the accident set forth in the accident investigation report, if any, may not be considered as evidence in any civil or criminal proceeding arising from the accident, nor may such information be considered an admission of liability of the United States or by any person referred to in those conclusions or statements.*

# SUMMARY OF FACTS AND STATEMENT OF OPINION
## DHC-8-202, T/N N356PH
## 5 OCTOBER 2013

## TABLE OF CONTENTS

ACRONYMS AND ABBREVIATIONS ........................................................................ iii
SUMMARY OF FACTS ............................................................................................... 1
1. AUTHORITY AND PURPOSE .......................................................................... 1
   a. Authority ...................................................................................................... 1
   b. Purpose ....................................................................................................... 1
2. ACCIDENT SUMMARY ................................................................................... 1
3. BACKGROUND ................................................................................................. 1
   a. Air Combat Command (ACC) .................................................................... 2
   b. Twelfth Air Force (Air Forces Southern) (12 AF (AFSOUTH)) ............... 2
   c. Air Force Materiel Command (AFMC) ...................................................... 2
   d. Air Force Life Cycle Management Center (AFLCMC) .............................. 3
   e. 645th Aeronautical Systems Group (645 AESG) ...................................... 3
   f. United States Southern Command (USSOUTHCOM) ................................ 3
   g. Joint Interagency Task Force South (JIATF-S) .......................................... 3
   h. Sierra Nevada Corporation (SNC) ............................................................. 3
   i. New Frontier Innovations, LLC (NFI) ....................................................... 4
   j. de Havilland DHC-8-202 "Prospector" ..................................................... 4
   k. Crew Positions ........................................................................................... 4
      (1) Pilots ..................................................................................................... 5
      (2) Mission Commander ............................................................................. 6
      (3) Mission Systems Operator .................................................................... 6
      (4) Host Nation Rider ................................................................................. 6
      (5) Host Nation Rider Escort ...................................................................... 7
   l. Avionics ...................................................................................................... 7
      (1) Enhanced Ground Proximity Warning System (EGPWS) ...................... 7
      (2) Radio Altimeter .................................................................................... 9
      (3) Color Weather Radar ............................................................................ 9
      (4) External Sensors ................................................................................... 9
4. SEQUENCE OF EVENTS .................................................................................. 10
   a. Mission ....................................................................................................... 10
   b. Planning ...................................................................................................... 10
   c. Preflight ...................................................................................................... 11
   d. Summary of Accident .................................................................................. 11
   e. Impact ......................................................................................................... 24
   f. Egress and Aircrew Flight Equipment (AFE) ............................................. 24
   g. Search and Rescue (SAR) ........................................................................... 24
   h. Recovery of Remains .................................................................................. 25
5. MAINTENANCE ................................................................................................ 26
   a. Forms Documentation ................................................................................. 26
   b. Recurring Discrepancies ............................................................................. 26

c. Inspections .........................................................................................................27
d. Maintenance Procedures.....................................................................................27
e. Maintenance Personnel and Supervision ...........................................................28
f. Fuel, Hydraulic, and Oil Inspection Analysis ...................................................29
g. Unscheduled Maintenance .................................................................................29
6. AIRFRAME, MISSILE, OR SPACE VEHICLE SYSTEMS ...................................29
a. Structures and Systems ......................................................................................29
   (1) Engines......................................................................................................29
   (2) Enhanced Ground Proximity Warning System (EGPWS)........................29
7. WEATHER.................................................................................................................30
a. Forecast Weather ...............................................................................................30
b. Observed Weather ..............................................................................................30
c. Space Environment ............................................................................................30
d. Operations..........................................................................................................30
8. AIRCREW QUALIFICATIONS ...............................................................................31
a. Mishap Pilot #1 (MP1) ......................................................................................31
b. Mishap Pilot #2 (MP2) ......................................................................................31
c. Mishap Mission Commander (MMC) ................................................................32
d. Mishap Mission Systems Operator (MMSO).....................................................32
e. Mishap Host Nation Rider (MHNR) ..................................................................32
f. Mishap Host Nation Rider Escort (MHNRE) ....................................................32
9. MEDICAL .................................................................................................................33
a. Qualifications .....................................................................................................33
b. Health..................................................................................................................33
c. Pathology ...........................................................................................................33
d. Lifestyle..............................................................................................................34
e. Crew Rest and Crew Duty Time..........................................................................34
10. OPERATIONS AND SUPERVISION .......................................................................34
a. Operations..........................................................................................................34
b. Supervision .........................................................................................................37
11. HUMAN FACTORS ..................................................................................................38
a. Introduction........................................................................................................38
b. Applicable Factors .............................................................................................39
12. GOVERNING DIRECTIVES AND PUBLICATIONS................................................42
a. Publicly Available Directives and Publications Relevant to the Mishap ..................42
b. Other Directives and Publications Relevant to the Mishap...........................................42
c. Known or Suspected Deviations from Directives or Publications .................................42
13. ADDITIONAL AREAS OF CONCERN ....................................................................42
STATEMENT OF OPINION.................................................................................................43
1. Opinion Summary.....................................................................................................43
2. Cause .......................................................................................................................44
3. Substantially Contributing Factors .........................................................................44
4. Conclusion ...............................................................................................................47
INDEX OF TABS ....................................................................................................................48

# ACRONYMS AND ABBREVIATIONS

| | | | |
|---|---|---|---|
| 460 SW/JA | 460th Space Wing Judge Advocate | CAFMC | Chief, Air Force Mission Colombia |
| 645 AESG | 645th Aeronautical Systems Group | CAOC | Combined Air Operations Center |
| 645 AESG/PM | 645th Aeronautical Systems Group Program Manager | CBP | Customs and Border Protection |
| | | CCID | Chief, Counter Illicit Division |
| A&P | Airframe and Powerplant | CDO | Command Duty Officer |
| ABD | Air Bridge Denial | CLS | Contract Logistics Support |
| AC | Active Component | CMSgt | Chief Master Sergeant |
| ACC | Air Combat Command | CND | Cannot Duplicate |
| ACP | Audio Control Panel | COAP | Chief of Air Operations |
| AD | Airworthiness Directive | COLAF | Colombian Air Force |
| ADC | Air Data Computer | COLNAV | Colombian Navy |
| ADO | Assistant Operations Officer | COMM | Communications |
| AF | Air Force | CRM | Crew Resource Management |
| AFB | Air Force Base | CTOC | Countering Transnational Organized Crime |
| AFE | Aircrew Flight Equipment | | |
| AFI | Air Force Instruction | CVR | Cockpit Voice Recorder |
| AFIP | Air Force Institute of Pathology | DJOC/OIC | Deputy Joint Operations Center Officer in Charge |
| AFMC | Air Force Materiel Command | | |
| AFSC | Air Force Specialty Code | DME | Distance Measuring Equipment |
| AFS/WO | Air Forces Southern Watch Officer | DoD | Department of Defense |
| AGL | Above Ground Level | DOM | Director of Maintenance |
| AIB | Accident Investigation Board | DR | Dead Reckoning |
| AIB/FAE | Accident Investigation Board Functional Area Expert | DSO | Defensive System Operator |
| | | E-3 | E-3 Airborne Warning and Control System |
| AIB/LA | Accident Investigation Board Legal Advisor | | |
| | | EGPWS | Enhanced Ground Proximity Warning System |
| AIB/MDM | Accident Investigation Board Medical Member | | |
| | | EHSI | Electronic Horizontal Situation Indicator |
| AIB/MXM | Accident Investigation Board Maintenance Member | | |
| | | ELT | Emergency Locating Transmitter |
| AIB/PM | Accident Investigation Board Pilot Member | EO | Electro-Optical |
| | | EO/IR | Electro-Optical/Infrared |
| AIB/PO | Accident Investigation Board Panamanian Observer | FAA | Federal Aviation Administration |
| | | FAM | Familiarization |
| AIB/R | Accident Investigation Board Recorder | FAR | Federal Aviation Regulation |
| | | FARC | Fuerzas Armadas Revolucionarias de Colombia |
| ALAT/SA | Assistant Legal Attaché Special Agent | | |
| | | FBI/SA | Federal Bureau of Investigation Special Agent |
| AMC | Air Mission Commander | | |
| AMOC | Air Marine Operations Center | FCF | Functional Check Flight |
| AMS | Aircraft Mechanic Specialist | FDR | Flight Data Recorder |
| AOR | Area of Responsibility | FLIR | Forward Looking Infrared |
| AP | Attaché Panama | FMS | Flight Management System |
| ASC | Aeronautical Systems Center | FMV | Full Motion Video |
| ATC | Air Traffic Control | FOD | Foreign Object Damage |
| ATO | Air Tasking Order | FOL | Forward Operating Location |
| AVS | Avionics Specialist | FPD/SAC | Force Protection Detachment Special Agent in Charge |
| AVT | Avionics Technician | | |
| AWACS | Airborne Warning and Control System | FSM | Field Service Manager |
| BA/IW | Bombardier Aerospace Identity Witness | GEO | Geographical |
| BOA | Broad Ordering Agreement | GOP | General Operating Procedures |
| C2 | Command and Control | GPS | Global Positioning System |

| | |
|---|---|
| GPWS | Ground Proximity Warning System |
| HELO | Helicopter |
| HF | High-Frequency |
| HFACS | Human Factors Analysis and Classification System |
| HN | Host Nation |
| HNR | Host Nation Rider |
| HNRE | Host Nation Rider Escort |
| HNR/IW | Host Nation Rider Identity Witness |
| HNR/PM | Host Nation Rider Program Manager |
| HR | Human Remains |
| HSI | Horizontal Situation Indicator |
| IA | Inspection Authorization |
| IAW | In Accordance With |
| ICAO | International Civil Aviation Organization |
| INOP | Non-Operational/Inoperational |
| IP | Instructor Pilot |
| IPC | Illustrated Parts Catalog |
| IQT | Initial Qualification Training |
| IR | Infrared |
| IS | Intelligence Specialist |
| ISB/IO | Interim Safety Board Investigating Officer |
| ISOPREP | Isolated Personnel Report |
| ISR | Intelligence, Surveillance, Reconnaissance |
| IW | Identity Witness |
| J3/DOO | J3 Director of Operations |
| J35/IAP | J35 International Air Planner |
| JIATF-S | Joint Interagency Task Force South |
| JOC | Joint Operation Center |
| JPRC | Joint Personnel Recovery Cell |
| JPRCC | Joint Personnel Recovery Command Center |
| KCAS | Knots Calibrated Airspeed |
| KIAS | Knots Indicated Airspeed |
| KM | Kilometer |
| L | Local Time |
| LANTIRN | Low Altitude Navigation and Targeting Infrared for Night |
| LDPM | Liberty Deputy Program Manager |
| LI | Lead Inspector |
| LI/IW | Lead Inspector Identity Witness |
| LLC | Limited Liability Company |
| LNO | Liaison Officer |
| Lt Col | Lieutenant Colonel |
| MA | Mishap Aircraft |
| MC | Mishap Crew |
| MEL | Minimum Equipment List |
| MFL | Maintenance Fault List |
| MHNR | Mishap Host Nation Rider |
| MHNRE | Mishap Host Nation Rider Escort |
| mIRC | Internet Relay Chat |
| MMC | Mishap Mission Commander |
| MMEL | Master Minimum Equipment List |
| MMSO | Mishap Mission Systems Operator |

| | |
|---|---|
| MO | Modus Operandi |
| MOS | Military Occupation Specialist |
| MP | Mishap Pilot |
| MPA | Maritime Patrol Aircraft |
| MP1S | Mishap Pilot #1 Spouse |
| MSgt | Master Sergeant |
| MSL | Mean Sea Level |
| MSO | Mission Systems Operator |
| MTI | Moving Target Indication |
| MXL | Maintenance Lead |
| MXT | Maintenance Technician |
| NAV/AIR/LNO | Naval Air Liaison Officer |
| NCIS/SA | Naval Criminal Investigative Service Special Agent |
| NCOIC | Noncommissioned Officer in Charge |
| NFI | New Frontier Innovations, LLC |
| NORDO | No Radio |
| NOTAMs | Notices to Airmen |
| NVG | Night Vision Goggles |
| OCONUS | Outside the Continental United States |
| OG/CDO | Operations Group Command Duty Officer |
| OI | Operating Instruction |
| OPCON | Operational Control |
| ORM | Operational Risk Management |
| OSI/SA | Office of Special Investigations Special Agent |
| OSO | Offensive System Operator |
| P | Pilot |
| PA | Public Affairs |
| PC | Primary Contractor |
| PCA | Primary Contractor Attorney |
| PCS | Permanent Change of Station |
| PDO | Prospector Duty Officer |
| PIC | Pilot in Command |
| PR Cell | Personnel Recovery Cell |
| PRMC | Personnel Recovery Mission Coordinator |
| PR/NCOIC | Personnel Recovery Noncommissioned Officer in Charge |
| PRRC | Personnel Recovery Regional Coordinator |
| PR/SOUTHCOM | Personnel Recovery Southern Command |
| PTO | Paid Time Off |
| P&W | Pratt and Whitney |
| Q1 | Fully Qualified |
| QA | Quality Assurance |
| RC | Reserve Component |
| RGB | Reduction Gearbox |
| RMI | Radio Magnetic Interference |
| ROE | Rules of Engagement |
| RT | Receiver Transceiver |
| SA | Situational Awareness |
| SAD | Situational Display |

| | | | | |
|---|---|---|---|---|
| SAI/BA | Senior Accident Investigator Bombardier Aerospace | | SIB/P | Safety Investigation Board President |
| SAR | Search and Rescue | | SIB/PM | Safety Investigation Board Pilot Member |
| SART | Search and Rescue Transponder | | | |
| SATCOM | Satellite Communication | | SIB/R | Safety Investigation Board Recorder |
| SC | Subcontractor | | | |
| SCA | Subcontractor Attorney | | SIB/VA | Safety Investigation Board Video Animation |
| SCP | Subcontractor Paralegal | | | |
| SC/SJA | Southern Command Staff Judge Advocate | | SIC | Second In Command |
| | | | SME | Subject Matter Expert |
| SDO | Squadron Duty Officer | | SMSgt | Senior Master Sergeant |
| SEAL | Sea, Air, Land Teams | | SNC | Sierra Nevada Corporation |
| SENAN | Servicio Nacional Aeronaval | | SO | System Operator |
| SERE | Survival, Evasion, Resistance, and Escape | | SPINS | Special Instructions |
| | | | TAC | Tactical |
| SI | Systems Integrator | | TACON | Tactical Control |
| SIB | Safety Investigation Board | | TAO | Tactical Action Officer |
| SIB/AFMC/R | Safety Investigation Board Air Force Materiel Command Representative | | TCAS | Traffic Collision Avoidance System |
| | | | TDY | Temporary Duty |
| | | | T/N | Tail Number |
| SIB/AFSEC/R1 | Safety Investigation Board Air Force Safety Center Representative 1 | | TPC | Tactical Pilotage Chart |
| | | | TTP | Tactics, Techniques, and Procedures |
| | | | TTW | Territorial Waters |
| SIB/AFSEC/R2 | Safety Investigation Board Air Force Safety Center Representative 2 | | VMC | Visual Meteorological Conditions |
| | | | VFR | Visual Flight Rules |
| | | | VHF | Very High Frequency |
| SIB/IO | Safety Investigation Board Investigating Officer | | VOIP | Voice Over Internet Protocol |
| | | | UHF | Ultra High Frequency |
| SIB/MDM | Safety Investigation Board Medical Member | | USSOUTHCOM | United States Southern Command |
| SIB/MXM | Safety Investigation Board Maintenance Member | | Z | Zulu |

The above list was compiled from the Summary of Facts, the Statement of Opinion, the Index of Tabs, and Witness Testimony (Tab V).

# SUMMARY OF FACTS

## 1. AUTHORITY AND PURPOSE

### a. Authority

On 11 October 2013, Lieutenant General Lori J. Robinson, Vice Commander, Air Combat Command (ACC), appointed Brigadier General Scott J. Zobrist to conduct an aircraft accident investigation of the 5 October 2013 mishap of a de Havilland DHC-8-202 aircraft, tail number (T/N) N356PH, in the Republic of Colombia (Tab Y-3). On 15 November 2013, the accident investigation board (AIB) convened at Joint Base Langley-Eustis, Virginia. A legal advisor (lieutenant colonel), maintenance member (master sergeant), pilot (lieutenant colonel), flight surgeon (captain), and a recorder (technical sergeant) were also appointed to the board (Tab Y-5). On 25 November 2013, at the invitation of the convening authority, an observer from the Republic of Panama joined the AIB (Tab Y-7). A Federal Aviation Administration (FAA) safety inspector was appointed as a functional area expert to assist the board (Tab Y-9). The AIB was conducted in accordance with Air Force Instruction 51-503, *Aerospace Accident Investigations*.

### b. Purpose

This is a legal investigation convened to inquire into the facts surrounding the aircraft accident, to prepare a publicly-releasable report, and to gather and preserve all available evidence for use in litigation, claims, disciplinary actions, administrative proceedings, and for other purposes.

## 2. ACCIDENT SUMMARY

On 5 October 2013, at approximately 0042 hours local time (L), a de Havilland DHC-8-202 "Prospector" aircraft, T/N N356PH, impacted the terrain in a remote area of the Republic of Colombia, approximately 1 kilometer south of the Panama-Colombia border, while on a routine night counter-narcotics mission (Tabs K-2, Q-5, and S-2 to S-6). The aircraft, operated by Sierra Nevada Corporation (SNC) pursuant to a contract awarded by Air Force Materiel Command (AFMC), was operating in support of United States (US) Southern Command (USSOUTHCOM) (Tabs V-2.15 and V-3.9 to V-3.10). Of the six aircrew members, four were killed on impact and two sustained serious injuries (Tab Q-5). Two of the four fatalities were civilian contractors, one was a member of the US Air National Guard, and the other was a member of Panama's National Air and Navy Service (Tab Q-5). Additionally, the crash destroyed the mishap aircraft (MA) along with $7.2 million in US government equipment on board the aircraft (Tabs Q-5 and DD-17).

## 3. BACKGROUND

The MA was operated by SNC (Tab V-3.4). The mishap crew (MC) was comprised of one SNC employee, three employees of New Frontier Innovations, LLC, (NFI), a US Air National Guard senior noncommissioned officer, and a Panamanian officer in Panama's National Air and Navy

Service (known as SENAN for Servicio Nacional Aeronaval) (Tabs G-3 to G-10, G-12, G-17, G-22, G-23, V-1.2, V-2.3, V-2.15, and DD-45). The mishap flight was flown in support of Joint Interagency Task Force South (JIATF-S) and USSOUTHCOM efforts to detect and monitor maritime drug activity in USSOUTHCOM's area of responsibility (Tab V-3.4). The detection and monitoring capabilities provided by the DHC-8-202 aircraft were contracted by AFMC, Air Force Life Cycle Management Center (AFLCMC), and the 645th Aeronautical Systems Group (645 AESG) (Tabs V-3.3, V-3.4, CC-7, and CC-13). A services contract with the US Air Force required SNC to provide a set amount of maritime surveillance over a designated period of time (Tabs V-3.4 and V-3.10).

### a. Air Combat Command (ACC)

ACC is the primary force provider of combat airpower to America's warfighting commands (Tab CC-3). To support global implementation of national security strategy, ACC operates fighter, bomber, reconnaissance, battle-management, and electronic-combat aircraft (Tab CC-3). It also provides command and control, communications and intelligence systems, and conducts global information operations (Tab CC-3). ACC organizes, trains, equips, and maintains combat-ready forces for rapid deployment and employment while ensuring strategic air defense forces are ready to meet the challenges of peacetime air sovereignty and wartime air defense (Tab CC-3).



### b. Twelfth Air Force (Air Forces Southern) (12 AF (AFSOUTH))

12 AF (AFSOUTH) is located at Davis-Monthan Air Force Base in Tucson, Arizona (Tab CC-29). There are more than 300 uniformed and civilian Airmen assigned to the headquarters, responsible for two equally important missions (Tab CC-29). First, in the traditional numbered air force role as Twelfth Air Force, the organization reports to Air Combat Command to organize, train, and equip US Airmen to be deployed for global military operations (Tab CC-29). Second, in the role of AFSOUTH, the organization serves as the air component to US Southern Command, responsible for providing air and space capabilities in support of US military involvement and partnerships across Central America, South America, and the Caribbean (Tab CC-29).



### c. Air Force Materiel Command (AFMC)

AFMC delivers expeditionary capabilities to the warfighter through development and transition of technology, professional acquisition management, exacting test and evaluation, and sustainment of all US Air Force weapon systems (Tab CC-7). AFMC provides the work force and infrastructure necessary to ensure the United States remains the world's most respected air and space force (Tab CC-7). AFMC fulfills its mission of equipping the US Air Force with the best weapons systems through the Air Force Research Laboratory and several unique centers, which are responsible for the total oversight for aircraft, electronic systems, and missiles and munitions (Tab CC-7).



### d.  Air Force Life Cycle Management Center (AFLCMC)



The AFLCMC, headquartered at Wright-Patterson Air Force Base, Ohio, is one of five centers reporting to AFMC (Tab CC-13).  Led by a 3-star general officer, AFLCMC is charged with life cycle management of US Air Force weapons systems from their inception to retirement.  The AFLCMC mission is to "acquire and support war-winning capabilities" (Tab CC-13).

### e.  645th Aeronautical Systems Group (645 AESG)



The 645 AESG, a unit subordinate to AFLCMC, provides management, direction, and control of the acquisition, modification, and logistics support for special purpose weapons systems and oversees the testing and fielding of new weapons systems, sensors, and platforms (Tabs CC-14 and CC-17).

### f.  United States Southern Command (USSOUTHCOM)



USSOUTHCOM is a joint military command supporting US national security objectives throughout the Western Hemisphere in cooperation with domestic and international partners, in order to foster security, ensure stability, and promote prosperity throughout Central and South America, the Caribbean, and the global community (Tab CC-21).  A primary focus of USSOUTHCOM's countering transnational organized crime (CTOC) efforts is supporting the interdiction of drug trafficking (Tab CC-19).  USSOUTHCOM collaborates with other agencies and nations to support CTOC efforts through detection and monitoring, information sharing, and partner-nation capacity building (Tab CC-19).

### g.  Joint Interagency Task Force South (JIATF-S)



JIATF-S is the national task force that serves as the catalyst for integrated and synchronized interagency counter-illicit trafficking operations, and is responsible for the detection and monitoring of suspect air and maritime drug activity in the Caribbean Sea, Gulf of Mexico, and the eastern Pacific (Tab CC-20).  JIATF-S also collects, processes, and disseminates counter-drug information for interagency and partner-nation operations (Tab CC-20).  JIATF-S's goal is to eliminate the primary flow of illicit drugs in and through its operating area (Tab CC-23).

### h.  Sierra Nevada Corporation (SNC)



SNC is a Nevada-based privately held company, which markets intelligence, surveillance, and reconnaissance (ISR) resources and capabilities (Tab CC-25).  With a workforce of more than 2,600 people, the company's services include aircraft systems design, modification, integration, test, and certification.  Additionally, the company sells ground and flight training, and logistics support (Tab CC-25).

### i. New Frontier Innovations, LLC (NFI)

NFI is a Virginia-based company with offices in Denver and Houston (Tab CC-27). Established in 2009, NFI specializes in engineering technology, training, and development of aircraft and space vehicles using advanced materials and proprietary techniques (Tab CC-27). NFI is exclusively staffed to supply customers with diverse intelligence and engineering experience, spanning the full spectrum of commercial, defense, federal, and other government agencies (Tab CC-27).

### j. de Havilland DHC-8-202 "Prospector"

The "Prospector" is a modified de Havilland DHC-8 Model 202 (DHC-8-202) transport aircraft used for detection and monitoring of illicit maritime drug trafficking (Tabs V-3.25 to V-3.26, DD-3, and DD-57). SNC modified three DHC-8 aircraft to the Prospector configuration and operated them in support of USSOUTHCOM under a services contract with the US Air Force (Tabs V-3.21, V-3.26, V-26.4, and DD-63). The Prospector is considered to be "contractor owned, contractor operated" because the aircraft are owned and operated by a contractor (Tabs V-3.21 and V-26.4). The only US government-owned equipment onboard Prospector aircraft are the mission systems unique to the Prospector aircraft (e.g. surveillance radar, electro-optical/infrared (EO/IR) camera, mission computer systems, satellite communications gear, etc.) (Tab V-3.28). The DHC-8-202 aircraft is a high-wing, T-Tail monoplane equipped with fully retractable, tricycle landing gear and is powered by two Pratt & Whitney, PW-123D, turboprop engines (Tabs D-2, DD-3, and DD-63). Prospector aircraft provide manned detection and monitoring capabilities directly to JIATF-S (Tabs V-3.5 to V-3.7). The Prospector is a complete collection, processing, analysis, and dissemination system (Tab DD-57). A fully operational Prospector system consists of a modified DHC-8-202 aircraft with sensors, line-of-sight and satellite communication data links, and a robust communications suite (Tab DD-57).



Figure 1. The Mishap Aircraft - de Havilland DHC-8-202 "Prospector" (Tab Z-11)

### k. Crew Positions

The Prospector is a unique configuration of DHC-8 aircraft designed by SNC specifically for counter-narcotics detection and monitoring missions (Tab V-3.4). Only three Prospector aircraft

have been built and Prospectors have been flying operational missions since June 2013 (Tabs V-3.26 and DD-13). According to witness testimony, no official descriptions existed for the unique crew positions in the Prospector aircraft (Tabs V-17.8 to V-17.10). There are three categories of crew positions in the Prospector: <u>pilots</u> (left seat pilot and right seat pilot); <u>mission systems operators</u>, or MSOs (mission commander and mission systems operator); and <u>host nation liaison</u> (host nation rider and host nation rider escort) (Tabs V-3.7 and V-3.13). Since no official responsibilities for the positions existed, responsibilities actually changed from flight to flight depending on the individual filling the specific position (Tabs V-17.8 to V-17.10). For example, the forward operating location (FOL) had four primary pilots who formed two pilot teams that rarely changed, enabling each pilot to be very familiar flying with the other pilot on his team (Tabs DD-13 to DD-14). However, each team had different operating techniques and procedures (Tabs V-17.8 to V-17.10). Testimony revealed that one pilot team executed terrain avoidance responsibilities themselves by actively using navigation aids in the cockpit to maintain positional awareness and ensure terrain clearance, while the other pilot team (the team MP2 was on) habitually delegated terrain avoidance responsibilities to the MSOs (Tabs V-17.8 to V-17.10). The inconsistent roles and responsibilities caused frustration among the MSOs (Tabs V-17.9 to V-17.10). On the day of the mishap, MP1 was a back-up pilot filling in, as he was not a part of the two primary pilot teams (Tabs DD-13 to DD-14).

While official descriptions for Prospector crew positions were never established, a general description of each position is summarized below, according to witness testimony of Prospector aircrew members (Tabs V-17.8 to V-17.10).

### (1) Pilots:

There are two pilot positions in the Prospector. The <u>left seat pilot</u> is the second in command (SIC) and is responsible for flying the aircraft (Tabs V-18.5 to V-18.6). The <u>right seat pilot</u> is the pilot in command (PIC) and is responsible for coordinating with air traffic control and the MSOs, and for configuring the mission monitor located on the right side of the cockpit (Tabs V-18.5 to V-18.6). The mission monitor, visible to the right seat pilot, displays either a moving map depicting aircraft location or a video image captured by the Prospector's EO/IR camera (Tab V-2.39). According to Federal Aviation Regulations (FAR) Part 91.3, the PIC is "directly responsible for, and is the final authority as to, the operation of that aircraft" (Tab BB-17). Additionally, FAR Part 91.13 states, "No person may operate an aircraft in a careless or reckless manner so as to endanger the life or property of another" (Tab BB-18). FAR Part 91 places the ultimate responsibility for safety of an aircraft and its crew on the PIC of that aircraft (Tab BB-18).



Figure 2.  DHC-8 Cockpit (Tab Z-3)

### (2)  Mission Commander:

The <u>mission commander</u> is an MSO who is primarily responsible for coordination with outside agencies, to include sending mission reports and interfacing with JIATF-S via chat (text message communication in real-time) and radio (Tab V-19.3).  The mission commander can also provide headings to the pilots for navigation purposes (Tab V-18.6).  The mission commander performs his duties from either side-facing seat depicted in Figure 3 (Tab V-13.5).

### (3) Mission Systems Operator:

The <u>mission systems operator</u> is an MSO who primarily operates the EO/IR camera and the search radar to locate and track vessels (Tabs V-19.3 to V-19.4).  Like the mission commander, the mission systems operator can also provide headings to the pilots for navigation purposes as the task of providing headings to the pilots was considered to be interchangeable between the two MSO positions (Tab V-18.6).  The mission systems operator performs his duties from either side-facing seat depicted in Figure 3 (Tab V-13.5).

### (4) Host Nation Rider:

The <u>host nation rider</u> is a member of Panama's security forces (Tab DD-10).  Serving as a representative of the host country, he observes operations and liaises with Panamanian law enforcement and military agencies (Tabs DD-10 and DD-11).  The host nation rider performs his duties from any of the forward-facing seats depicted in Figure 3 (Tab V-12.4).

**(5) Host Nation Rider Escort:**

The host nation rider escort is primarily responsible for working with the host nation rider and acting as a liaison for the aircrew (Tab V-14.3). Additionally, he interprets and relays information to local law enforcement agencies (Tabs V-12.3 and V-14.3 to V-14.4). The host nation rider escort performs his duties from any of the forward-facing seats depicted in Figure 3 (Tab V-12.4)



Figure 3. Diagram of Prospector Cabin (Tab Z-5)

**l. Avionics**

**(1) Enhanced Ground Proximity Warning System (EGPWS)**

The MA was equipped with an Enhanced Ground Proximity Warning System (EGPWS), which helps prevent controlled flight into terrain or severe wind shear accidents (Tab DD-50). The system uses a global database and inputs from a number of aircraft systems to include radio altimeter and Global Positioning System (GPS), among others (Tab DD-51). The system monitors aircraft position and provides a timely warning to aircrews of pending terrain impact (Tab DD-51). The EGPWS has six different alert modes, which are depicted in Figure 4 (Tab DD-52).



Figure 4.  Ground Proximity Warning Modes (Tab DD-52)

Mode 2 is the primary mode relevant to this mishap.  Mode 2 warns of excessive terrain closure rate, i.e. the rate at which an aircraft is flying towards the ground (Tab DD-53).  Figure 5 depicts a notional excessive terrain closure rate scenario and the Mode 2 warning function (Tab DD-53).



Figure 5.  Excessive Terrain Closure Rate Warning (Tab DD-53)

It is not necessary for the aircraft to be descending in order to produce a Mode 2 alert; level flight (or even a climb) toward obstructing terrain can result in hazardous terrain closure rate (Tabs DD-50 to DD-53). On the mishap flight, the MA's EGPWS was disabled and not functioning, meaning the EGPWS was not available to provide safety warnings (Tabs U-15 and V-1.31). The system had been deactivated by maintenance personnel three days before the mishap because it had been malfunctioning and giving pilots erroneous warnings (Tabs U-15 and V-1.31).

### (2) Radio Altimeter

The MA was equipped with a radio altimeter, which provides a measurement of aircraft altitude above the terrain with a 0 to 2,500 foot operating range (Tab DD-61). Radio altitude information is displayed on the attitude director indicator, which is a visual display of the aircraft attitude in reference to the horizon located in front of both pilots (Tab DD-63). The radio altitude is used by the flight guidance computers, air data computers, and flight data recorder (Tab DD-61).

### (3) Color Weather Radar

The MA was equipped with a color weather radar system (Tab V-1.49). This weather radar, operated by the pilots, is primarily used to detect hazardous weather conditions at night and while in weather conditions that restrict pilot visibility (e.g. when in clouds) (Tabs V-1.47, V-17.8, and V-17.16). Additionally, the weather radar can be used as a tool to display an aircraft's position relative to terrain features such as a coastline (Tab V-17.8).

### (4) External Sensors

The MA was equipped with two main external sensors and a software suite to integrate and display sensor information described below (Tabs V-3.26, V-26.4, and DD-57). The sensors and software together gave the MA the ability to detect and monitor maritime targets (Tabs V-3.7, V-3.26, V-26.4, and DD-57). Either the mission commander or the MSO could operate this equipment (Tab V-13.5).

Electro-optical/Infrared (EO/IR) sensor: The MA was equipped with a MX-15HDi model EO/IR turret that consists of a high-definition camera and infrared imager (Tabs V-3.7 and DD-17 to DD-18). The system also has video and Ethernet interface capabilities (Tabs DD-17 and DD-18). This camera's image is available on the cockpit mission monitor (Tab V-2.39).

Radar: The MA was equipped with a SELEX SeaSpray 7300 surveillance radar that was used by the MSOs to scan the surface of the water and track vessels (Tabs V-3.7 and N-7). The radar has multiple modes to include maritime detection and monitoring, imaging, moving target indication, as well as a search and rescue transponder used for tracking surface vessels (Tab DD-19).

Prospector Mission Software: The sensors are managed through the Prospector's mission software suite, which was designed to support Sierra Nevada Corporation ISR platforms (Tabs V-3.7 and DD-57). The software permits operation of the onboard sensors and supports the sharing of information (Tabs V-3.7 and DD-57). It includes a map display to show aircraft position, which is also available on the cockpit mission monitor visible to the right seat pilot

(Tab V-1.10). This system archives mission data in a time-indexed format to support live and post-mission digital video recorder playback and analysis (Tab DD-57).

## 4. SEQUENCE OF EVENTS

### a. Mission

The MA, call sign Bat 02, had been tasked by JIATF-S to execute nighttime detection and monitoring operations in the Caribbean Sea off the coast of Panama and Colombia (V-2.35). The MA was to depart their FOL in Panama at 2300L, fly to the tasked area of operations, provide routine detection and monitoring support, and return to the FOL after a mission of approximately 7.5 hours duration (Tab K-2). This mission, like over 80 similar Prospector missions before it, was to be conducted at night (Tab DD-41).

### b. Planning

Although normally a back-up pilot and primarily focused on FOL management, MP1 was available to fly the mishap mission because another recently arrived SNC manager took over some of MP1's ground responsibilities, giving MP1 more time to fly (Tabs V-1.8 to V-1.9, V-2.11 and V-15.13). While FAA-qualified in the DHC-8-202 aircraft, MP1 had not previously piloted an operational Prospector mission (Tabs T-4, V-1.8 to V-1.9, and V-2.11). The MC arrived at the FOL for the pre-mission briefing approximately 1.5 hours prior to their scheduled takeoff (Tab V-1.37). As per local procedures, the mishap pilots (MP1 and MP2) reported to base operations in the airport administrative office and accomplished their portion of mission planning (Tabs V-1.36 and V-2.32 to V-2.33).

The MC followed the normal planning cycle, which began with the mishap pilots reviewing the current weather report, Notices to Airmen (NOTAMs), aircrew qualification status, and other individual mission tasks (Tabs V-2.32 and V-2.33). While the mishap pilots were doing this, the rest of the MC reported to the MA to start equipment preflight checklists (Tabs V-1.37 to V-1.38). Upon arriving at the MA, the mishap mission commander (MMC) received the mission operating area, communications plan, and other specific details pertinent to their mission from JIATF-S (Tab V-1.38). The MC completed these tasks without incident (Tabs V-1.40 and V-2.33 to V-2.35).

The MC followed the normal preflight briefing format, which consisted of a review of the following: intelligence report, weather, mission operating area, altitude, fuel required, aircraft forms, and other specific details pertinent to their mission (Tabs V-1.38 and V-2.33). The MC briefed together as a crew at the MA in accordance with their standard practice (Tab V-2.33).

Although mission planning and briefing may have been adequate under normal circumstances, the mishap flight preflight briefing failed to account for the disabled EGPWS (Tabs U-15 and V-2.31). In certain circumstances, FAA rules permit DHC-8-202 aircraft with an inoperative EGPWS to fly if "alternate procedures are established and used" to compensate for the inoperative EGWPS (DD-26 to DD-27). Details of these rules are discussed later in the report.

However, required alternate procedures were not established or discussed by the MC, other than MP2 stating they needed to "stay off of the land" (Tab V-2.31).

### c. Preflight

Preflight operations were normal in accordance with checklist procedures, with the exception of the EGPWS ground test (Tab V-1.40). This checklist item was omitted by the mishap pilots because maintenance personnel had disabled the system in accordance with the DHC-8-202 minimum equipment list (MEL) by pulling both system circuit breakers to prevent erroneous warnings (Tabs U-15, V-1.31, V-2.27, and V-17.23 to V-17.24). The MA maintenance forms reflected a number of false "BANK ANGLE" and "TOO LOW, GEAR" warnings on previous flights (Tabs U-10, U-15, U-26, and U-27). Engine start and other required checklist items were accomplished prior to taxi with no mission impact (Tab V-1.40).

### d. Summary of Accident

The MA departed the FOL at approximately 2245L via a standard departure route to the east (Tabs V-1.40 and DD-69). The MA climbed to a cruising altitude of approximately 14,000 feet above mean sea level (MSL) and proceeded to the mission area (Tabs V-2.35 and DD-69).

While en route, the MC informed air traffic control (ATC) they would be proceeding under "Due Regard"[1] rules and descended to approximately 4,000 feet MSL (Tabs V-2.35 and DD-70). In order to get below a low cloud ceiling, the MA further descended to an altitude of 1,500 feet MSL over the water and set up a search orbit (Tabs V-1.56 and DD-70). Since all Prospector missions were conducted at night, operational and safety considerations required the aircraft to remain over water due to terrain elevation in the area (Tab V-2.31). Prospector cockpit lighting was not compatible with night vision goggles (NVGs), and pilots did not have NVGs issued to them (Tab V-16.19). Additionally, positional awareness was important because overflight of other nations' territorial waters (TTW) required advance approval (Tabs V-1.56, V-1.64, V-6.13, and DD-15).

The MC began searching for vessels suspected of carrying illegal narcotics and established contact with a Colombian Navy (COLNAV) counter-drug vessel after the MC detected a vessel suspected of transporting illegal narcotics (Tabs N-2, N-5, and N-7). While tracking the suspect vessel, the MA unintentionally crossed the shoreline and overflew Panamanian terrain in the first of what would be two inadvertent land incursions (Tabs N-3 and EE-7 to EE-10). The next few sections address the conversations of the MC captured on the cockpit voice recorder (CVR) during this phase of flight (Tabs N-2 to N-16).

---

[1] Prospector missions typically proceeded under "Due Regard" due to operational reasons (Tabs V-1.37 and V-2.35). There are certain operational situations that do not lend themselves to International Civil Aviation Organization (ICAO) flight procedures such as: military contingencies; classified missions; politically sensitive missions; or routine aircraft carrier operations or other training activities (Tab BB-7). Operations not conducted under ICAO flight procedures are conducted under the "Due Regard" or "operational" label (Tab BB-7). Essentially, flight under the "Due Regard" or "operational" options obligates aircraft commanders to be their own air traffic control agency and to separate their aircraft from all other air traffic (Tab BB-7). This is normally done outside ATC-controlled airspace (Tab BB-7).

**First Land Incursion**

This first unintentional land overflight began at 00:18:05L, approximately 24 minutes and 42 seconds before the impact (Tabs N-3 to N-5, and DD-70). Seven seconds after the MA first crossed over the shoreline, the mishap mission systems operator (MMSO) called, "Right, zero-two-zero," meaning "turn right to a heading of zero-two-zero degrees," which was acknowledged by MP1 (Tab N-3).[2] The 020 degree heading given by the MMSO redirected the MA back to a course over water (Tab EE-7). The flight data recorder (FDR) shows the MA initiated a right turn eight seconds after MP1 confirmed the 020 degree heading (Tab DD-70). Approximately 46 seconds after the MA crossed over the coastline and was still over land, MP2 asked, "What's our terrain clearance here?" MP1 then asked, "You guys got us over land?" (Tab N-3). At this point, the MA was already midway through its turn back toward water (Tabs N-3 to N-4, and EE-7).

MP1 then said, "I'm showing us at 400 feet" (Tab N-3). As MP1 made this statement, the FDR indicated the MA's radio altimeter showed an altitude of 426 feet above ground level (AGL) (Tab DD-70). This correlates with the peak of a 1,014 foot (309 meter) hill directly below their flight path; however, the MA did not climb (Tabs EE-7 and DD-70). MP2 then asked the MMC and MMSO, "Hey, uh, guys, hello? You guys got us over land, what's our terrain here? Sea level…" (Tab N-4).

The MA continued its right turn to a heading of 020 degrees. The MA resumed flight over water after flying over land for approximately one minute and 25 seconds (Tabs DD-70 and EE-7). MP1, MP2, and the MMSO continued their dialogue regarding navigation duties and land avoidance (Tabs N-4 to N-5). Referring to the mission monitor visible to MP2 in the right seat of the cockpit, the MMSO asked, "Is your map going up there?" The MP2 replied, "Yeah" (Tab N-4). During this discussion, MP2 said, "We'll be on video if you guys want to do the map," thereby expressing his expectation for the MMSO to monitor the map and navigate while MP2 viewed the video (Tabs N-4 to N-5). Witness testimony confirmed this expectation (Tabs V-2.37 and V-16.10). The MMSO replied, "I've got ya," but hesitated: "We're trying to coordinate…with other people, so I thought you guys were just gonna…," indicating other tasks would divide his attention from navigation (Tabs N-4 to N-5).

MP1 and MP2 had multiple navigation aids available in the cockpit to use for navigation and terrain avoidance, including: an iPad tablet with GPS map; a moving map generated by Prospector's mission systems displayed to MP2 in the right seat on the mission monitor; a color weather radar display with terrain mapping capability; and, navigation waypoints in the DHC-8-202's navigation system (Tabs V-17.8 to V-17.9, and V-17.12 to V-17.13). During the target-tracking portion of the mishap flight, the mishap pilots delegated the duty of navigation and terrain avoidance to the MMSO and MMC as confirmed in the conversation above (Tabs N-4 to

---

[2] In aviation, an aircraft's heading is measured in degrees clockwise from 0 degrees to 360 degrees using compass convention (0 degrees being north, 90 degrees being east, 180 degrees being south, and 270 degrees being west). Heading is usually expressed in three digits, using preliminary zeros if needed, e.g. 090 degrees (Tabs DD-76 to DD-77).

N-5).  Additionally, the above conversation shows MP1 and MP2 did not clearly communicate their expectation for the MMSO and MMC to execute navigation duties (Tabs N-3 to N-5). Neither the MMSO nor the MMC had been trained for "low level terrain navigation" (Tabs V-2.46 to V-2.47).  Accurate navigation was critical because the MA was flying at night and at low altitude, and while the MA was intended to remain over water, there was terrain nearby (Tabs V-1.55 and EE-7 to EE-11).  There was almost no lunar illumination and no notable coastal cultural lighting, so the mishap pilots had no outside visual references to the terrain (Tabs F-2, F-3, V-2.57, V-16.15, V-16.19, V-16.24, W-3, and W-5).

Figure 6 depicts the ground track of the MA's position during this phase of flight and includes an excerpt from the CVR correlated to the MA's position (Tab EE-7).

**1** [00:18:11L]   MMSO: RIGHT, ZERO-TWO-ZERO.
[00:18:13L]   MP1: Uh, zero-two-zero.
[00:18:17L]   MMC: When you have a second, I've got a request.
[00:18:26L]   MMC: Ok, no problema.
**2** [00:18:50L]   MP1: What's our terrain clearance here?
[00:18:57L]   MP2: You guys got us over land?
[00:18:58L]   MP1: Yeah, what's our terrain here?
[00:19:00L]   MP2: Yeah, hey...
**3** [00:19:01L]   MP1: I'm showing us at four hundred feet.
[00:19:04L]   MP2: Hey, uh, guys, hello? You guys got us over land, what's our terrain here? Sea level...
**4** [00:19:19L]   MMSO: Is your map going up there?
[00:19:21L]   MP2: Yeah.
[00:19:22L]   MMC: The, the highest in the quadrant is uh, seven, uh...seven-one.
[00:19:26L]   MP2: Okay, we don't have any quadrant up here to tell us, so that's why we're just checking with ya...
[00:19:29L]   MMC: Oh, okay.
[00:19:31L]   MP2: Seven-hundred?
[00:19:36L]   MMC: It says, seven-one, what does that...I don't know.
[00:19:39L]   MP2: Uh...
**5** [00:19:40L]   MP1: Seven-thousand, one-hundred feet.
[00:19:42L]   MP2: Seven-*thousand*, one hundred feet, yeah, that's higher than us.
[00:19:49L]   MP1: ...watching our radar altimeter tick down pretty quick there for a moment.
[00:19:53L]   MP2: Ha, uh, ha...yeah that's uh..
[00:19:55L]   MP1: Yeah.
**6** [00:19:57L]   MMSO: Alright, cool, yeah, sorry about that, are you guys going to be on map or on video, because, if that's the case, I'm...
**7** [00:20:03L]   MP2: Well, we'll be on video if you guys want to do the map, but we gotta...we can't go over land...
[00:20:08L]   MMSO: I've got ya, I'm just saying, 'cause we're trying to coordinate...
[00:20:09L]   MP2: Not a problem...
**8** [00:20:10L]   MMSO: ...with other people, so I thought you guys were just gonna...let's just do a track two-zero-zero to zero-two-zero, just back and forth. Let's go uh, let's continue zero-two-zero for about...three minutes and then right turn to two-zero-zero for three minutes and just keep doing that.
[00:20:29L]   MP2: Okay...
[00:20:29L]   MP1: Copy that.
[00:20:30L]   MP2: Zero-two-zero for three minutes and then what was the next one?
[00:20:34L]   MMSO: Two-zero-zero.
[00:20:35L]   MP1: Two-zero-zero...
[00:20:36L]   MP2: Two-zero-zero.
[00:20:37L]   MP1: One-eighty, yeah.
**9** [00:20:38L]   MP2: Okay. One-eighty. Alright, roger that. And you've got the time started?
[00:20:40L]   MP1: Yeah.



Figure 6.  First Land Incursion (Tab EE-7)

**Overwater Navigation Confusion**

After the first land incursion, the MA returned to overwater flight and remained over water for the next 21 minutes while continuing to work with the COLNAV to direct the interdiction of a suspected drug trafficking vessel (Tabs N-5 to N-8, and DD-70). During this phase of flight, the MMSO formulated a plan to fly for three minutes away from land on a heading of 020 degrees and for three minutes back toward land on a heading of 200 degrees, and they did this for the next seven minutes (Tabs N-5 to N-8, and EE-8). At approximately 00:27:00L, the CVR recorded the MMSO altering their plan, deciding to fly for three minutes away from land on a heading of 020 degrees and for two minutes back towards land on a heading of 200 degrees (Tab N-8). The suspect vessel they were monitoring was maneuvering and the MC realized they had the possibility of entering Colombian TTW airspace; therefore, the MC coordinated with JIATF-S for permission to operate in the airspace above Colombian waters (Tabs N-13, V-1.64 to V-1.65, and V-2.35 to V-2.36). Colombian authorities approved the TTW request (Tab DD-15).

Inconsistent verbal communications resulted in pilot navigational confusion on multiple occasions during this phase of flight, as the mishap pilots depended on MMSO and MMC navigational directions (Tabs N-9 and N-11, V-2.37 to V-2.39, and V-2.47 to V-2.48). At 00:27:57L, approximately 13 minutes and 50 seconds before impact, the MMC issued a command with no specified recipient: "Right turn to two-zero-zero" (Tab N-9). MP1 replied, "Copy that. Well we're doing... okay, copy." MP1 hesitated before initiating a turn to the 200 degree heading given by the MMC. The 200 degree heading did not follow the plan they agreed upon approximately eight minutes prior, which entailed flying set time intervals back and forth along opposite headings to avoid the terrain (Tab N-5). MP2 spoke up to clarify the new heading: "So, do you guys want us to go into an orbit around him now?" The MMSO replied, "Oh, no, no, no, no" (Tab N-9). By saying this, the MMSO negated the MMC's issued heading of "right 200 degrees." This interaction demonstrates contradictory flight headings given by the MMSO and MMC. The FDR showed the mishap pilots did not turn to the MMC's issued 200 degree heading at that time; rather, the MA maintained its heading of 180 degrees for the next 2 minutes and 30 seconds (Tabs N-9, DD-70, and EE-8).

Witness testimony revealed Prospector MSO training did not include instruction on aircrew terminology and commands (Tabs V-20.10 to V-20.11, and V-20.24 to V-20.25). Witnesses testified the primary means of identifying commands among the six aircrew members in the Prospector aircraft was voice recognition, and, as evidenced by the conversation in the paragraph above, the MC did not use standard command prefaces for aircrew communication to identify intended recipients of messages passed on the intercom (Tabs V-1.45 and V-19.14).

Figure 7 depicts the ground track of the MA's position during this phase of flight and includes an excerpt from the CVR correlated to the MA's position (Tab EE-8).

[00:28:57L]  MMC: Right turn to two-zero-zero.

[00:28:59L]  MP1: Copy that. Well we're doing…okay, copy.

[00:29:03L]  MP2: So, do you guys want us to go into an orbit around him now?
[00:29:05L]  MMSO: Oh, no, no, no, no.
[00:29:06L]  MP1: No, no, we're just…back and forth.

[00:29:09L]  MMC: Yeah, we can't orbit him at all at this point.
[00:29:13L]  MMSO: Yeah, he's pretty much crossing over.
[00:29:18L]  MP2: …mind my own business. (laughter) I'm trying to catch up, you know, but I forgot the, you know, the two minute rule.
[00:29:27L]  MMSO: Yeah.



Figure 7.  Overwater Navigation Confusion (Tab EE-8)

**Flight Toward Second Land Incursion**

At approximately 00:34:15L, 8 minutes and 32 seconds prior to impact, as the MC monitored the suspect drug trafficking vessel, the MMC issued a heading to the mishap pilots, referring to them as "flight": "And flight, how about uh, how about a one-four-zero heading" (Tab N-11). MP1 replied, "One-four-zero" (Tab N-11). A few seconds later the MMSO said, "No, no…" (Tab N-11). MP1 then attempted to confirm that the MMC heading of 140 degrees was not intended for the mishap pilots: "…that's not for us?" (Tab N-11). The MMSO gave a new heading, starting in Spanish but finishing in English: "Tres, three-six-zero, three-six-zero" (Tab N-11). The MSOs sometimes used Spanish to communicate with surface forces directly (Tab V-14.16). However, the MMSO did not specify for whom this heading was intended (Tab N-11). MP1 replied, "Three-six-zero, copy" (Tab N-11), indicating MP1 understood the 360 degree heading given by the MMSO was intended for the pilots. FDR evidence shows that the MA began a left turn toward a heading of 360 degrees at that time (Tabs DD-70 to DD-71, and EE-9). The MA completed the turn and established a 360 degree heading approximately 1 minute and 20 seconds after initiating the turn (Tab DD-71).

Figure 8 depicts the ground track of the MA's position during this phase of flight and includes an excerpt from the CVR correlated to the MA's position (Tab EE-9).

**1** [00:34:12L] MP1: …heading for us, or…?

**2** [00:34:17L] MMC: Alright, this guy's going evasive too, hang on a second. And flight, how about uh, how about a one-four-zero heading.

[00:34:30L] MP1: One-four-zero?

**3** [00:34:37L] MMSO: No, no…

[00:34:38L] MP1: …that's not for us?

**4** [00:34:39L] MMSO: …tres, three-six-zero, three-zix-zero.

[00:34:42L] MP1: Three-six-zero. Copy.

[00:34:53L] MMSO: Zero-eight-forty-one, zero-seven-seven, what?

[00:34:57L] MHRNE: Two-zero.

[00:35:00L] MMSO: Two-zero. Ah, correction, you said three-zero-six.

[00:35:03L] MHRNE: Oh, my bad.

[00:35:12L] MMSO: Actually, tell them, uh, three-four-five, for…three miles.

[00:35:22L] MHRNE: I'm sorry [MMSO], three-four-five?

[00:35:25L] MMSO: Yeah…I know it's a lot of static. Three-four-five for, uh, four miles.

[00:35:31L] MHRNE: Copy that.

[00:35:32L] MMSO: I see him…shit, I can't hear. I can see him, I've got him on radar, he is, uh, he's three miles away on a three-four-five. Oh yeah, got him coach. This is what I'm talking about [MMC], you know, this is what we've needed this whole time.

[00:36:03L] MMSO: Oh, no, no, no.

**5** [00:36:05L] MMC: Hey, guys, I needed a southeast turn, right now about one-five-zero.

[00:36:11L] MMSO: I've got an intercept, I've got both of them.

**6** [00:36:20L] MMC: Hey flight, I don't know why you didn't take the, uh, one-four-zero heading, I need about one-six-zero now.

[00:36:25L] MP1: One-six-zero.

[00:36:26L] MMC: Yeah, thanks.

[00:36:27L] MMSO: Uh, I've got him, hold on, stand by.

[00:36:29L] MHRNE: Standing by.

[00:36:31L] MMSO: Uhh, I've got him on radar. Tell him, uh, come right, three-five-zero, two miles. I've got him on uh camera.

[00:36:49L] MMSO: Yep, got him.

**7** [00:37:09L] MMSO: Alright, come in to uh, two-zero-zero.

[00:37:12L] MP1: Two-zero-zero.

[00:37:15L] MMSO: Yep.



Figure 8.  Flight Toward Second Land Incursion (Tab EE-9)

At approximately 00:36:05L, 12 seconds after the MA began flying straight on the new heading of 360 degrees, the MMC issued another heading: "Hey, guys, I needed a southeast turn, right now about one-five-zero" (Tab N-12). The MMC did not include a specific command preface to his heading. The 150 degree heading given by the MMC would have put the MA on a course parallel to the coastline (Tab EE-9). The mishap pilots did not verbally respond to this heading and FDR evidence showed the MA continued on its 360 degree heading without changing to 150 degrees, indicating the mishap pilots either did not hear the heading given by the MMC or they did not understand that the heading was intended for them (Tabs N-12, DD-71, and EE-9).

Approximately 15 seconds later, the MMC used the phrase "flight" again to speak to the mishap pilots: "Hey flight, I don't know why you didn't take the, uh, one-four-zero heading, I need about one-six-zero now" (Tab N-12). The MMC's statement referenced the headings he gave previously and questioned why these headings were not being followed (Tabs N-11 to N-12). MP1 responded, "One-six-zero" (Tab N-12). FDR evidence shows that the MA initiated a right turn at that time, approximately 6 minutes and 20 seconds prior to impact, indicating MP1 understood the 160 degree heading was intended for MP1 and MP2 (Tabs DD-71 and EE-9). However, approximately 44 seconds later, and before the MA could roll out to the 160 degree heading, the MMSO contradicted the MMC and issued a new heading (Tab N-13). Without specifying for whom the command was intended, the MMSO said, "Alright, come in to uh, two-zero-zero." MP1 responded, "Two-zero-zero" (Tab N-13). The FDR shows the MA rolled out of its turn on a heading of 200 degrees 28 seconds after MP1 acknowledged the MMSO's command (Tab DD-71). The 200 degree heading placed the MA on a course toward land (Tabs N-13, DD-71, and EE-9). However, neither MP1 nor MP2 questioned or commented about their course, and in testimony, they reported not knowing they were flying toward land (Tabs N-12 to N-13, V-1.60, and V-2.50).

The MA maintained a heading of 200 degrees for the next 4 minutes and 30 seconds (Tabs N-13, DD-71, and EE-10) while at an altitude of approximately 1,500 feet MSL and an airspeed between approximately 120 knots calibrated airspeed (KCAS) and 135 KCAS (Tabs V-1.55 and DD-71). Flying the MA for approximately 4 minutes and 30 seconds on any one heading was in direct contradiction with the MC's most recent plan, which was to fly three minutes away from land and two minutes back towards land (Tab N-8).

The preceding series of contradicting and overriding commands between the MMSO, MMC, MP1, and MP2, which led up to the 200 degree heading, illustrates the confusion caused by unclear verbal communication used by the MC (Tabs N-12 to N-13). Additionally, the multiple headings given and flown in this interaction were not consistent with the orbital flight plan upon which the MC previously agreed, and there is no evidence to show the MC attempted to return to the agreed upon orbital flight pattern (Tabs N-4 to N-16, and EE-10). While MP1 and MP2 agreed to the MMSO's navigational plan, the plan failed to clearly assign navigation duties to a specific aircrew member; rather, it established a time-dependent, orbital flight pattern based on two opposite headings (Tab N-5). Throughout the flight, the MMSO made no comment indicating he understood that MP1 and MP2 intended for him to be the primary navigator (Tab N). The MMSO even attempted to clarify responsibilities during the conversation following the first land incursion when MP2 said, "We'll be on video if you guys want to do the map" (Tabs N-4 to N-5). The MMSO replied, "I've got ya, I'm just saying, 'cause we're trying to

coordinate…with other people, so I thought you guys were just gonna..." (Tabs N-4 to N-5). This exchange demonstrated there was still no clear understanding on any aircrew member's part as to who would assume responsibility as the primary navigator; therefore, navigation duties remained unassigned (Tabs N-4 to N-5). Yet, during the investigation, MP2 testified to his expectation for the MSOs to perform navigation and terrain avoidance duties stating, "we're following their vectors and their instructions and complying to those" (Tab V-2.48).

In the final 5 minutes of flight, the MMSO was intensely occupied with the complex process of target tracking and vectoring intercepting COLNAV surface vessels (Tabs N-10 to N-15). This process involved using the intercom to pass moment-by-moment headings to the mishap host nation rider escort (MHNRE) for him to relay to the COLNAV forces, while simultaneously monitoring and manipulating the EO/IR sensor and radar (Tabs N-13 to N-14, V-1.64, V-1.66, V-19.3, and V-19.14 to V-19.15). It was in this context that the mishap pilots expected the MMSO to serve as the primary aircraft navigator for terrain avoidance (Tabs N-4 to N-5, V-1.55, and V-2.37). Witnesses reported MP2 typically preferred the MSO to give many or "all" navigational headings to the pilots, citing MP2's aversion to some of the electronic equipment available to him and systematic technical difficulties with the equipment (Tabs V-1.14, V-1.47, V-2.40 to V-2.42, V-2.44, V-16.12, V-17.7, and V-17.8). The practice of delegating navigation and terrain avoidance duties to the MSOs was common for MP2 during the detection and monitoring segments of previous flights (Tabs V-2.38, V-2.48, V-15.7, V-15.9 to V-15.10, V-16.10, and V-19.11). MP2 delegated these responsibilities despite knowing the MMC and MMSO had not been trained for "low level terrain navigation" (Tabs V-2.46 to V-2.47). According to FAA rules, the PIC (MP2) is ultimately responsible for the safe conduct of the aircraft operations (Tab BB-17). However, MP2 still delegated navigation and terrain avoidance responsibilities to the MSOs, testifying that the MSOs have "the best information, they know what they need to do" and that he attempted to "back them up" in their navigation duties (Tabs V-2.38, V-2.48, V-15.7, V-15.9 to V-15.10, V-16.10, and V-19.11).

The mishap pilots' intention for the MSOs to fulfill primary navigation and terrain avoidance duties added yet another responsibility to a busy MSO task list (Tabs V-16.11, V-17.9 to V-17.10, V-19.7 to V-19.8, and V-19.10 to V-19.11). During the course of a typical Prospector flight, MSOs manipulate the EO/IR sensor and radar, detect and monitor targets, determine and communicate intercept headings to surface forces through the host nation rider/host nation rider escort, relay flight headings to the pilots to assist in target tracking, and coordinate with command and control elements through multiple communication channels (Tabs V-2.36 to V-2.38, V-14.7, V-16.5 to V-16.6, V-16.11, V-17.9 to V-17.10, V-18.6, V-19.3 to V-19.4, and V-19.7). MSOs and pilots testified that the responsibility of aircraft navigation made the MSO job busy and increased MSO workload to a "somewhat overwhelming" level (Tabs V-16.11, V-17.9 to V-17.10, V-19.7 to V-19.8, and V-19.10). However, witness testimony indicated this was an accepted inflight practice at the FOL (Tabs V-2.38 to V-2.39, and V-16.11 to V-16.12). Witnesses were unaware of any contractor-provided guidance or standards delineating inflight navigation duties amongst the Prospector aircrew members (Tabs V-19.16, V-20.8, and V-20.16). As a result, two divergent methods of dividing inflight responsibilities developed, which depended on pilot preference. MP2's pilot team relied on the MSOs to execute navigation and terrain avoidance duties, while the other Prospector pilot team retained those critical duties themselves (Tabs V-2.37 to V-2.39, V-17.7, and V-18.6). MSOs alternated flying with both

pilot teams and had to adjust their duties accordingly (Tabs DD-13 to DD-14). The inconsistent roles and responsibilities caused frustration among the MSOs (Tabs V-17.9 to V-17.10).

**Second Land Incursion and Impact**

After giving the mishap pilots the 200 degree heading toward land at 00:37:09L, approximately 5 minutes and 38 seconds prior to impact, the MMSO did not communicate further directions to the mishap pilots for another 4 minutes and 21 seconds (Tab EE-10). During this time, the MMSO and MMC were in nearly constant communication with the MHNRE on the intercom, giving the MHNRE recommended headings to pass to the COLNAV interceptor vessel for use in the intercept of the suspect drug boat (Tabs N-13 to N-16). All of this communication between the MMSO, MMC, and MHNRE was audible to the pilots on the intercom (Tab V-1.44). However, as with previous headings passed from the MMSO and MMC, command prefaces were rarely used to indicate for whom the heading was intended (Tabs N-13 to N-16).

At approximately 00:40:30L, while still on the 200 degree heading toward land, the MA unintentionally began flying over land for the second time (Tab EE-10). As the MA crossed the coastline, the pilots could not see anything outside the cockpit due to no moonlight, no cultural lighting, and an overcast cloud deck of 1,600 feet MSL (Tabs V-1.56, V-2.71, W-3, and W-5). It is reasonable to assume that had lighting conditions been different (e.g. bright moonlight or daytime), the mishap pilots may have seen the coastline and terrain ahead of them, and used these visual references to remain over water as intended. MP1 testified that, based on previous experience, the night lighting conditions present were not unusual or unexpected given the remote location over which they were flying (Tab V-1.56).

At 00:41:30L, 1 minute and 17 seconds prior to impact, the MMSO began giving the mishap pilots navigation instructions again: "Guys, turn right, right, right, right" (Tab N-14). Four seconds later, the MMSO directed the mishap pilots to a specific heading by using the override function on the intercom, which broadcasts on all intercom channels as well as a speaker in the cockpit: "Guys, right three-six-zero," indicating a desired right turn to a heading of 360 degrees (due north). The MMSO did not specify why he called this new heading (Tabs N-14 to N-15). By that point, the MA had already been flying over land for approximately 55 seconds and was at least two miles inland (Tab EE-10). MP1 and MP2 testified they were uncertain of their location at that time (Tabs N-14 to N-15, V-1.60 to V-1.61, V-2.50 to V-2.51, DD-71 to DD-72, and EE-10). In response to the MMSO's call to turn "right three-six-zero," MP1 began turning the MA to a heading of 360 degrees. Unbeknownst to the MC, this heading resulted in the MA flying in the direction of a hill with an elevation higher than the MA's current altitude (Tabs V-15.6, DD-72, and EE-10).

While the MA was turning right to a 360 degree heading, approximately 30 seconds prior to impact, the CVR captured a command on the intercom from an unknown source: "PULL UP" (Tabs N-15 and V-29.3 to V-29.4). A subject matter expert from de Havilland, the MA manufacturer, analyzed the CVR and FDR data and determined that the unknown "PULL UP" command, which sounded synthetically generated, did not come from the disabled EGPWS system (Tabs V-29.3 to V-29.4). The AIB was unable to determine the source of the "PULL UP" command. However, both MP1 and MP2 testified they did not recall hearing this

command, and the FDR did not show evidence of any notable effort to gain altitude following the command (Tabs V-1.53, V-2.51, and DD-72).

It is unknown if other aircrew members in the MC heard the "PULL UP" command, but at 23 seconds prior to impact, the MMSO said, "Climb," which was not acknowledged by either MP1 or MP2 (Tab N-15).  At 18 seconds prior to impact, the MMSO issued the following command using the override function on the intercom:  "Come up, elevate, elevate up."  However, there was no verbally specified recipient for his command, nor did MP1 or MP2 acknowledge it (Tab N-15).  The FDR did not reveal any actions taken to gain significant altitude at this time (Tab DD-72).  At 12 seconds before impact, the MMSO issued another unspecified command using the override function on the intercom:  "Elevate your speed, er, altitude, altitude" to which MP2 responded, "okay," and MP1 questioned, "Altitude?  Alright." (Tab N-15)  The CVR and FDR indicate that MP1 and MP2 initiated measures to increase altitude eight seconds before impact.  However, these altitude-gaining efforts were too late to avoid the terrain (Tabs N-15, DD-72, and EE-10).

By analyzing the CVR and FDR data, the de Havilland expert determined that had the EGPWS been enabled and operating normally, the system would have generated a warning of impending terrain impact to the pilots at least 34 seconds prior to impact, giving them sufficient time to take corrective action (Tabs V-29.4 to V-29.5).

Figure 9 depicts the final ground track of the MA, location of the impact, and includes an excerpt from the CVR correlated to the MA's position (Tab EE-10).



1 [00:39:42L] MP1: Over to…see if we got anything on video.
[00:39:45L] MMSO: Tell him to come right…
[00:39:57L] MMSO: Zero-three-zero, zero-three-zero, he passed him. Yeah.
[00:40:09L] MMC: See if we can put him…there we go.
[00:40:10L] MMSO: There you go. He's behind him, uh, he's behind him about half mile…
[00:40:23L] MMSO: Zero-nine-zero, zero-nine-zero, zero-nine-zero…Whoa…
[00:40:35L] MMC: Whoa…
[00:40:35L] MMSO: …where ya goin' dude?
[00:40:36L] MMC: …come right.
[00:40:37L] MMSO: Right, right, right, right.
[00:40:47L] MMSO: Tell him to keep coming right, keep coming right, keep coming right.
[00:40:56L] HRNE: Affirm.
[00:41:01L] MMSO: Keep coming right…right, right, right, right.
[00:41:06L] MMC: Yeah…he needs to slow down.
[00:41:09L] MMSO: One-eight-zero, one-eight-zero, one-eight-zero.
[00:41:24L] MMC: See how it's going DIW?
[00:41:32L] MMSO: Guys, turn right, right, right, right, right.

2 [00:41:36L] MMSO: **GUYS, RIGHT THREE-SIX-ZERO.**

3 [00:41:39L] MP1: Three-six-zero.
[00:41:41L] MP2: Three-six-zero.
[00:41:43L] MMSO: You stay with them, [MMC].
[00:41:45L] MMC: Yeah, sorry, I get wrapped up in this shit.

4 [00:41:53L] MMSO: **HARD RIGHT, HARD RIGHT.**
[00:41:55L] MP1: Coming around.
[00:42:03L] MHRNE: False confirmation.
[00:42:10L] UNKNOWN: …ugh…
[00:42:17L] UNKNOWN: Pull..up
[00:42:24L] MMSO: Climb.

5 [00:42:29L] MMSO: **COME UP, ELEVATE, ELEVATE UP.**
[00:42:32L] MP2: Three-six-ze..three-six-zero, Lance.
[00:42:34L] MP1: Yeah, I know

6 [00:42:35L] MMSO: **ELEVATE YOUR SPEED, ER ALTITUDE, ALTITUDE.**
[00:42:37L] MP2: Okay…
[00:42:38L] MP1: Altitude? Alright.
[00:42:39L] MP2: Okay, here we go, power.
[00:42:40L] MP1: Power up, thanks.

7 [00:42:42L] MP2: And, go into a nice steep climb.
[00:42:44L] MP2: Yep.
[00:42:47L] END



Figure 9.   Second Land Incursion and Impact (Tab EE-10)

### e. Impact

The MA impacted the side of a hill 300 feet below the crest at approximately 00:42:47L, roughly 1 kilometer south of the Panama-Colombia border (Tabs S and EE-10). At the time of impact, the MA was initiating a wings-level 1.12G climb from 1,500 feet MSL at approximately 120 KCAS with flaps retracted (Tab DD-72).

### f. Egress and Aircrew Flight Equipment (AFE)

After the MA impacted the terrain, MP1 and MP2 testimony suggests the rear of the cabin immediately caught on fire (Tabs V-1.71, V-1.75, and V-2.63). MP1 attempted to egress the MA through a flight compartment escape hatch (Tab V-1.28). The escape hatch is installed in the flight compartment roof and provides an emergency exit for the flight crew. The operating handle is built into the bottom of the hatch and has two positions, CLOSED and VENT. The CLOSED position locks the hatch; the VENT position permits the hatch to be removed inward (Tab DD-64). MP1 initially moved the hatch handle to the VENT position and attempted to open the hatch by pushing and trying to open it outward. MP1 realized his mistake and repeated the process, this time pulling the hatch inward as it is designed to operate, but was again unsuccessful in opening the hatch (Tab V-1.28). Flames from the cabin entered the cockpit (Tab V-1.28). While attempting to locate a fire extinguisher in a dark cockpit lit only by flames, MP1 observed a hole in the area of the left side cockpit window (Tabs V-1.28 and V-1.29). MP1 egressed the MA through this hole and was quickly followed by MP2 (Tab V-1.70). MP1 fell approximately ten to fifteen feet to the ground, and warned MP2 about the drop (Tabs V-1.70 and V-2.63). MP2 then used a tree to help him avoid falling as he egressed the MA (Tab V-2.63). MP2 observed there was fire in the cockpit and the cabin of the MA was completely engulfed in flames. MP2 did not hear voices coming from the cabin and noted that the side door containing the stairs to the cabin was also on fire (Tab V-2.63). MP1 and MP2 discussed attempting to aid the crew members still inside the MA, but the engulfing fire precluded them from taking any action (Tabs V-1.71 and V-2.63). MP1 testified that he "called out to the top of my lungs their names, all of them," to which MP2 responded, "No, the aircraft is engulfed in flames" (Tab V-1.71). It was later determined by review of autopsy evidence that any rescue attempts would have been futile because the four other aircrew members died upon impact (Tabs X-4 to X-5).

### g. Search and Rescue (SAR)

The MA impacted the terrain at approximately 00:42:47L (Tabs S and EE-10). JIATF-S repeatedly tried to contact the MA via satellite communication radios at 0105L. At 0110L JIATF-S tried to contact the MA via high frequency chat, and at 0130L initiated the "aircraft overdue" checklist (Tab V-8.5). In accordance with the checklist, JIATF-S began contacting air traffic control agencies that were controlling the MA and partner nations in which the MA could have landed (Tab V-8.5). They also called phone numbers from the aircrew telephone roster to determine if anyone had been in communication with the MA (Tab V-8.5). At approximately 0300L, after JIATF-S efforts to locate the MA proved unsuccessful, both the Colombian and Panamanian liaisons to JIATF-S were notified (Tab V-8.10). At 0408L a Colombian Air Force (COLAF) C-560 aircraft (Figure 10) launched to search for the MA (Tab V-8.10). The JIATF-S noncommissioned officer in charge for personnel recovery contacted the Panamanian Coast

Guard and requested support to patrol the operating area and coastline where the MA had been operating (Tab V-8.5). The Panamanian Coast Guard launched two interceptor vessels to accommodate this request (Tab V-8.10). At 0517L the COLAF C-560 reported arriving in the suspected crash area and relayed that there were numerous small fires. The COLAF launched a UH-60 Black Hawk (Figure 11) rescue helicopter at 0543L, and after sunrise, the COLAF C-560 reported the source of the fires was aircraft wreckage.



Figure 10. C-560 (Tab Z-7)



Figure 11. UH-60 (Tab Z-9)

At 0626L, the COLAF launched a second C-560 to relieve the first C-560, and the UH-60 established communications with the first C-560 at 0645L. At approximately 0700L the first C-560 returned to base to refuel as the second C-560 and a Panamanian rescue helicopter arrived on scene (Tab V-8.10). During the night of the mishap, it rained and there was a low cloud layer over the MA wreckage (Tab V-1.72). Combined with the slope of the ridge and dense foliage, there was no suitable landing zone for helicopters near the wreckage (Tab V-1.72 to V-1.73). The COLAF aircraft notified JIATF-S there was a Colombian Army unit eight kilometers from the crash site and they were moving toward the downed aircraft at 0840L (Tabs V-8.6 and V-8.10). While awaiting rescue, MP1 was immobile due to injuries and MP2 was only partially mobile due to rib injuries (Tabs V-1.71 to V-1.72). MP1 and MP2 decided to stay with the aircraft wreckage hoping the emergency locator on the MA would help rescue assets find them (Tab V-1.72). Because the MA was engulfed in flames with all the equipment on board, there was no first aid equipment or supplies available to the mishap pilots (Tab V-1.72). The army unit arrived on scene at 0855L, helped the mishap pilots move away from the wreckage, accounted for all personnel in the MC, and prepared an area for the rescue helicopters to lower rescue litters (Tabs V-1.72, V-1.73, and V-8.10). This task entailed falling numerous trees (Tab V-1.72 to V-1.73). At approximately 1145L both survivors were aboard the rescue helicopter and transported to the COLAF forward staging base (Tabs V-8.11). Once there, because of their extensive injuries, the survivors were evacuated to the Santa Fe Hospital in Bogotá, Colombia (Tabs V-1.73, V-8.7 to V-8.9, and V-8.11). Ultimately, the survivors were flown to the US for the remainder of their medical treatment (Tab V-28.8). Both MP1 and MP2 had high praise for the Colombian rescue forces, commenting on their excellent performance during the entire rescue (Tabs V-1.73 and V-2.64).

**h. Recovery of Remains**

The Colombian Army unit on scene, in conjunction with COLAF personnel, recovered and transported aircrew member remains and accompanying personal effects (Tabs V-8.7 and V-

8.11).  The remains and effects from the crash site were transported to Bogotá, Colombia.  US personnel then took the MSO, MMC, and MHNRE into their care for return to the US, and Panamanian personnel took the mishap host nation rider (MHNR) into their care for return to Panama (Tabs V-8.7 and V-8.11).

# 5. MAINTENANCE

### a. Forms Documentation

The AFMC services contract required the MA to be maintained in accordance with FAA regulations (Tab V-3.13).  The maintainers used a series of contractor maintenance forms to document DHC-8-202 maintenance (Tabs DD-65 to DD-66).  The "Avtrak" system is a civilian system used by the maintainers to track inspections that had been accomplished and to forecast future inspections (Tab V-22.16).  It was also used to track flight times, landing cycles, engine components, and airworthiness directives (Tabs V-22.16, V-23.9, and V-23.13).  A thorough review of the aircraft forms documenting recently performed maintenance on the MA, coupled with witness testimony, revealed multiple documentation discrepancies (Tabs DD-65 to DD-66).  On 18 and 19 July 2013 there was an Enhanced Ground Proximity Warning System (EGPWS) discrepancy entered in two aircraft flight logs.  Both discrepancies were transferred to separate discrepancy records (discrepancy records B166514 and B166515) (Tabs U-9 and U-10).  The action taken to repair the EGPWS, according to the forms, was removal and replacement of the unit on 22 September 2013 (Tabs U-26 and U-29).  Although the 18 and 19 July 2013 discrepancies may have been corrected, documentation of such was not available (Tabs DD-65 to DD-66).  Forms were documented with local time dates despite a requirement to reference dates in Greenwich Mean Time (also known as Zulu Time).  This documentation error resulted in dates being documented one day earlier than the actual Zulu date (Tabs U-15 to U-17, and V-22.5 to V-22.6).  There was also a lack of standardization with documenting maintenance actions, which led to inconsistent date formats and incomplete documentation (Tabs U-3 to U-14, U-18, U-20, and U-24 to U-26).

### b. Recurring Discrepancies

Review of the MA maintenance documentation forms from April 2013 to October 2013 revealed a history of recurring EGPWS discrepancies.  A total of four EGPWS discrepancies were documented (Tabs U-3, U-9, U-10, and U-15).  The first discrepancy was documented on 3 April 2013 due to the "GPWS Inop" advisory light illuminating (Tabs U-3 and U-23).  Wiring to the EGPWS was found to be improperly configured and required installation of a wire from the attitude and heading reference unit to the EGPWS computer (Tab U-23).  Between 18 and 19 July 2013 there were also two incidents of erroneous aural "BANK ANGLE" warnings produced in flight (Tabs U-9 and U-10).  On 22 September 2013, the EGPWS computer was removed and replaced with a serviceable unit (Tabs U-26 and U-29).  Despite repair efforts, another EGPWS discrepancy was documented on 1 October 2013 as result of an erroneous "TOO LOW GEAR" aural warning (Tab U-15).  This was the final EGPWS discrepancy prior to the mishap (Tabs DD-65 to DD-66).  This discrepancy was not corrected prior to the mishap flight.  However, the maintainers deactivated the EGPWS three days before the mishap to prevent further erroneous warnings (Tabs U-15, V-1.31, and V-22.10).

#### c. Inspections

The inspection program for the MA was based on 500-hour intervals, at which time the aircraft and systems were inspected (Tabs V-22.15 and V-23.13). The equalized inspection schedule had been developed in a manner that allowed a portion of the inspection to be accomplished every 83 flight hours or every month, whichever occurred first (Tabs V-22.14 to V-22.15, V-23.13, and DD-68). In addition, a more frequent minor inspection, identified as an "L" check, was required to be accomplished every 50 flight hours or every 12 days (Tab DD-68). Maintainers performed an "L" check inspection on the MA on 2 October 2013. All inspections were completed with no concerns noted (Tabs D-2, U-29, V-22.14, V-24.11, and DD-65 to DD-66).

On 4 October 2013, a preflight inspection was performed on the MA prior to the mishap flight (Tabs V-21.4 and V-22.4). During the preflight inspection, the Airframe and Powerplant (A&P) mechanics who inspected the flight deck identified that the EGPWS circuit breakers were pulled and collared (Tabs V-21.6 and V-21.7). A red collar with a tag below stating "Inoperative Systems" was placed around circuit breakers that were pulled out to prevent them from being pushed back in (Tabs V-1.31 and V-23.7). The mechanic who performed the cockpit section preflight stated that the quality assurance (QA) member on shift would have reviewed the forms with the pilots (Tab V-21.4). The QA member signed the maintenance release, but did not check the forms to verify the number of days the EGPWS was inoperable prior to the mishap flight (Tab V-24.6). No other discrepancies were noted during the preflight inspection (Tab V-22.4).

#### d. Maintenance Procedures

The MA was required to be maintained under FAA regulations Part 91 (Tabs V-1.32, V-3.13, V-16.20, and V-23.10). In compliance with Part 91, a minimum equipment list (MEL) must be established for an aircraft to take off with inoperative instruments or equipment (Tab BB-19). The master minimum equipment list (MMEL) is developed by the FAA in conjunction with the aviation industry and can be used to fill the requirements of the MEL (Tabs DD-5 to DD-8). The purpose of the MMEL is explained in the MMEL preamble: "Experience has shown that with the various levels of redundancy designed into modern aircraft, operation of every system or component installed may not be necessary when the remaining equipment can provide an acceptable level of safety." It continues, "The FAA-approved MMEL includes only those items of equipment which the Administrator finds may be inoperative and yet maintain an acceptable level of safety by appropriate conditions and limitations" (Tabs BB-49 to BB-52).

On 2 October 2013, maintainers began work on the EGPWS discrepancy from the MA's previous flight (Tabs V-23.6 to V-23.7). An A&P-certified mechanic pulled the EGPWS circuit breakers, collared them, and placed the MEL stickers by the circuit breakers in the flight deck, thereby rendering the system inoperative (Tabs V-23.6 to V-23.7). Maintenance personnel referenced the guidance in the FAA MMEL established for the MA to accomplish this task (Tabs U-15 and U-27). Additionally, a discrepancy record (B166529) was also created and reflected that the MA EGPWS was to be operated under requirements of the MMEL (Tabs U-15 and U-27).

According to the MMEL, the MA could take off with an inoperative EGPWS provided two conditions were met: "a) alternate procedures are established and used, and b) repairs are made

within two flight days" (Tab BB-44).[3]   Regarding the second condition, in violation of the MMEL, the MA was operated with the inoperable EGPWS for three subsequent flight days, the third of which was the mishap flight (Tabs U-16, U-17, V-21.7, and V-22.4).  The third flight (the mishap flight) exceeded the two flight day limit imposed by the MMEL by one day (Tabs BB-44, BB-48, and DD-25 to DD-27).  In accordance with the FAA's MMEL, the MA should have been grounded on the day of the mishap flight.

Unrelated to the EGPWS problems, the MA also had a leaking cockpit emergency escape hatch (Tabs V-1.26 and V-21.11).  Maintainers performed a temporary repair on the emergency exit by applying speed tape to the external surface (Tabs V-1.27, V-21.11, V-22.11, and V-24.9).  Speed tape is a packing-like tape that can be used on flight control surfaces, is able to withstand high speeds, and is often used by aircraft maintainers "if the maintenance procedures allow that" (Tab V-1.27).  However, this repair is not described in the de Havilland maintenance repair manuals nor was the maintenance lead aware of any procedures in the manuals permitting this repair (Tabs V-22.11 and DD-65 to DD-66).  This further illustrates maintenance irregularities, but does not suggest the escape hatch maintenance was a factor in the mishap.

**e. Maintenance Personnel and Supervision**

There was no direct military oversight of DHC-8-202 Prospector maintenance (Tab V-3.10). Due to the requirements to maintain the aircraft under FAA Part 91 regulations, SNC maintainers were required to be certified in accordance with FAA regulations and maintained, at a minimum, current A&P certifications (Tabs DD-25 to DD-27, DD-29 to DD-38, and DD-65 to DD-66).  In addition to A&P certifications, some maintainers held an additional Inspection Authorization certification (Tabs V-21.3, V-22.20 to V-22.21, V-23.10, DD-30, DD-36, and DD-38).  All mechanics performing maintenance and inspections on the MA held current certifications (Tabs DD-25 to DD-26, DD-30, DD-36, DD-38, and DD-65 to DD-66).

Despite the maintenance supervisor's qualifications, he did not recognize that the EGPWS needed to be repaired within two flight days or the aircraft should be grounded.  Specifically, he testified that maintainers at the FOL utilized an MMEL that allowed aircraft to be operated for three flight days after the EGPWS was disabled (Tab V-22.7).  However, the MMEL provided to substantiate the supervisor's testimony was from Transport Canada, and was not the applicable FAA MMEL that the maintainers actually used to correct the 2 October 2013 EGPWS discrepancy (Tab BB-53).[4]

---

[3]  According to the FAA MMEL policy letter, a "flight day" is defined as "a 24-hour period (from midnight to midnight) either universal coordinated time (UTC) or local time, as established by the aircraft operator, during which at least one flight is initiated for the affected aircraft."  (Tab BB-48)

[4]  At least two different MMELs existed for the DHC-8:  the FAA's MMEL and Transport Canada's MMEL (Tabs BB-39, BB-53, and DD-65 to DD-66).  Transport Canada is the equivalent of the US Department of Transportation and is responsible for transportation policies and programs in Canada, to include aviation (Tabs DD-65 to DD-66). There were variances between the two MMELs (Tabs BB-44, BB-57, and DD-65 to DD-66).  Specifically, the FAA MMEL has a two flight day repair requirement for the EGPWS, whereas the Transport Canada MMEL has a three flight day repair requirement (Tabs BB-44 and BB-57).  Documentation completed by SNC maintainers is consistent with the FAA MMEL indicating SNC maintenance personnel were indeed utilizing the FAA MMEL, not the Transport Canada MMEL.  For instance, the page numbers inputted into the MA maintenance forms match the page

### f. Fuel, Hydraulic, and Oil Inspection Analysis

No fluid samples were available from this mishap (Tab D-3). No evidence was found to suggest fuel, hydraulic fluid, or oil were factors in this mishap.

### g. Unscheduled Maintenance

On 3 October 2013, two days prior to the mishap, the MA had a Traffic Collision Avoidance System (TCAS) failure during a flight (Tabs U-17 and V-23.5). The following day, on 4 October 2013, an SNC A&P-certified mechanic removed and reinstalled a transmitter/receiver unit and recycled the circuit breakers (Tab U-17). A self-test was accomplished in accordance with maintenance manuals and operationally checked "good" (Tab U-17). On the mishap flight, the TCAS system was operational and functional (Tab V-2.58). No evidence was found to suggest this unscheduled maintenance on the MA was a factor in the mishap.

## 6. AIRFRAME, MISSILE, OR SPACE VEHICLE SYSTEMS

### a. Structures and Systems

Due to the remote and unsecure location of the MA's impact, recovery of all aircraft systems was not possible (Tab Q-2). Retrieval was limited to only sensitive equipment, the FDR, and the CVR (Tab Q-2). The EGPWS was the only aircraft system known to be faulty when the MA took off on the mishap flight (Tabs DD-65 to DD-66). The only other known defective aircraft structure was the leaking cockpit emergency escape hatch, which had been sealed with speed tape as noted previously (Tabs V-1.27, V-21.11, V-22.11, and V-24.9).

### (1) Engines

Prior to the mishap flight, engine #1 had 3,259.6 hours of operating time and engine #2 had 3,276.6 hours of operating time (Tab D-2). There were no components recovered from either PW-123D engine (Tab Q-2). Data from the FDR indicated both engines were operating and producing power at the time of impact. The FDR illustrated that in the last 5 seconds before impact the revolutions per minute (rpm), fuel flow, torque, and inlet turbine temperature all increased for both engines, which correlates with the CVR indicating the mishap pilots moved throttles to increase power output just prior to impact (Tabs N-15 and DD-72). Both engines were fully operational on the mishap flight (Tab V-2.59).

### (2) Enhanced Ground Proximity Warning System (EGPWS)

The EGPWS system had been deactivated on 2 October 2013 by a maintainer (Tabs U-15, U-27, and V-23.6 to V-23.7). System circuit breakers were pulled, collared, documented in the forms, and MEL stickers placed next to circuit breakers at the time of the MA's launch (Tabs V-2.27 to

---

numbers from the FAA MMEL (Tabs U-19 to U-20, U-27, BB-43 to BB-46, and BB-54 to BB-56). This indicates they were using the FAA MMEL despite testimony from the maintenance supervisor, and the Transport Canada MMEL he provided, to substantiate his testimony of a three flight day EGPWS repair requirement (Tab BB-53).

V-2.28, and V-23.6 to V-23.7). Approximately 30 seconds prior to impact, a single audible "PULL UP" can be heard on the CVR (Tab N-15).

Even if the EGPWS had been activated and working properly, none of the six modes of operation provide a single aural "PULL UP" on the Honeywell EGPWS MKVII (Tabs DD-65 to DD-66). All modes that produce an aural "PULL UP" message are coupled with other aural warnings, such as "TERRAIN, TERRAIN" and "WHOOP, WHOOP" (Tabs V-29.3 and DD-65 to DD-66). The de Havilland subject matter expert was unable to determine the source of the "PULL UP" warning, but was able to determine that it did not come from EGPWS (Tab V-29.3). Ultimately, MP1 and MP2 both testified they did not hear the aural "PULL UP" warning captured on the CVR (Tabs V-1.55 and V-2.60) nor did the FDR reveal any pilot actions suggesting they heard it (Tab DD-73).

## 7. WEATHER

### a. Forecast Weather

The mishap pilots received their weather forecast from a non-military source. MP1 stated they often used a civilian website to get their weather briefings (Tabs V-1.37 and V-2.33). The weather forecast for the local area was clear skies with a few clouds at 2,000 feet. Winds were forecast to be calm with no significant weather conditions according to the observations and forecast from the Fuerza Aerea Colombiana Direcccion De Navegacion Aerea Subdireccion De Meteorologia (Colombian Air Force Directorate of Air Navigation Sub-Directorate of Meteorology) (Tab F-10). There was no forecast precipitation (Tab F-10) and lunar illumination was forecast to be low at 0.9% (Tabs W-3 and W-5).

### b. Observed Weather

According to testimony from MP1 and MP2, the observed weather was a low, overcast ceiling, requiring flight at 1,500 feet MSL to maintain EO/IR sensor contact with surface vessels (Tab V-1.55). Neither MP1 nor MP2 reported precipitation during their interviews, and none was forecast (Tabs F-10, V-1.1 to V-1.76, and V-2.1 to V-2.74). The MA did not have night vision capabilities and because of night conditions and low lunar illumination, no outside references were visible to the mishap pilots through the MA's windscreen (Tabs V-1.56, V-16.19, W-3, and W-5).

### c. Space Environment

Not applicable.

### d. Operations

According to testimony from MP1, the weather at the time of the mishap was overcast with a cloud deck at 1,600 feet MSL which caused MP1 to descend the MA to an altitude of 1,500 feet MSL to get below the cloud deck and monitor the suspected drug trafficking boat (Tab V-1.55). There was also almost no lunar illumination (0.9%) on the night of the mishap (Tabs W-3 and

W-5). No evidence was found to suggest the MA was operating outside its prescribed operational limitations with respect to weather.

# 8. AIRCREW QUALIFICATIONS

Because four of the six mishap aircrew members were civilian contractors, limited aircrew qualification information and training documentation was available to the AIB as compared to US Air Force aircrew training and standardization and evaluation records.

### a. Mishap Pilot #1 (MP1)

MP1 was FAA-qualified to fly the MA as SIC (Tab DD-27). There is no FAA currency requirement when flying as SIC (Tab DD-27). MP1 was an FAA-certified pilot with approximately 6,500 total flying hours in over 80 types of aircraft and held an FAA Airline Transport Pilot/Multi-engine Land rating, an Instructor Pilot rating, and a type rating in the DHC-8 (Tabs G-6, T-3 to T-4, V-1.5 and V-1.6). He also held an FAA Airframe and Powerplant certification to perform aircraft maintenance (Tabs T-3 to T-4). The fact that MP1 had not flown any operational missions from the FOL was the primary reason he flying as SIC of the MA the night of the mishap (Tab V-1.8).

At the time of the mishap, MP1's recent flight time was as follows:

|  | Hours | Sorties |
|---|---|---|
| Last 30 Days | 0 | 0 |
| Last 60 Days | 0 | 0 |
| Last 90 Days | 0 | 0 |

Figure 12. MP1's 30-60-90 Day Flying History (Tab G-7)

### b. Mishap Pilot #2 (MP2)

MP2 was FAA-qualified to fly the MA as PIC (Tab DD-27). MP2 also met the FAA currency requirement to fly as PIC since he had completed three takeoffs and landings in the previous 90 days (Tabs DD-13 to DD-14, and DD-27). MP2 had recently completed DHC-8 recurrent training at Flight Safety International in Atlanta, Georgia, on 30 June 2013 (Tabs G-3 and T-9 to T-16). MP2 had over 6,900 total flying hours (Tab V-2.8). MP2 held an FAA Commercial Pilot/Multi-engine Land rating, an Instructor Pilot rating, and a type rating in the DHC-8 (Tabs T-5 to T-6).

At the time of the mishap, MP2's recent flight time was as follows:

|  | Hours | Sorties |
|---|---|---|
| Last 30 Days | 91.5 | 11 |
| Last 60 Days | 214.1 | 27 |
| Last 90 Days | 294.1 | 42 |

Figure 13. MP2's 30-60-90 Day Flying History (Tab G-4)

#### c. Mishap Mission Commander (MMC)

The MMC was performing duties that do not require FAA licensing (Tab DD-27). Aircrew qualification records do not exist for the MMC (Tab G-9). The MMC retired from the US Air Force and US Customs and Border Protection (CBP), and had flown missions similar to Prospector missions with CBP (Tabs V-16.28 and V-19.20). Witness testimony revealed he was highly respected by the other Prospector aircrew members for his hard work and professionalism (Tabs V-20.32, V-25.16, and V-25.17). He was considered to be one of the most experienced mission systems operators at the FOL and was "well-liked by everyone" (Tabs V-20.23, V-20.28, and V-25.15).

#### d. Mishap Mission Systems Operator (MMSO)

The MMSO was performing duties that do not require FAA licensing (Tab DD-27). Aircrew qualification records do not exist for the MMSO (Tab G-10). The MMSO had served eight years in the US Air Force and had taken a lead role in developing a checklist for Prospector mission systems operators (Tabs V-20.16 to V-20.17, and DD-47). Witnesses testified that he was highly respected by everyone he worked with for his professionalism and leadership of the Prospector aircrew members (Tabs V-20.16 to V-20.17). He was recognized as one of the most knowledgeable MSOs at the FOL and was highly regarded for his work during meetings at JIATF-S (Tab V-25.15). The MMSO was lauded for his exceptional mission focus, and was "loved by all" and "very close to nearly everyone on the team" (Tabs V-20.28 and V-25.15).

#### e. Mishap Host Nation Rider (MHNR)

The MHNR was a lieutenant in Panama's Air and Naval Service, SENAN (Tabs G-17 and K-2). While the MHNR's training and experience documentation was not available, fellow Prospector aircrew members who flew with the MHNR commented on his superb professionalism, competence, and motivated attitude (Tabs V-13.23 to V-13.24, and V-14.16 to V-14.17). He was lauded for being exceptionally astute and "excellent to work with" (Tab V-14.17).

|  | Hours | Sorties |
|---|---|---|
| Last 60 Days | Approximately 40 | Approximately 4 |

Figure 14. MHNR's Estimated 30-60-90 Day Flying History (Tab G-13)

#### f. Mishap Host Nation Rider Escort (MHNRE)

The MHNRE was a highly decorated 20-year veteran of the US Air National Guard and was current and qualified as a host nation rider escort in the DHC-8 (Tabs G-12 to G-13). He had accumulated over 200 sorties and more than 2,200 flying hours as a host nation rider escort (Tabs DD-45 to DD-46). The MHNRE was certified in the DHC-8 on 10 June of 2013 (Tabs G-18 to G-19). He had never received any evaluation of less than "fully qualified," and his professionalism and expertise were evident by the fact he had been selected to be an evaluator in November of 2012 (Tabs G-18 to G-23, and V-11.22). Witness testimony revealed he was highly respected for his intelligence, expertise, and professionalism (Tabs V-14.19 to V-14.20). He was the individual others would go to for advice, and was known to be very articulate and "a

great instructor, a great evaluator" (Tab V-14.20). He "exemplified the best that the Host Nation Rider Program has to offer" (Tab V-14.20).

At the time of the mishap, the MHNRE's recent flight time was as follows:

| | Hours | Sorties |
|---|---|---|
| Last 30 Days | 24.9 | 3 |
| Last 60 Days | 80.9 | 10 |
| Last 90 Days | 112.3 | 15 |

Figure 15.  MHNRE's 30-60-90 Day Flying History (Tab G-13)

## 9. MEDICAL

### a. Qualifications

At the time of the mishap, MP1, MP2, and the MHNRE had documentation showing that they held current medical qualification for flight duties (Tabs G-3, G-4, G-6, G-7, X-3 to X-5, X-7, and DD-27). The MMC and MMSO were civilians performing duties that did not require FAA medical qualification (Tabs X-4 and DD-27). MP2 was blind in his right eye, but had no limitations on his FAA license with regard to this condition (Tabs G-3 to G-4, T-6, V-2.69 to V-2.70, and X-4), and no evidence was found to suggest this condition was a factor in the mishap. The MHNR's medical records and medical qualifications were not disclosed to the board; however, no evidence was found to suggest that the MHNR's medical qualifications were a factor in the mishap (Tab X-5).

### b. Health

Testimony from MP1 and MP2 and post-mishap medical reports indicate they suffered substantial injuries resulting from the mishap (Tabs V-1.4 to V-1.5, V-1.28, V-1.33 to V-1.34, V-2.4 to V-2.6, V-2.63, V-2.68, and X-3 to X-4).

### c. Pathology

The autopsy reports for the MMC, MMSO, and MHNRE concluded that they died of blunt force injuries sustained at the time of impact (Tabs X-4 to X-5). Standard tissue toxicology tests from the MMC, MMSO, and MHNRE found no evidence of alcohol, medications, or drugs of abuse (Tabs X-4 to X-5). An autopsy report for the MHNR was not disclosed to the board (Tab X-5).

No post-mishap toxicology, drug, or alcohol testing was done on MP1 or MP2 as it was not available (Tabs X-3 to X-4). However, witnesses unanimously testified MP1 and MP2 did not use illicit drugs or excessive alcohol (Tabs V-1.1 to V-29.6, and X-3 to X-4). No evidence was found to suggest any MC medical conditions or medications were a factor in the mishap (Tabs X-3 to X-5).

### d. Lifestyle

No evidence was found to suggest the MC or mishap maintenance personnel lifestyle factors were a factor in the mishap (Tabs X-3 to X-5).

### e. Crew Rest and Crew Duty Time

Air Force Instruction (AFI) 11-202, Volume 3, *General Flight Rules*, 22 October 2010, paragraph 9.8 provides instruction on crew rest for Air Force aircrew members performing any of the following flight-related duties: preflight, load/unload, start, and taxi aircraft (Tabs BB-4 to BB-5). US Air Force aircrew are individually responsible for ensuring sufficient crew rest (Tab BB-5). Aircrew require at least 10 continuous hours of restful activities (including an opportunity for at least 8 hours of uninterrupted sleep) during the 12 hours immediately prior to the flight duty period (Tabs BB-4 to BB-5). As a member of the US Air National Guard, the MHNRE was the only member of the MC to whom AFI 11-202 applied. Although no physical crew rest log was available to confirm the MHNRE's crew rest compliance, witness testimony indicates he appropriately adhered to his rest requirements in accordance with the instruction (Tabs V-11.16 and V-13.19).

MP1 and MP2 were civilian pilots flying under Part 91 of FAA regulations and they did not have specific FAA-mandated rest requirements (Tab DD-27). Additionally, the MMSO and MMC did not have FAA-mandated rest requirements (Tab DD-27). Rest requirements for the MHNR were not made available to the AIB. No evidence was found to suggest crew rest, sleep patterns, or fatigue were a factor in the mishap (Tabs V-17.26).

## 10. OPERATIONS AND SUPERVISION

### a. Operations

Prospector missions had been operating from the FOL in Panama using two DHC-8-202 Prospector aircraft since June 2013 (Tabs DD-13 to DD-14). Eighty-eight Prospector missions were flown from the start of operations in Panama until the date of the mishap, 5 October 2013, (Tab DD-41) with the normal tasking being one mission per night (Tabs DD-13 to DD-14). Typical mission duration averaged eight hours, and all missions were conducted at night (Tabs DD-13 to DD-14). The number of personnel available to fly a Prospector mission averaged two to three at each aircrew position (Tabs DD-13 to DD-14). As such, each aircrew member flew on roughly 35-50% of the total missions (Tabs D-13 to D-14). Operations ceased from 13 June 2013 to 15 July 2013 due to visa issues (Tabs V-1.19 and DD-13 to DD-14). After those issues were resolved, operations resumed on 16 July 2013 and continued until the mishap (Tabs DD-13 to DD-14).

Aircrew Experience. The MC had differing levels of experience in flying and sensor operations. MP1 was a US civilian employed by SNC who also served as the manager for SNC operations in Panama (Tab V-1.2). MP1 was the SIC of the MA and was flying the MA at the time of the mishap (Tabs V-1.8 and V-15.9). MP1's management duties consumed the majority of his time and limited his ability to fly as a pilot (Tabs V-1.25 and V-25.8). Before the mishap flight, MP1 had flown as an observer twice, but had never flown an operational mission from the FOL as a

pilot (Tab V-1.8). Several days prior to the mishap, a member from SNC leadership arrived at the FOL (Tabs V-25.3 and V-25.6). This SNC leader began assuming many of MP1's managerial duties, which gave MP1 more time to focus on flying and maintenance operations (Tabs V-1.25 and V-25.5 to V-25.6). The mishap flight, MP1's first operational Prospector mission as a pilot, was part of a plan for MP1 to begin flying more often to become more familiar with operations (Tabs V-1.3 and V-1.25).

MP2 was a US civilian who worked for the sub-contractor, NFI, which provided pilots and mission systems operators to the primary contractor, SNC (Tabs V-2.2 to V-2.3, and V-2.15). MP2 was the pilot in command (PIC) of the MA (Tab V-15.9). According to Federal Aviation Regulations (FAR) Part 91.3, the PIC is "directly responsible for, and is the final authority as to, the operation of that aircraft" (Tab BB-17). Additionally, FAR Part 91.13 states, "No person may operate an aircraft in a careless or reckless manner so as to endanger the life or property of another" (Tab BB-18). Therefore, according to FAA regulations, the PIC is ultimately responsible for operating an aircraft in a safe manner (Tabs BB-17 and BB-18). MP2 had been in Panama since May 2013 (Tab V-2.10).

Prospector missions rarely included the same six aircrew members on board due to constantly changing shift rotations and the number of aircrew positions and agencies filling those positions (Tabs DD-13 to DD-14). There was some degree of consistency at the pilot position since the pilots at the FOL had formed two teams in which the same pilots always flew together (Tabs DD-13 to DD-14). In fact, flight logs indicate the mishap sortie was the first sortie in which MP2 flew with a pilot other than his normal pilot teammate (Tabs DD-13 to DD-14). MP1 was FAA-qualified to fly the DHC-8-202 on the mishap flight, but since this was his first operational mission in Panama as a pilot, MP1 flew as SIC (Tabs T-3 to T-4, and V-1.8). MP2 was flying as the PIC and was highly experienced in that position, flying as PIC on roughly half of the 88 Prospector missions flown from the FOL (Tabs V-2.3, V-15.9, and DD-13 to DD-14). While flight logs are incomplete, records suggest there was less consistency at the MSO position with no clear teaming concept apparent to fill the mission commander and mission systems operator positions (Tabs DD-13 to DD-14). The MMSO and the MMC both had extensive experience in Prospector operations (Tab V-20.23). No documentation regarding the MMSO and the MMC training and experience was found, but the AIB estimates both had flown at least 30 operational missions from the FOL since operations began in June 2013 (Tabs DD-13 to DD-14). The MMC retired from the US Air Force and US Customs and Border Protection (CBP), and had flown missions similar to Prospector missions with CBP (Tabs V-16.28 and V-19.20). The MMSO had served eight years in the US Air Force (Tab DD-47) and had taken a lead role in developing a checklist for Prospector mission systems operators (Tabs V-20.16 to V-20.17). The MHNR was a lieutenant in Panama's Air and Naval Service, SENAN, and was very experienced in counter-narcotics operations (Tabs G-17 and K-2). The MHNRE was a 20-year veteran of the US Air National Guard and had accumulated over 200 sorties and more than 2,200 flying hours as a host nation rider escort (Tabs DD-45 to DD-46). The MHNRE served as an instructor and evaluator in USSOUTHCOM's Host Nation Rider Escort Program (Tab V-14.20).

Training. Initial training for MSOs and pilots was conducted by SNC in the US (Tabs V-1.16, V-18.4 to V-18.5, V-19.15, and V-20.16). Witnesses testified this initial training was hindered by program engineering delays and that the training received was insufficient and "essentially

nonexistent" (Tabs V-1.14, V-2.11 to V-2.17, V-17.20, and V-20.18). Witnesses stated that initial training focused primarily on basic usage of Prospector's missions systems, such as the surface surveillance radar and EO/IR sensor, and did not adequately teach the aircrew how to integrate their interdependent duties in order to function as a cohesive aircrew (Tabs V-2.11 to V-2.12). Pilots played a crucial role in executing the Prospector's detection and monitoring mission (Tabs DD-63 to DD-64). They did not simply fly from point to point; rather, they were required to fly specific patterns, at night and at low altitude, to enable the MSOs to use their sensors effectively (Tabs DD-63 to DD-64). During their training, no checklist or guide was provided for integrating the duties of the pilots, MSOs, HNR, and HNRE (Tabs V-1.14 to V-1.15, V-2.11 to V-2.17, V-17.4, V-17.20 to V-17.21, V-19.15 to V-19.16, and V-20.17). A number of MSOs took it upon themselves to build an MSO checklist for inflight operations after their arrival at the FOL (Tabs V-19.16 and V-20.16). Witnesses described poorly defined roles and responsibilities, which caused concern in some aircrew about task overload (Tabs V-17.9 to V-17.10, V-18.6, V-19.3 to V-19.4, V-19.7 to V-19.8, and V-19.16). As noted previously, the MSO training did not include any training for "low level terrain navigation" (Tabs V-2.46 to V-2.47). SNC was unable to provide documentation verifying training accomplished by the MC.

Testimony indicated Prospector aircrew members flew very limited training missions at the primary training location in the US, and some of their first inflight exposure to the Prospector's mission systems was during their "demonstration" flights in Florida prior to deployment to the FOL (Tab V-6.4 and V-17.20). Demonstration flights were intended to display the aircraft and aircrew's fully functioning mission systems capabilities to JIATF-S during daytime missions (Tabs V-2.12 to V-2.13, V-17.4, V-17.20, V-20.18, and V-20.24). Per witness testimony, an aircrew member's next flight after the demonstration flight was an operational flight at the FOL (Tabs V-16.4 to V-16.5).

Because the contract contained no specific aircrew training requirements for the unique Prospector mission beyond the general requirements of Part 91 of the FAA regulations, and because it did not contain oversight requirements for training or maintenance, SNC was not contractually obligated to develop and implement a formal training plan for its Prospector aircrews (Tab V-3.7). As a result, while Prospector pilots met the basic qualification requirements to fly the DHC-8-202 as required under Part 91 of the FAA regulations, Prospector aircrews received very limited collective aircrew training to execute the unique mission they were conducting as a crew (Tabs V-1.14, V-6.4, V-17.20, and V-20.18). Further what little training they did receive was ad hoc and undocumented (Tabs V-1.14, V-6.4, V-17.20, and V-20.18).

Operations Tempo. Operations tempo at the FOL was driven by the typical Prospector daily tasking to execute one detection and monitoring mission of approximately eight hours duration every night (Tabs DD-13 to DD-14). The typical shift schedule for an individual aircrew member was four workdays on, followed by four days off (Tabs V-1.22 and V-1.40). Since the shifts worked were typically night shifts, Prospector aircrew members endured constant circadian rhythm changes as they shifted from working four nights in a row to having four days off (Tab V-1.22). However, while the MC's operational environment was challenging and complex, no evidence was found to suggest it was a factor in the mishap.

**b. Supervision**

Control of *contractors* operating in support of military operations differs significantly from control of *military forces*. Authority over military forces emanates from the legal authority of command (Tab BB-26). Authority over contractors, however, comes exclusively from the contract between the contractor and the Department of Defense (DoD). Section 1.d. of DoD Instruction 3020.41, "Operational Contractor Support," describes this relationship (Tab BB-59 to BB-60):

*"The contract is the only legal basis for the relationship between the DoD and the contractor. The contract shall specify the terms and conditions, to include minimum acceptable professional standards, under which the contractor is to perform; the method by which the contractor will be notified of the deployment procedures to process contractor personnel; and the specific support relationship between the contractor and the DoD."* (Tab BB-59 to BB-60)

As such, contracts must specify the required actions expected of contractors as it is the only mechanism by which operational commanders can control contractors operating in support of military operations (Tab BB-59 to BB-60).

USSOUTHCOM obtained Prospector aircraft and personnel through a services contract with SNC (Tab V-26.4). A services contract is "a contract that directly engages the time and effort of a contractor whose primary purpose is to perform an identifiable task rather than to furnish an end item of supply" (Tab BB-61). In turn, USSOUTHCOM provided Prospector aircraft and personnel to JIATF-S for use in counter-narcotics operations. AFMC was the military organization USSOUTHCOM coordinated with to negotiate and write the contract with SNC (Tab V-3.4). The 645 AESG, an organization subordinate to AFMC, was primarily responsible for all aspects of contract formation and administration, to include inclusion of requirements to meet operational needs and any oversight by DoD agencies (Tabs V-3.4, V-3.9, and CC-14).

While the contract required Prospector pilots to be FAA-qualified to fly the DHC-8-202 aircraft, it contained no specific requirements regarding collective aircrew training to accomplish the unique Prospector mission, nor did it call for any oversight by military agencies to ensure compliance (Tabs V-3.4 to V-3.5, V-3.7, and V-3.10). This is unlike Air Force aircrew flying missions similar to Prospector missions, who must complete formal training programs and remain proficient in specific training areas to operate effectively as a crew (Tabs DD-63 to DD-64). Additionally, Air Force aircrew are overseen by standardization and evaluation personnel to ensure compliance with standards (Tabs DD-63 to DD-64). In accordance with the contract, SNC was only expected to deliver the contracted service (a set amount of maritime surveillance over a designated period of time) in a safe and effective manner; the contract contained no specific collective aircrew training requirements to enable the aircrews to execute the unique Prospector mission (Tabs V-3.4 and V-3.12). The program manager who managed the contract at the 645 AESG testified that limited oversight was specified in the contract to reduce cost to the government (Tabs V-3.10 and V-3.15). The risk of less government oversight was accepted due to SNC's previous record of satisfactorily executing similar missions (Tabs V-3.10 and V-3.15).

The 645 AESG negotiated the contract with SNC using requirements provided by the user, USSOUTHCOM, and their subordinate task force, JIATF-S (Tabs V-3.4 to V-3.6). USSOUTHCOM personnel from their Directorate for Operations (J3) participated in the contract formation process, which included defining user requirements (Tabs V-26.3 to V-26.4). Air Forces Southern (AFSOUTH) is USSOUTHCOM's air component (Tab CC-29). In that capacity, AFSOUTH is "responsible for providing air and space capabilities in support of US military involvement and partnerships across Central America, South America and the Caribbean" (Tab CC-29). Normally a combatant command's air component would provide some oversight of air assets operating in its area of operations (Tabs BB-30 to BB-32). However, AFSOUTH had no role in the requirements process, nor did they have a role in the contracting process for Prospector aircraft and personnel that would be operating in USSOUTHCOM's area of responsibility (Tab V-3.18).

Military oversight of the Prospector mission was very limited (Tab V-26.5). While JIATF-S provided some *tactical* oversight of daily tasking and execution, the contract contained no specific collective aircrew training requirements for the unique Prospector mission or oversight requirements for military organizations to provide oversight of training, safety, standardization/evaluation, operations, or maintenance functions (Tabs V-3.4 to V-3.5, V-3.10, V-3.18, and V-26.5). However, because the contract contained no such collective aircrew training or oversight requirements, SNC was not contractually obligated to develop and implement a formal training plan for its Prospector aircrews to a level that would be expected of Air Force aircrews (Tabs V-3.7 and DD-63 to DD-64). As a result, Prospector aircrews received very limited collective aircrew training to execute the unique Prospector mission, and what little training they did receive was ad hoc and undocumented (Tabs V-1.14, V-6.4, V-17.20, and V-20.18). Similarly, Prospector maintenance was expected to meet contractual requirements, which directed compliance with FAA regulations under Part 91 (Tab V-3.15). No military oversight existed to ensure contract compliance with either training or maintenance standards (Tabs V-3.10 and V-26.5).

## 11. HUMAN FACTORS

### a. Introduction

Air Force Instruction 91-204, *Safety Investigations and Reports,* 24 September 2008, Attachment 5, contains the Department of Defense Human Factors Analysis and Classification System *(HFACS)*, which lists potential human factors that can play a role in aircraft mishaps (Tabs BB-7 and BB-12 to BB-14). The HFACS is used to identify and categorize significant human factors in a sequence of events leading to a mishap (Tabs BB-8 to BB-11). The following human factors are applicable in this mishap (Tabs BB-8 to BB-11).

**b. Applicable Factors**

**(1) Task Delegation.** Task delegation is a factor when the crew or team members failed to actively manage the distribution of mission tasks to prevent the overloading of any crew member (Tab BB-12).

Task delegation was a factor in this mishap sequence for three reasons.  First, the mishap pilots delegated critical, traditional pilot duties to the Prospector MSOs (MMSO and MMC), specifically navigation and terrain avoidance duties (Tabs V-1.37, V-1.44, V-1.45, V-1.61, V-2.37, and V-2.38 to V-2.39).  Second, the mishap pilots did not clearly communicate their expectation for the MSOs to execute navigation duties (Tabs N-3 to N-5).  Finally, the delegated tasks contributed to an excessive workload for the MSOs, resulting in an unsafe situation that directly contributed to the mishap (Tabs N-4 to N-5, V-16.11, V-17.9 to V-17.10, V-19.10, and BB-12).

Navigation and Terrain Avoidance Duties.  Despite having multiple navigation aids available in the cockpit to use for navigation and terrain avoidance, MP1 and MP2 delegated the duty of navigation and terrain avoidance to the MMSO and MMC (Tabs N-4 to N-5, V-17.8 to V-17.9, and V-17.12 to V-17.13).  Witnesses reported MP2 typically preferred the MSOs to give many or "all" navigational headings to the pilots, citing MP2's aversion to some of the electronic equipment available to him and systematic technical difficulties with the equipment (Tabs V-1.14, V-1.47, V-2.40 to V-2.42, V-2.44, V-16.12, V-17.7, and V-17.8).  The practice of delegating navigation duty was common for MP2 during the detection and monitoring segments of the flight (Tabs V-2.38, V-2.48, V-15.7, V-15.9 to V-15.10, V-16.10, and V-19.11).  While MP2 knew the MMSO and MMC had not been trained for "low level terrain navigation," he explained during testimony that the MSOs have "the best information, they know what they need to do" and he attempted to "back them up" in navigation duties (Tabs V-2.38, V-2.46 to V-2.48, V-15.7, V-15.9 to V-15.10, V-16.10, and V-19.11).

Unclear Primary Navigation Duty Delegation.  When the MA unintentionally flew over land the first time on the mishap flight, it prompted a discussion between MP1, MP2, and the MMSO about navigation duties (Tabs N-3 to N-5).  The MMSO proposed a plan to fly a set of two opposite headings back and forth for set time intervals, to which the mishap pilots agreed (Tabs N-4 to N-5).  MP1 and MP2 agreed to the MMSO's navigational plan (Tab N-5), but the plan failed to clearly assign navigation duties to a specific aircrew member.  Instead, it established a time-dependent, orbital flight pattern based on two opposite headings (Tab N-5).  Throughout the flight, neither the MMSO nor the MMC made any comments indicating they understood that MP1 and MP2 intended for the MSOs to have primary navigation and terrain avoidance responsibilities (Tabs N-2 to N-16).  The MMSO even attempted to clarify responsibilities within the MC during the conversation following the first land incursion (Tabs N-3 to N-5).  Despite the attempt to clarify navigation responsibilities, primary navigation duties remained unassigned (Tabs N-4 to N-5).  Yet, during the investigation, MP2 testified to his expectation for the MSOs to perform navigation and terrain avoidance duties by stating, "we're following their vectors and their instructions and complying to those" (Tab V-2.48).

Excessive Work Load for the MSOs.  MP1 and MP2's intention for the MSOs to fulfill primary navigation and terrain avoidance duties added yet another responsibility to a busy MSO task list

(Tabs V-16.11, V-17.9 to V-17.10, V-19.7 to V-19.8, and V-19.10 to V-19.11). Multiple Prospector MSOs and pilots testified that the responsibility of aircraft navigation made the MSOs' jobs busy and increased MSO workload to a "somewhat overwhelming" level (Tabs V-16.11, V-17.9 to V-17.10, V-19.7 to V-19.8, and V-19.10). However, witness testimony indicated this was an accepted inflight practice at the FOL (Tabs V-2.38 to V-2.39, and V-16.11 to V-16.12). Witnesses were unaware of any contractor-provided guidance or standards delineating inflight navigation duties amongst the Prospector aircrew members (Tabs V-19.16, V-20.8, and V-20.16). As a result, two divergent methods of dividing inflight responsibilities developed, which depended on which pilot team an aircrew member flew with (Tabs V-2.37 to V-2.39, V-17.7, and V-18.6). When flying with MP2's pilot team, MSOs were expected to execute navigation and terrain avoidance duties, while the other Prospector pilot team retained those critical duties themselves (Tabs V-2.37 to V-2.39, V-17.7, and V-18.6). Since MSOs alternated flying with different pilot teams, they had to adjust their duties accordingly (Tabs V-17.9 to V-17.10). The inconsistent roles and responsibilities caused frustration among the MSOs (Tabs V-17.9 to V-17.10).

MP1 and MP2 delegated their traditional pilot duties of navigation and terrain avoidance to the MSOs (Tabs V-2.37 to V-2.39). However, MP1 and MP2's communication of these duties to the MMSO and MMC was inadequate (Tabs N-3 to N-5). Additionally, the MMSO and MMC's primary duties saturated their capabilities at a critical time in the mishap sequence, resulting in the MSOs' failure to meet MP1 and MP2's expectations regarding navigation and terrain avoidance duties (Tabs V-15.7, V-15.9 to V-15.10, and V-16.29). The evidence suggests these elements of task delegation were factors in this mishap.

> **(2) Standard/Proper Terminology.** Standard/proper terminology is a factor when clear and concise terms, phrases, hand signals, etc. per service standards and training were not used (Tab BB-13).

Communication difficulties occurred on the mishap flight among the MC, most notably between the pilots and MSOs (Tabs N-9, N-11, N-12, and N-15). The MMSO and MMC completed multiple tasks simultaneously, which required verbal commands to multiple entities in various locations, sometimes in two languages (Tabs N-11, V-1.65, V-13.17, and V-14.16). Prospector MSO training did not include instruction on aircrew terminology and commands (Tabs V-20.10 to V-20.11, and V-20.24 to V-20.25). Witnesses testified the primary means of identifying commands from various members within the Prospector aircrew was voice recognition, and the MC did not use standard command prefaces for aircrew communication to indicate the aircrew member for whom a message was intended (Tabs V-1.45 and V-19.14).

The CVR captured the MC's lack of clear and concise terminology at multiple times during the 30 minutes immediately preceding the impact (Tabs N-2 to N-15). (Note: The Prospector CVR does not record conversations between the MHNRE and COLNAV vessels, or between the MMSO/MMC and the COLNAV vessels, so the impact of this additional intercom communication is unknown (Tabs N-2 to N-16, and V-13.18).) Throughout the recorded conversation, the MMSO, MMC, and mishap pilots consistently failed to use a command preface, making it difficult to discern for whom a message was intended (Tabs N-2 to N-15).

MC communication confusion was evident multiple times during the final 30 minutes of the mishap flight (Tabs N-9, N-11 to N-13, and N-15). At approximately 14 minutes prior to impact, the MMSO used unspecified comments to override and negate a heading issued by the MMC (Tabs N-9 and EE-8). Starting approximately eight minutes and 32 seconds prior to impact, the MMC and MMSO issued multiple unspecified contradicting headings to MP1 and MP2 (Tabs N-11 to N-13, and EE-9). These confusing commands resulted in the MA flying on a course toward land (Tabs N-11 to N-13, and EE-9). In the final seconds of the MA flight, the MMSO attempted to communicate, "Climb," "Come up, elevate," and "Elevate your speed, er, altitude" (Tab N-15). However, these commands were not directed to a specific individual and were not acknowledged by the pilots until eight seconds prior to impact (Tabs N-15 and EE-10).

There is evidence to suggest the lack of standard terminology used was a factor in this mishap because unclear terminology led to communication misunderstanding within the MC, which created an unsafe flying environment and directly contributed to the mishap (Tabs N-3 to N-15, BB-13, and EE-8).

(3)   **Program Oversight/Program Management.**   Program Oversight/Program Management is a factor when programs are implemented without sufficient support, oversight or planning, and this leads to an unsafe situation (Tab BB-14).

Military oversight of the Prospector mission was very limited (Tab V-26.5). Beyond the basic pilot qualification requirements in Part 91 of FAA regulations, the contract contained no specific collective aircrew training requirements to enable the aircrews to execute the unique Prospector mission (Tabs V-3.4 to V-3.5, V-3.10, V-3.18, and V-26.5). Additionally, the contract called for no specific oversight requirements for military organizations to provide oversight of training, safety, standardization/evaluation, operations, or maintenance functions (Tabs V-3.4 to V-3.5, V-3.10, V-3.18, and V-26.5). Because the contract contained no such training or oversight requirements, SNC was not contractually obligated to develop and implement a formal training plan for its Prospector aircrews to a level that would be expected in Air Force aircrew training (Tabs V-3.7 and DD-63 to DD-64). As a result, Prospector aircrews received very limited collective aircrew training to execute the unique Prospector mission, and what little training they did receive was ad hoc and undocumented (Tabs V-1.14, V-6.4, V-17.20, and V-20.18).

Similarly, Prospector maintenance was expected to meet contractual requirements, which directed compliance with FAA regulations under Part 91 (Tab V-3.15). Previous sections of this report highlighted inadequate maintenance procedures at the FOL, specifically, non-compliance with FAA-mandated repair timelines for the EGPWS, which resulted in the MA flying when it should have been grounded on the day of the mishap flight (Tabs BB-44, BB-48, and DD-25 to DD-27). However, no military oversight existed to ensure contract compliance with maintenance standards (Tabs V-3.10 and V-26.5).

Authority over contractors operating in support of military operations comes exclusively from the contract between the contractor and the Department of Defense (DoD) (Tab BB-59 to BB-60). Contracts are the only mechanism by which operational commanders can control contractors operating in support of military operations (Tab BB-59 to BB-60). This means that required contractor actions must specifically be written into the contract for it to be enforceable (Tab BB-59 to BB-60). However, the contract for the Prospector mission did not require any

operational oversight by a military agency to ensure Prospector aircrews were adequately trained to execute the unique mission, nor did it require any oversight to ensure maintenance procedures complied with FAA regulations (Tabs V-3.10 and V-26.5). Because of this, the contract resulted in a program with inadequate aircrew training and unsafe maintenance practices (Tabs V-3.10 and V-26.5). Therefore, Program Oversight/Program management was a factor in this mishap.

## 12. GOVERNING DIRECTIVES AND PUBLICATIONS

### a. Publicly Available Directives and Publications Relevant to the Mishap

(1)  AFI 11-202, Volume 3, *General Flight Rules,* 22 October 2010
(2)  AFI 51-503, *Aerospace Accident Investigation,* 26 May 2010
(3)  AFI 91-204, *Safety Investigations and Reports,* Attachment 5, 24 September 2008

**NOTICE:**  All directives and publications listed above are available digitally on the Air Force Departmental Publishing Office website at:  http://www.e-publishing.af.mil.

### b. Other Directives and Publications Relevant to the Mishap

(1)  DoD Flight Information Publication, *General Planning*, valid 4 April 2013 to 14 November 2013
(2)  *Federal Aviation Regulations Part 91*, 22 August 2013 with interim change update 19 September 2013
(3)  Joint Publication 1, *Doctrine for the Armed Forces of the United States*, 25 March 2013
(4)  Joint Publication 1-02, *Department of Defense Dictionary of Military and Associated Terms*, 8 November 2010

### c. Known or Suspected Deviations from Directives or Publications

None.

## 13. ADDITIONAL AREAS OF CONCERN

None.

19 March 2014

*Scott J. Zobrist*

SCOTT J. ZOBRIST
Brigadier General, USAF
President, Accident Investigation Board

# STATEMENT OF OPINION

### DHC-8-202, T/N N356PH
### 1 KM SOUTH OF THE PANAMA-COLOMBIA BORDER
### 5 OCTOBER 2013

*Under 10 U.S.C. § 2254(d) the opinion of the accident investigator as to the cause of, or the factors contributing to, the accident set forth in the accident investigation report, if any, may not be considered as evidence in any civil or criminal proceeding arising from the accident, nor may such information be considered an admission of liability of the United States or by any person referred to in those conclusions or statements.*

## 1. OPINION SUMMARY

On 5 October 2013, at approximately 0042 hours local time (L), a de Havilland DHC-8-202 "Prospector" aircraft, tail number N356PH, impacted the terrain in a remote area of the Republic of Colombia, approximately 1 kilometer south of the Panama-Colombia border, while on a night counter-narcotics mission. The mishap aircraft (MA), operated by Sierra Nevada Corporation (SNC) pursuant to a contract awarded by Air Force Materiel Command (AFMC), was operating in support of United States Southern Command (USSOUTHCOM). Four of the six aircrew members onboard were killed on impact. The two pilots were injured. Additionally, the crash destroyed the MA along with $7.2 million in United States (US) government equipment on board the MA.

The six aircrew members were: mishap pilot #1 (MP1); mishap pilot #2 (MP2); the mishap mission commander (MMC); the mishap mission systems operator (MMSO); the mishap host nation rider (MHNR); and the mishap host nation rider escort (MHNRE). MP1 was a US civilian employed by SNC who also served as the manager for SNC operations in Panama. A pilot certified by the Federal Aviation Administration (FAA) with over 6,500 total flying hours, MP1 was the second in command and was flying the MA at the time of the mishap. MP2, the MMC, and the MMSO were US civilians working for a sub-contractor, New Frontier Innovations, LLC (NFI). NFI provided pilots and mission systems operators (MSOs) to the primary contractor, SNC. MP2 was an FAA-certified pilot with over 6,900 hours of flying time and was the pilot in command (PIC) of the MA. The MMC was an MSO and was retired from the US Air Force and US Customs and Border Protection. The MMSO was an MSO and had previous systems operations experience in the US Air Force. The MHNR was an officer in Panama's National Air and Navy Service. The MHNRE was a 20-year US Air National Guard veteran and had over 200 sorties and more than 2,200 flying hours as a host nation rider escort.

The MA, call sign Bat 02, departed a forward operating location in the Republic of Panama, at 2245L on 4 October 2013 and proceeded to its tasked area of operations in the Caribbean Sea off the southeastern coast of Panama. The mishap crew (MC) had detected a boat suspected of transporting illegal drugs and monitored it from an altitude of 1,500 feet above mean sea level (MSL) in the darkness. Although intending to remain over water during operations, MP1 and MP2 unintentionally flew over land and impacted the terrain. I find, by clear and convincing evidence, the cause of the mishap was MP1 and MP2's failure to ensure the MA remained over

water, which resulted in unplanned night flight over land at low altitude and subsequent controlled flight into the terrain. Additionally, I find, by a preponderance of evidence, four other factors substantially contributed to the mishap: (1) inappropriate delegation of terrain avoidance responsibility; (2) ineffective communication among the mishap aircrew; (3) an inoperative Enhanced Ground Proximity Warning System (EGPWS); and (4) lack of operational oversight. I developed my opinion by analyzing factual data including the flight data recorder, cockpit voice recorder, witness testimony, maintenance records, subject matter expert analysis, and other sources of information.

## 2. CAUSE

The cause of this mishap, supported by clear and convincing evidence, was the failure of MP1 and MP2 to ensure the MA remained over water, which resulted in unplanned night flight over land at low altitude and subsequent controlled flight into the terrain. The testimonies of MP1 and MP2 indicated they intended to keep the MA over water during all detection and monitoring operations on this flight due to operational requirements and limited visibility from the darkness. Information from the flight data recorder confirms the MA crossed the shoreline and began overflight of land approximately two minutes and ten seconds prior to impacting the terrain. It is reasonable to assume that had lighting conditions been different, the mishap pilots would have seen the coastline and terrain, and used these visual references to remain over water as intended. The cockpit voice recording revealed MP1 and MP2 did not realize the MA had been over land for at least one minute and forty-seven seconds, at which time the MMSO directed MP1 and MP2 to climb from their operating altitude of 1,500 feet MSL. 23 seconds later, the MA impacted the terrain at approximately 1,550 feet MSL, roughly 300 feet below the crest of a hill. I find by clear and convincing evidence that had MP1 and MP2 ensured the MA remained over water, the mishap would not have occurred.

## 3. SUBSTANTIALLY CONTRIBUTING FACTORS

**(a) Inappropriate Delegation of Terrain Avoidance Responsibility:** According to Federal Aviation Regulation (FAR) Part 91.3, the PIC is "directly responsible for, and is the final authority as to, the operation of that aircraft." Additionally, FAR Part 91.13 states, "No person may operate an aircraft in a careless or reckless manner so as to endanger the life or property of another." This means the PIC of an aircraft is ultimately responsible for safety of that aircraft and its crew. MP1 and MP2 inappropriately delegated responsibility for terrain avoidance to the MMSO and MMC, which substantially contributed to the failure of the mishap pilots to keep the MA over water as planned. Statements made by MP1 and MP2 to investigators immediately after the mishap and in sworn testimony indicate the mishap pilots expected the MMSO and MMC to give them headings to remain clear of terrain. However, the MMSO and MMC already had many mission tasks and, most importantly, were not specifically trained or certified to perform terrain avoidance tasks. Additionally, the cockpit voice recorder revealed the MC never clearly established who had terrain avoidance responsibility on the mishap flight. The MA unintentionally overflew land twice on the mishap flight, the first time approximately 24 minutes before the mishap. The cockpit voice recording following the first land incursion confirmed the mishap pilots expected the MMSO and MMC to keep the MA over water (MP2: "You guys got us over land, what's our terrain here?"). The conversation that followed did not establish

responsibility for terrain avoidance among the MC, perpetuating the unsafe situation where no aircrew member had clearly accepted this responsibility. While the mishap pilots could not see the terrain because of the night conditions and the lack of cultural lighting in the area, they did have multiple navigational aids available in the cockpit to ensure terrain clearance themselves. Terrain avoidance is a critical part of flight safety and is a task normally executed by pilots. However, MP1 and MP2 still delegated terrain avoidance responsibilities to the MMSO and MMC, individuals not trained to perform this task, and individuals who already had a significant task load. As noted above, the PIC is ultimately responsible for flight safety according to FAA regulations. Therefore, while both MP1 and MP2 contributed to the inappropriate delegation of terrain avoidance responsibilities to the MMC and MMSO, MP2, as the PIC, was ultimately responsible for ensuring the safety of the MA and the entire crew. I find by a preponderance of evidence that MP1 and MP2 inappropriately delegated terrain avoidance responsibilities to the MMSO and MMC, which reduced the mishap pilots' situational awareness and led to the unplanned flight over land that resulted in the MA's impact with the terrain.

   **(b) Ineffective Communication among the Mishap Aircrew:** Ineffective communication among the mishap aircrew substantially contributed to the failure of MP1 and MP2 to keep the MA over water as planned. The cockpit voice recorder and aircraft position data revealed the MC miscommunicated multiple times in the final minutes of the mishap flight, which resulted in the MA flying in a direction different from the heading given by the MMC. On two occasions, the MMC gave a heading that would have put the MA on a course parallel to the coastline, keeping the MA clear of terrain. In one instance, the mishap pilots did not respond to the MMC's issued heading, and in the other, the MMSO appeared to override the MMC's issued heading. The lack of standard terminology and communication procedures inhibited the MC from effectively passing navigation headings from the MMSO and MMC to the mishap pilots. Specifically, confusion existed among the MC because there was no differentiation between *navigation* headings from the MMSO to MP1 and MP2 and *intercept* headings from the MMSO to the MHNRE for use in the intercept of the suspect drug trafficking boat. Adding to this confusion was the fact that the MMC also passed both types of headings, presenting a second source of both navigation and intercept headings, therefore complicating the mishap pilots' task of discerning which headings were intended for their use in navigation. The result of this ineffective communication was significant miscommunication throughout the final minutes of the mishap flight, which negatively impacted the MC's situational awareness and navigation of the MA. I find by a preponderance of evidence the communication among the MC was ineffective, which substantially contributed to the failure of MP1 and MP2 to ensure the MA remained over water as intended.

   **(c) Inoperative Enhanced Ground Proximity Warning System (EGPWS):** The EGPWS is a system that alerts pilots to terrain clearance hazards in time to take corrective actions to avoid the terrain. The MA's EGPWS was inoperative during the mishap flight because maintenance personnel disabled it on the morning of 2 October 2013 following a flight on which the EGPWS gave multiple erroneous warnings. Maintenance documents confirm the EGPWS on the MA remained disabled on three subsequent flights, the third of which was the mishap flight. FAA regulations allow DHC-8 aircraft to fly with an inoperative EGPWS if two conditions are met: 1) "Alternate procedures are established and used"; and 2) "Repairs are made within two flight days." Neither condition was met on the mishap flight. Testimony from MP1 and MP2

showed that no specific alternate procedures were established prior to flight other than "stay off the land" as MP2 testified. Additionally, had FAA regulations been followed, the MA would have been grounded on the day of the mishap flight since the EGPWS repair timeline had been exceeded by one flight day. A normally operating EGPWS would have provided MP1 and MP2 warning of terrain hazards with sufficient time for corrective action to avoid the terrain. I find by a preponderance of evidence an inoperative EGPWS substantially contributed to this mishap.

(d) **Lack of Operational Oversight:** Lack of operational oversight of the Prospector mission resulted in inadequate aircrew training and unsafe maintenance practices, both of which substantially contributed to the mishap. Based upon how the Prospector contract was drafted and administered, no military organization was charged with providing operational oversight of the Prospector mission. Other than directing compliance with Part 91 of FAA regulations for basic pilot qualifications and aircraft maintenance, the services contract with SNC contained no additional requirements for Prospector aircrew training. Specifically, there were no contract requirements to train aircrew to their unique detection and monitoring mission, nor did the contract direct any operational oversight of Prospector operations and maintenance. This resulted from a contracting process that attempted to reduce cost to the US government, but produced an environment in which civilian contractors executed complex military-style missions with no formal collective aircrew training and no military oversight of maintenance. Had the Prospector contracting process included air operations experts, it is likely that a formal training plan would have been required and developed that focused on clearly defined aircrew roles and responsibilities, effective communications, and effective flying procedures.

While Prospector aircrews participated in some training sponsored by SNC prior to flying operational missions in Panama, the training was limited, ad hoc, and undocumented. Additionally, according to witness testimony, the training focused primarily on basic usage of the Prospector's mission systems, such as the surface surveillance radar and EO/IR sensor, rather than focusing on integrating the entire aircrew, including the pilots, into a cohesive team executing the tasked mission. Pilots played a crucial role in executing the Prospector's detection and monitoring mission. They did not simply fly from point to point; rather, they were required to fly specific patterns, at night and at low altitude, to enable the MSOs to use their sensors effectively. Flying missions safely under these conditions required a well-trained, integrated aircrew with effective aircrew communication. However, because the contracting process did not involve USSOUTHCOM's air operations experts from its air component, AFSOUTH, and because no oversight was written into the contract regarding collective aircrew training required to execute the unique Prospector mission, no training program existed which collectively trained the aircrews to a common standard, and no operational oversight existed to enforce such standards. As a result, the two separate pilot teams who flew Prospector missions developed different roles and responsibilities, communication techniques, and operational procedures. This forced an entire aircrew to adjust procedures on each mission instead of operating to a common standard, regardless of aircrew composition. For example, testimony revealed that when MP2 was the PIC, the pilots expected the MSOs to perform the majority of terrain avoidance tasks. The other pilot team, however, executed these critical terrain avoidance responsibilities themselves by actively using navigation aids in the cockpit to maintain positional awareness and ensure terrain clearance rather than delegating the responsibility to the MSOs. Had the Prospector contract required operational oversight by a military organization, a training program

would have been developed that would have enabled the MC to execute their mission safely. Maintenance operations also had no military oversight. Analysis revealed multiple documentation errors in aircraft maintenance forms, as well as other instances of non-compliance with technical orders and FAA regulations, specifically, flying the MA on the day of the mishap with the inoperative EGPWS for the third consecutive flight. Proper oversight over maintenance operations would have likely grounded the MA prior to the mishap flight because of the known EGWPS malfunction, thus preventing the mishap.

While operational oversight alone may not have prevented the mishap, it is clear the lack of such oversight negatively affected safety. I find by a preponderance of the evidence that lack of operational oversight led to inadequate aircrew training and unsafe maintenance practices, which substantially contributed to the mishap.

## 4. CONCLUSION

I find, by clear and convincing evidence, the cause of the mishap was MP1 and MP2's failure to ensure the MA remained over water, which resulted in unplanned night flight over land at low altitude and subsequent controlled flight into the terrain. Additionally, I find, by a preponderance of evidence, four other factors substantially contributed to the mishap: (1) inappropriate delegation of terrain avoidance responsibility; (2) ineffective communication among the mishap aircrew; (3) an inoperative Enhanced Ground Proximity Warning System (EGPWS); and (4) lack of operational oversight.

19 March 2014

*Scott J. Zobrist*

SCOTT J. ZOBRIST
Brigadier General, USAF
President, Accident Investigation Board

# INDEX OF TABS

DISTRIBUTION MEMORANDUM AND SAFETY INVESTIGATOR INFORMATION ........ A

NOT USED ................................................................................................................. B

NOT USED ................................................................................................................. C

MAINTENANCE REPORT, RECORDS, AND DATA ............................................... D

NOT USED ................................................................................................................. E

WEATHER AND ENVIRONMENTAL RECORDS AND DATA ............................. F

PERSONNEL RECORDS ......................................................................................... G

EGRESS, IMPACT, AND CRASHWORTHY ANALYSIS ........................................ H

DEFICIENCY REPORTS ........................................................................................... I

RELEASABLE TECHNICAL REPORTS AND ENGINEERING EVALUATIONS ................. J

MISSION RECORDS AND DATA ............................................................................ K

DATA FROM ON-BOARD RECORDERS ............................................................... L

DATA FROM GROUND RADAR AND OTHER SOURCES .................................. M

TRANSCRIPTS OF VOICE COMMUNICATIONS ............................................... N

ANY ADDITIONAL SUBSTANTIATING DATA AND REPORTS ......................... O

DAMAGE AND INJURY SUMMARIES ................................................................ P

AIB TRANSFER DOCUMENTS .............................................................................. Q

RELEASABLE WITNESS TESTIMONY ................................................................. R

RELEASABLE PHOTOGRAPHS, VIDEOS, AND DIAGRAMS ............................ S

INDIVIDUAL FLIGHT RECORDS AND ORDERS, NOT INCLUDED IN TAB G ................. T

AIRCRAFT MAINTENANCE RECORDS, NOT INCLUDED IN TAB D ................ U

WITNESS TESTIMONY AND STATEMENTS ....................................................... V

WEATHER OBSERVATIONS, NOT INCLUDED IN TAB F .................................................. W

STATEMENTS OF INJURY OR DEATH ....................................................................... X

DOCUMENTS APPOINTING THE AIB MEMBERS ................................................... Y

PHOTOGRAPHS, NOT INCLUDED IN TAB S ............................................................. Z

NOT USED ......................................................................................................................... AA

GOVERNMENT DOCUMENTS AND REGULATIONS ........................................... BB

FACT SHEETS ................................................................................................................... CC

SUPPORTING DOCUMENTATION ......................................................................... DD

MAPS ................................................................................................................................... EE